IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DICKINSON OF SAN ANTONIO, INC. | § | BANKRUPTCY NO. 16-52492-RBK |
| | § | |
| DEBTOR | § | CHAPTER 7 |
| | § | |
| | § | |
| JOHN PATRICK LOWE, | § | |
| CHAPTER 7 TRUSTEE | § | |
| FOR THE BANKRUPTCY ESTATE | § | |
| OF DICKINSON OF SAN ANTONIO, INC., | § | |
| DICKINSON OF AUSTIN, INC., AND | § | |
| DICKINSON OF TULSA, INC. | § | |
| | § | ADV. PROC. NO. _____ |
| PLAINTIFF | § | |
| | § | |
| v. | § | |
| | § | |
| AMERICAN STUDENT FINANCIAL GROUP | § | |
| INC., COTTINGHAM MANAGEMENT | § | |
| COMPANY, LLC, COTTINGHAM | § | |
| APEX TEXAS FUND, LLC AND TANGO | § | |
| DELTA FINANCIAL, INC. | § | |
| DEFENDANTS | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, John Patrick Lowe, Chapter 7 Trustee ("Plaintiff" or "Trustee") for the

Bankruptcy Estate of Dickinson of San Antonio, Inc. aka Career Point College ("Career Point")

hereby files this Original Complaint, respectfully showing the Court as follows:

### I. PRELIMINARY STATEMENT

After almost two years of investigation, the Trustee has determined that the vast majority

of Career Point's working capital vanished into a scheme devised by American Student Financial

Group, Inc. ("ASFG") and Cottingham Management Company, LLC ("Cottingham

Management") through a sham entity by the name of Cottingham APEX Texas Fund, LLC ("Cottingham-Texas"). ASFG and Cottingham Management employed a devise, scheme and artifice to defraud both the United States Department of Education and schools such as Career Point by financing student loans through sham secured transactions. ASFG and Cottingham Management have done so by financing and controlling purportedly independent third party entities such as Cottingham-Texas to serve as shills for the purpose of allegedly holding collateral to secure ASFG's loans to students. Cottingham-Texas in truth turned over all of its assets to ASFG in order to finance the very loans that ASFG made to Career Point's students. Cottingham-Texas is nothing more than a shell California LLC with no assets other than promissory notes it received from ASFG evidencing the very fraud perpetuated on Career Point.

In order to meet the statutory requirements to receive federal student aid funds, Career Point had to originate at least ten percent of its cash basis revenues from non-federal sources. Career Point purportedly received a substantial portion of its non-federal cash from nursing students who took out loans from ASFG. Career Point would then in turn secure ASFG's loans to students by depositing half of the funds received from ASFG with an allegedly independent third party, Cottingham-Texas. While the agreement between ASFG and Career Point at first appears to be an arms-length transaction, the undisclosed fact was that all of the money deposited by Career Point with Cottingham-Texas was immediately funneled back to ASFG. In short, ASFG funded loans to nursing students enrolled at Career Point, but used Career Point's own monies to fund some portion of those loans. Thus, the very purpose of the 90/10 rule was frustrated because Career Point did not maintain the cash proceeds of the student loans in house in order to operate.

Unbeknownst to Career Point, Cottingham-Texas never actually retained any of the funds that were transferred as part of the agreement with ASFG; instead, Cottingham-Texas transferred

all of those funds back to ASFG. So while $7.6 million dollars of Cottingham Notes were listed on the Career Point balance sheet, they were worthless, as ASFG never intended to allow Cottingham-Texas to pay the amounts owed to Career Point. Cottingham-Texas was merely a device, scheme or artifice to defraud used by ASFG to defraud Career Point. When Career Point did fail, Cottingham-Texas was listed in the Career Point's schedules as owing Career Point approximately $7,600,000.00. None of that money has been paid to the Trustee despite a formal request for payment. Instead, ASFG kept those funds and the student notes it originated or purchased from Career Point. ASFG will effectively be paid twice for the amount it lent to Career Point students.

Cottingham-Texas was the alter-ego of ASFG, formed with money from ASFG, set-up for the purpose of skirting the DOE 90/10 rule and was simply the instrumentality of a fraud on Career Point. ASFG even represented to Career Point that it had no relationship with Cottingham-Texas, stating instead that it solely had a lending relationship with an affiliate of Cottingham Management. ASFG failed to disclose to Career Point that all of the money transferred by Career Point to Cottingham-Texas was funneled back to ASFG for its own working capital. ASFG is liable to Career Point for all of the money owed by Cottingham-Texas to Career Point and now the Trustee.

Cottingham-Texas issued at least forty-nine notes payable to Career Point which were all securities. Cottingham failed to disclose to Career Point the material fact that all of the proceeds of its notes were funneled immediately back to ASFG thereby making Cottingham-Texas insolvent. ASFG and Cottingham Management were both control persons of Cottingham-Texas and aided and abetted Cottingham-Texas in the securities fraud visited upon Career Point.

Had the contracts and arrangements between Career Point, Cottingham-Texas, Cottingham Management and ASFG been anything other than a fraud, ASFG would have taken some action to lift the automatic stay in order to either (a) ratify its previous receipt of all the proceeds from the Cottingham Notes in satisfaction of its alleged security interest in the Cottingham Notes or (b) sought re-purchase of the student loans by the Estate. Instead, ASFG has quietly held on to the funds payable under the Cottingham Notes, while preventing the Estate from taking any actions to effectively service the student loans, so that ASFG could obtain a double recovery.

Based on these allegations, this Court should avoid the lien and equitably subordinate the debt that ASFG and/or Tango Delta Financial, Inc. ("Tango Delta") purportedly has in connection with the Cottingham-Texas Promissory Notes, to the debts owed to all other unsecured creditors.

Over the four years prior to the Petition Date, Career Point transferred $8,445,121.63 to Cottingham-Texas and $5,170,034.36 to ASFG. These amounts constitute fraudulent transfers, as Career Point failed to reasonably equivalent value. Additionally, Career Point paid $593,241.12 to ASFG within the ninety (90) days on account of an antecedent debt, which constitutes a preferential transfer.

## II.   PARTIES

1.      Plaintiff is the duly qualified and acting Chapter 7 Trustee of the Bankruptcy Estate of Dickinson of San Antonio, Inc., and brings this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001, 28 U.S.C. § 157, and all other applicable law. Career Point is the 100% owner of Plaintiff Dickinson of Tulsa, Inc. ("Dickinson Tulsa") and Plaintiff Dickinson of Austin, Inc. ("Dickinson Austin").

2.      Defendant American Student Financial Group, Inc., is a Delaware corporation that can be served with process by First Class Mail through its registered agent Tim Duuos at, 400 South Sierra Avenue, Suite 101, Solana Beach, California, 92075.

3.      Defendant Cottingham Apex Texas Fund, LLC, is a California limited liability company that can be served with process by First Class Mail through its registered agent Stephen Bick at 2382 Faraday Avenue, Suite 250, Carlsbad, California 92008.

4.      Defendant Cottingham Management Company, LLC, is a Nevada limited liability company that can be served with process by First Class Mail through its registered agent Stephen Bick at 2888 Loker Ave. E, Ste. 117F, Carlsbad, California 92010.

5.      Defendant Tango Delta Financial, Inc. ("Tango Delta") is a Delaware Corporation company that can be served with process by First Class Mail through its registered agent Timothy Robert Duoos at 1378 Harbor Drive, Sarasota, Florida 34239.

### III.    JURISDICTION

6.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334 and Fed. R. Bankr. P. 7001. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157. To the extent necessary, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. To the extent the reference is withdrawn or the Bankruptcy Court is unable to enter a final judgment, Plaintiff requests the Bankruptcy Court be permitted and assigned to preside over all pre-trial matters, including the issuance of findings of fact and conclusions of law.

### IV.    VENUE

7.      Venue in this adversary proceeding is proper before this Court pursuant to 28 U.S.C. § 1409.

# V. FACTS

## THE TUITION LOAN AGREEMENT

8.      On or about April 25, 2013, Career Point and ASFG entered into the certain American Student Financial Group, Inc. Tuition Loan Program Agreement (the "Tuition Loan Agreement"), whereby a tuition loan financing program to provide direct student loans for nursing students at Career Point was established.

9.      The Tuition Loan Agreement provides that for each month in which Career Point places an "Accepted Tuition Loan" in release status, ASFG will disburse to Career Point an amount of money equal to the total amount of released Accepted Tuition Loans (the "Tuition Loan Disbursement").

10.     Each Accepted Tuition Loan that was entered into by a Student Borrower, as defined in the Tuition Loan Agreement, carried an interest rate of twelve (12%) percent per annum.

11.     As part of the Tuition Loan Agreement, Career Point was required to enter into the Program Subsidy Investment, which required an immediate cash payment of fifty (50%) percent of the Tuition Loan Disbursement to Cottingham-Texas to purchase a Program Subsidy Loan under a Master Promissory Note provided by Cottingham-Texas. By way of example, if a Career Point student took out a $10,000.00 loan for a tuition payment to Career Point, Career Point would receive $10,000 of cash revenue, and would in turn transfer $5,000.00 to Cottingham-Texas in exchange for a note made by Cottingham-Texas and payable to Career Point in the amount of $5,000.00.

12.     ASFG was granted a security interest in the Master Promissory Note, as well as each of the Program Subsidy Loans, in order to secure the repayment of the Accepted Tuition Loans by each Student Borrower.

13. In the event a Student Borrower defaulted under an Accepted Tuition Loan, ASFG could request that Career Point repurchase the Defaulted Loan by paying an amount equal to (i) the remaining principal balance of the Defaulted Loan, (ii) all accrued and unpaid late payment charges and returned payment fees, and (iii) fifty (50%) percent of the accrued and unpaid interest outstanding as of the Loan Purchase Due Date.

14. Neither the Tuition Loan Agreement nor the Master Promissory Note provides for any accelerated recovery of the Program Subsidy Loan in order to satisfy the repurchase obligation; instead, Career Point was required to use its own operating funds to satisfy the repurchase obligations. This effectively caused Career Point to use operating funds that it received from Federal Student Aid to repurchase Defaulted Loan obligations, effectively increasing the percentage of collateral available to ASFG.

15. ASFG was responsible for choosing the Servicer on behalf of ASFG under the Tuition Loan Agreement.

16. In the event ASFG required Career Point to repurchase Defaulted Loans, then upon payment, ASFG was required to convey ownership of the Defaulted Loans to Career Point. Despite holding almost $7.6 million in funds owed to Career Point, ASFG has not reassigned any of the Defaulted Loans to the Estate.

17. As part of the Tuition Loan Agreement, ASFG represented, warranted and covenanted to Career Point that ASFG is not directly or indirectly related to or affiliated with Cottingham-Texas, as follows:

> 15.1 Representations, Warranties and Covenants of ASFG. As of the Effective Date, and as of the date ASFG sells and conveys each Defaulted Loan, Interest Reduced Loan and Designated Loan to Client hereunder, ASFG represents, warrants and covenants to Client as follows:
>
> 15.1.7 Neither Investment Fund nor its manager, Cottingham Management, LLC, are, directly or indirectly, related to or affiliated with ASFG by any

common legal or beneficial ownership, common management personnel, or in any other manner. There are no common owners (directly or indirectly), officers, directors, principals or managers between ASFG on one side, and Investment Fund and its manager on the other side. ASFG is an obligor to an affiliated company of Cottingham Management, LLC, under a debt instrument issued by ASFG.

18.     This representation was materially false, as all of the funds lent by Career Point were delivered to ASFG through Notes between Cottingham-Texas and ASFG.

19.     In an oblique fashion, ASFG did disclose that it was an obligor to an affiliated company of Cottingham Management under a debt instrument; however, ASFG failed to disclose that almost all of the funds used to purchase the Program Subsidy Loans from Cottingham-Texas would be transferred to ASFG, leaving Cottingham-Texas insolvent, without any liquid assets to pay Career Point on its notes and obligations.

20.     On May 21, 2013, Cottingham Management invoiced ASFG for costs associated with the formation of Cottingham-Texas.

**THE 2013 MASTER PROMISSORY NOTE FOR THE TUITION LOAN AGREEMENT**

21.     On or about April 25, 2013, Career Point entered into that certain Master Promissory Note (the "2013 Master Promissory Note") with Cottingham-Texas. Attached hereto as Exhibit "A" is a true and correct copy of the 2013 Master Promissory Note, which is incorporated herein for all purposes.

22.     The 2013 Master Promissory Note provides for the payment of interest at various rates; however, based on information and belief, the rate typically applicable to Subsidy Program Loans made by Career Point was 1.22%.

23.     Pursuant to the 2013 Master Promissory Note, Career Point was to receive interest only payments for at least a period of 18 months, then principal and interest payments were to be made thereafter.

24.     The failure to make the monthly payments constitutes a default by Cottingham-Texas under the 2013 Master Promissory Note.

25.     Upon the occurrence of an event of default, the holder of the 2013 Master Promissory Note may accelerate the debt, such that the entire unpaid principal balance and accrued interest are immediately due and payable.

26.     To the extent the holder of the 2013 Master Promissory Note engages an attorney to undertake collection efforts, the 2013 Master Promissory Note provides for the recovery of attorney's fees and costs.

**THE ACCOUNT PURCHASE PROGRAM AGREEMENT**

27.     In 2015, the arrangement between ASFG and Career Point changed.  On December 22, 2015, Career Point and ASFG entered into that certain Account Purchase Program Agreement (the "Account Purchase Program"), whereby the tuition loan financing program was established such that ASFG agreed to purchase student loans that were generated by Career Point (the "Purchased Loans").

28.     The Account Purchase Program provides that each month, ASFG has the right, but not the obligation, to purchase student loans from Career Point.

29.     In the event that ASFG agreed to purchase loans from Career Point, then on the distribution date, ASFG would disburse to Career Point an amount equal to the total amount for the Selected Accounts (the "Purchase Disbursement").

30.     Based on information and belief, each of the Purchased Loans that were entered into by a Student Borrower, as defined in the Account Purchase Program Agreement, carried an interest rate of twelve (12%) percent per annum.

31.     As part of the Account Purchase Program, Career Point was required to enter into the Program Subsidy Investment, which required an immediate cash payment of fifty (50%) percent of the Purchase Disbursement to Cottingham-Texas to purchase a Program Subsidy Loan under a Master Promissory Note provided by Cottingham-Texas.

32.     ASFG was granted a security interest in the Master Promissory Note, as well as each of the Program Subsidy Loans, in order to secure the repayment of the Purchased Loans by each Student Borrower.

33.     In the event a Student Borrower defaulted under a Purchased Loan, ASFG could request that Career Point repurchase the Defaulted Loan by paying an amount equal to (i) the remaining principal balance of the Defaulted Loan, (ii) all accrued and unpaid late payment charges and returned payment fees, and (iii) fifty (50%) percent of the accrued and unpaid interest outstanding as of the Loan Purchase Due Date.

34.     The Account Purchase Program Agreement does not provide for any accelerated recovery of the Program Subsidy Loan in order to satisfy the repurchase obligation; instead, Career Point was required to use its own operating funds to satisfy the repurchase obligations.  This effectively increased the percentage of collateral available to ASFG.

35.     In the event, ASFG required Career Point to repurchase Defaulted Loans, then upon payment, ASFG was required to convey ownership of the Defaulted Loans to Career Point.

36.     As part of the Account Purchase Program Agreement, ASFG represented, warranted and covenanted that ASFG is not directly or indirectly related to or affiliated with Cottingham-Texas, as follows:

> 15.1 Representations, Warranties and Covenants of ASFG.  As of the Effective Date, ASFG make the following representations, warranties and covenants:
>
> 15.1.6  Neither Investment Fund nor its manager, Cottingham Management, LLC, are, directly or indirectly, related to, or affiliated with, ASFG by any common legal

or beneficial ownership or common management personnel. There are no common owners (directly or indirectly), officers, directors, principals or managers between ASFG on one side, and Investment Fund and its manager on the other side.

37.     ASFG failed to disclose that almost all of the funds used to purchase the Program Subsidy Loans from Cottingham-Texas were diverted to ASFG.  Interestingly, the oblique disclosure of loans from affiliates of Cottingham Management is omitted in the representations and warranties under the Account Purchase Program Agreement.

## THE 2015 MASTER PROMISSORY NOTE FOR THE ACCOUNT PURCHASE PROGRAM

38.     On or about December 22, 2015, Career Point entered into that certain Master Promissory Note (the "2015 Master Promissory Note") with Cottingham-Texas, in relation to the Account Purchase Program.  Attached hereto as Exhibit "B" is a true and correct copy of the 2015 Master Promissory Note, which is incorporated herein for all purposes.

39.     The 2015 Master Promissory Note provides for the payment of interest at various rates; however, based on information and belief, the rate typically applicable to Subsidy Program Loans made by Career Point was 1.22%..

40.     Pursuant to the 2015 Master Promissory Note, Career Point was to receive interest only payments for at least a period of 18 months, then principal and interest payments were to be made thereafter.

41.     The failure to make the monthly payments constitutes a default by Cottingham-Texas under the 2015 Master Promissory Note.

42.     Upon the occurrence of an event of default, the holder of the 2015 Master Promissory Note may accelerate the debt, such that the entire unpaid principal balance and accrued interest are immediately due and payable.

43.     To the extent the holder of the 2015 Master Promissory Note engages an attorney to undertake collection efforts, the 2015 Master Promissory Note provides for the recovery of attorney's fees and costs.

**THE 2015 MASTER PROMISSORY NOTE FOR THE ACCOUNT PURCHASE PROGRAM FOR DICKINSON OF AUSTIN, INC.**

44.     On or about December 22, 2015, Career Point entered into that certain Master Promissory Note (the "Austin Promissory Note") with Cottingham-Texas, in relation to the Account Purchase Program with Dickinson of Austin, Inc. Attached hereto as Exhibit "C" is a true and correct copy of the Austin Promissory Note, which is incorporated herein for all purposes.

45.     Dickinson of Austin, Inc. is a wholly owned subsidiary of Career Point.

46.     The Austin Promissory Note provides for the payment of interest at various rates; however, based on information and belief, the rate typically applicable to Subsidy Program Loans made by Career Point was 1.22%.

47.     Pursuant to the Austin Promissory Note, Career Point was to receive interest only payments for at least a period of 18 months, then principal and interest payments were to be made thereafter.

48.     The failure to make the monthly payments constitutes a default by Cottingham-Texas under the Austin Promissory Note.

49.     Upon the occurrence of an event of default, the holder of the Austin Promissory Note may accelerate the debt, such that the entire unpaid principal balance and accrued interest are immediately due and payable.

50.     To the extent the holder of the Austin Promissory Note engages an attorney to undertake collection efforts, the Austin Promissory Note provides for the recovery of attorney's fees and costs.

**THE 2015 MASTER PROMISSORY NOTE FOR THE ACCOUNT PURCHASE PROGRAM FOR DICKINSON OF TULSA, INC.**

51.     On or about December 22, 2015, Career Point entered into that certain Master Promissory Note (the "Tulsa Promissory Note") with Cottingham-Texas, in relation to the Account Purchase Program with Dickinson of Tulsa, Inc.  Attached hereto as Exhibit "D" is a true and correct copy of the Tulsa Promissory Note, which is incorporated herein for all purposes.

52.     Dickinson of Tulsa, Inc. is a wholly owned subsidiary of Career Point.

53.     The Tulsa Promissory Note provides for the payment of interest at various rates; however, based on information and belief, the rate typically applicable to Subsidy Program Loans made by Career Point was 1.22%.

54.     Pursuant to the Tulsa Promissory Note, Career Point was to receive interest only payments for at least a period of 18 months, then principal and interest payments were to be made thereafter.

55.     The failure to make the monthly payments constitutes a default by Cottingham-Texas under the Tulsa Promissory Note.

56.     Upon the occurrence of an event of default, the holder of the Tulsa Promissory Note may accelerate the debt, such that the entire unpaid principal balance and accrued interest are immediately due and payable.

57.     To the extent the holder of the Tulsa Promissory Note engages an attorney to undertake collection efforts, the Tulsa Promissory Note provides for the recovery of attorney's fees and costs.

## THE BANKRUPTCY CASE

58.     On October 31, 2016 (the "Petition Date"), Career Point filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Bankruptcy Case").

59.     On January 11, 2017, the Bankruptcy Case was converted to Chapter 7 and the Trustee was appointed to administer Bankruptcy Estate. The 341 Meeting for this case has been conducted and concluded. Mr. Lowe is the Chapter 7 Trustee in the Career Bankruptcy Case.

60.     Career Point derived a substantial portion of its revenues from Student Financial Aid ("SFA") received by its students under Title IV programs administered by the U.S. Department of Education pursuant to the Higher Education Act of 1965, as amended ("HEA"). To continue to participate in the SFA programs, Career Point was required to comply with the regulations promulgated under the HEA. The regulations restricted the proportion of cash receipts for tuition and fees from eligible programs to not more than 90 percent from the Title IV programs (the "90-10 Revenue Test"). The failure of Career Point to meet the 90 percent limitation would result in the loss of the Career Point's ability to participate in the SFA programs.

61.     In an effort to obtain funds that would satisfy the 90-10 Revenue Test, Career Point entered into the Tuition Loan Agreement and the Account Purchase Program Agreement.

62.     The Trustee is aware and alleges, based on review of the available financial records of Career Point, the college was operating at a loss since 2012 due to the large amount of transfers from Career Point to Larry Earle, Edudyne Systems, Inc., ASFG and Cottingham-Texas.  Thus, Career Point has been insolvent since 2012.  The Trustee alleges that financial records of Career Point were manipulated in such a way to make it appear that the college was in compliance with

the 90-10 Revenue Test so that the federal government would continue to fund the college through SFA programs.

63.     Since the appointment of the Trustee, Cottingham-Texas has failed to make any payments to Career Point despite numerous loans being in either the Interest Only Period or the Principal Repayment Period.

64.     On June 21, 2018, Trustee notified Cottingham-Texas in writing that it was in default under the 2013 Master Promissory Note. Cottingham-Texas did not cure the default, such that the full unpaid principal balance, as well as accrued but unpaid interest, has been accelerated.

65.     On June 21, 2018, Trustee notified Cottingham-Texas in writing that it was in default under the 2015 Master Promissory Note. Cottingham-Texas did not cure the default, such that the full unpaid principal balance, as well as accrued but unpaid interest, has been accelerated.

66.     On June 21, 2018, Trustee notified Cottingham-Texas in writing that it was in default under the Austin Promissory Note. Cottingham-Texas did not cure the default, such that the full unpaid principal balance, as well as accrued but unpaid interest, has been accelerated.

67.     On June 21, 2018, Trustee notified Cottingham-Texas in writing that it was in default under the Tulsa Promissory Note. Cottingham-Texas did not cure the default, such that the full unpaid principal balance, as well as accrued but unpaid interest, has been accelerated.

68.     Based on information and belief, the total amount owed by Cottingham-Texas under the 2013 Master Promissory Note, the 2015 Master Promissory Note, the Austin Promissory Note and the Tulsa Promissory Note is no less than $7,630,996.00.

69.     Based on information and belief, Cottingham-Texas is not currently holding any of the funds that were previously lent by Career Point under the 2013 Master Promissory Note, the

2015 Master Promissory Note, the Austin Promissory Note and the Tulsa Promissory Note; instead, all of the funds are currently in the possession of ASFG.

70.     Based on information and belief, ASFG has significantly cut back its efforts to collect any amounts owed by Student Borrowers.

71.     ASFG has not sought relief from the automatic stay to setoff, recoup or take any other action to obtain legal possession to the funds in which it claims a security interest.

72.     Since June 12, 2013, Career Point, through Edudyne Systems, Inc., delivered $8,445,121.63 to Cottingham-Texas (the "Cottingham 544 Transfers").  Attached hereto as Exhibit "E" is a chart setting forth the date and amount of each of the Cottingham 544 Transfers that were made to Cottingham-Texas within the past four (4) years.

73.     Since October 31, 2014, Career Point, through Edudyne Systems, Inc., delivered $5,612,205.56 to Cottingham-Texas (the "Cottingham 548 Transfers").  Attached hereto as Exhibit "F" is a chart setting forth the date and amount of each of the Cottingham 548 Transfers that were made to Cottingham-Texas within the past two (2) years.

74.     Since June 12, 2013, Career Point, through Edudyne Systems, Inc., delivered $5,170,034.36 to ASFG (the "ASFG 544 Transfers").  Attached hereto as Exhibit "G" is a chart setting forth the date and amount of each of the ASFG 544 Transfers that were made to ASFG within the past four (4) years.

75.     Since October 31, 2014, Career Point, through Edudyne Systems, Inc., delivered $4,084,116.34 to ASFG (the "ASFG 548 Transfers").  Attached hereto as Exhibit "H" is a chart setting forth the date and amount of each of the ASFG 548 Transfers that were made to ASFG within the past two (2) years.

76.     Since August 2, 2016, Career Point, through Edudyne Systems, Inc., delivered $593,241.12 to ASFG (the "ASFG Preferential Transfers"). Attached hereto as Exhibit "I" is a chart setting forth the date and amount of each of the ASFG Preferential Transfers that were to ASFG within the ninety (90) days prior to the Petition Date.

77.     On April 5, 2017, Tango Delta filed Claim No. 223 in the amount of $11,748,564.00. Claim No. 223 does not contain any documentation demonstrating that Tango Delta was assigned any of the documents between ASFG and Career Point. Furthermore, Claim No. 223 does not show that Tango Delta properly perfected any liens on Career Point's assets prior to the filing of the Bankruptcy Case. Instead, all of the documents demonstrate that ASFG filed various UCC filings in an attempt to secure a debt owed to ASFG.

## VI.     CAUSES OF ACTION

### Count 1 – Career Point Suit on 2013 Master Promissory Note and 2015 Master Promissory Note  (Cottingham-Texas)

78.     Paragraphs 1 through 77 are incorporated herein by reference.

79.     All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

80.     The Trustee, as representative of the bankruptcy estate of Career Point, is the holder of the 2013 Master Promissory Note and the 2015 Master Promissory Note.

81.     Cottingham-Texas has failed to make the payments required under Article 2 of the 2013 Master Promissory Note and the 2015 Master Promissory Note.

82.     The failure to make such payments is an Event of Default under section 4.1(a) of the 2013 Master Promissory Note and the 2015 Master Promissory Note.

83.     On June 21, 2018, Trustee notified Cottingham-Texas in writing that it was in default under the 2013 Master Promissory Note and the 2015 Master Promissory Note.

84.     Cottingham-Texas did not cure the default, such that the full unpaid principal balance, as well as accrued but unpaid interest, has been accelerated.

85.     Therefore, the Trustee has demonstrated that default has occurred under the 2013 Master Promissory Note and the 2015 Master Promissory Note, such that the Trustee is entitled to recover all unpaid principal amounts plus the accrued but unpaid interest under the 2013 Master Promissory Note and the 2015 Master Promissory Note, and is entitled to a judgment on behalf of Career Point's estate.

## Count 2 – Dickinson Austin Suit on Austin Promissory Note (Cottingham-Texas)

86.     Paragraphs 1 through 77 are incorporated herein by reference.

87.     All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

88.     The Trustee, as representative of the bankruptcy estate of Career Point, asserts this claim derivatively on behalf of Dickinson Austin to recover all amounts owed under the Austin Promissory Note.

89.     Cottingham-Texas has failed to make the payments required under Article 2 of the Austin Promissory Note.

90.     The failure to make such payments is an Event of Default under section 4.1(a) of the Austin Promissory Note.

91.     On June 21, 2018, Trustee notified Cottingham-Texas in writing that it was in default under the Austin Promissory Note.

92.     Cottingham-Texas did not cure the default, such that the full unpaid principal balance, as well as accrued but unpaid interest, has been accelerated.

93.     Therefore, the Trustee has demonstrated that default has occurred under the Austin Promissory Note, such that the Trustee is entitled to recover all unpaid principal amounts plus the accrued but unpaid interest under the Austin Promissory Note, and is entitled to a judgment on behalf of Career Point's estate.

**Count 3 – Dickinson Tulsa Suit on Tulsa Promissory Note (Cottingham-Texas)**

94.     Paragraphs 1 through 77 are incorporated herein by reference.

95.     All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

96.     The Trustee, as representative of the bankruptcy estate of Career Point, asserts this claim derivatively on behalf of Dickinson Tulsa to recover all amounts owed under the Tulsa Promissory Note.

97.     Cottingham-Texas has failed to make the payments required under Article 2 of the Tulsa Promissory Note.

98.     The failure to make such payments is an Event of Default under section 4.1(a) of the Tulsa Promissory Note.

99.     On June 21, 2018, Trustee notified Cottingham-Texas in writing that it was in default under the Tulsa Promissory Note.

100.    Cottingham-Texas did not cure the default, such that the full unpaid principal balance, as well as accrued but unpaid interest, has been accelerated.

101.    Therefore, the Trustee has demonstrated that default has occurred under the Tulsa Promissory Note, such that the Trustee is entitled to recover all unpaid principal amounts plus the

accrued but unpaid interest under the Tulsa Promissory Note, and is entitled to a judgment on behalf of Career Point's estate in an amount not less than $7,630,966.00.

### Count 4 – Turnover under 11 U.S.C. § 542(b) (Cottingham-Texas)

102.    Paragraphs 1 through 77 are incorporated herein by reference.

103.    All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

104.    Pursuant to 11 U.S.C. § 542(b), the Trustee files this complaint seeking turnover of funds owed by Cottingham-Texas to Career Point.

105.    Pursuant to the 2013 Master Promissory Note and the 2015 Master Promissory Note, Cottingham-Texas is required to make interest payments, and principal payments depending on the date of each Program Subsidy Loan, for a period of time, depending on the Average Disbursement Amount ("Repayment Period").

106.    At the end of the Repayment Period, Cottingham-Texas was required to make amortized payments of principal and interest for a period of time, again depending on the Average Disbursement Amount.

107.    Cottingham-Texas has failed to make any payments under the 2013 Master Promissory Note and the 2015 Master Promissory Note to Career Point since the Petition Date, despite numerous Program Subsidy Loans being in the Repayment Period.

108.    Therefore, to the extent the Court determines that a default has not occurred under the 2013 Master Promissory Note and the 2015 Master Promissory Note, the Trustee, pursuant to 11 U.S.C. §542(b), now demands turnover of funds owed by Cottingham-Texas to Career Point.

**Count 5 – Declaratory Judgment regarding Alter Ego and Sham to Perpetuate Fraud**
**(ASFG and Cottingham Management)**

109.     Paragraphs 1 through 108 are incorporated herein by reference. All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

110.     The Trustee seeks a declaratory judgment pursuant to 28 U.S.C. § 2201, Fed. R. Civ. P. 57, and Fed. R. Bankr. P. 7001, finding that (1) Defendant Cottingham-Texas is the alter ego, extension, and instrumentality of Defendants ASFG and Cottingham Management; and (2) Defendants ASFG and Cottingham Management are liable for the debts of Cottingham-Texas and Trustee is entitled to recover on behalf of the Career Point, the debts owed by Cottingham-Texas to Career Point.

111.     Cottingham-Texas was operated as the alter ego of ASFG and Cottingham Management and as part of a scheme to defraud creditors and Career Point for the ultimate benefit of ASFG and Cottingham Management.  Defendants ASFG and Cottingham Management intentionally used Cottingham-Texas as a sham and transferred the assets of Career Point to or for the benefit of Defendants ASFG and Cottingham Management.

112.     The Trustee hereby requests that the Court enter a declaratory judgment declaring that Cottingham-Texas is the alter ego, extension, and instrumentality of ASFG and Cottingham Management; the assets of ASFG and Cottingham Management are subject and available for the satisfaction of Cottingham-Texas' debts; and awarding the Trustee all relief to which he is entitled, including the award of attorneys' fees incurred in seeking this declaration.

## Count 6 – Breach of Contract – Tuition Loan Agreement (ASFG)

113.     Paragraphs 1 through 77 are incorporated herein by reference.

114.     All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied.  All notices required have been provided or were waived, excused, or otherwise satisfied.

115.     The Trustee files this complaint seeking damages, direct and consequential, attorneys' fees, and costs caused by the actions by ASFG.  Career Point and ASFG executed the Tuition Loan Agreement which by their terms, directed ASFG and/or its agents to properly service all Student Loans.

116.     To date, ASFG has substantially discontinued servicing the Student Loans under the Tuition Loan Agreement, causing significant financial harm to Career Point.

117.     To the extent any of the Student Loans constitute Defaulted Loans, the Trustee on behalf of Career Point is entitled to reconveyance of the Defaulted Loans for the purpose of seeking repayment from the Student Borrower.  Despite holding almost $8 million in funds paid by Career Point, ASFG has failed to deliver any Defaulted Loans to the Trustee.

118.     Thus, ASFG's failure to (a) continue collection efforts and (b) identify and return those Student Loans that are Defaulted Loans, constitutes a breach of material provisions of the Tuition Loan Agreement.

119.     Therefore, the Trustee has demonstrated a breach of contract by ASFG, such that the Trustee is entitled to a judgment on behalf of Career Point's estate for breach of the Tuition Loan Agreement and recover damages, as demonstrated at trial, as well as consequential damages, attorneys' fees, and costs.

**Count 7 – Breach of Contract – Account Purchase Program Agreement (ASFG)**

120.     Paragraphs 1 through 77 are incorporated herein by reference.

121.     All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied.  All notices required have been provided or were waived, excused, or otherwise satisfied.

122.     The Trustee files this complaint seeking damages, direct and consequential, attorneys' fees, and costs caused by the actions by ASFG.  Career Point and ASFG executed the Account Purchase Program Agreement which by their terms, directed ASFG to reconvey Defaulted Loans.

123.     To the extent any of the Student Loans constitute Defaulted Loans, the Trustee on behalf of Career Point is entitled to reconveyance of the Defaulted Loans for the purpose of seeking repayment from the Student Borrower.  Despite holding almost $8 million in funds paid by Career Point, ASFG has failed to deliver any Defaulted Loans to the Trustee.

124.     Thus, ASFG's failure to identify and return those Student Loans that are Defaulted Loans, constitutes a breach of material provisions of the Account Purchase Program Agreement.

125.     Therefore, the Trustee has demonstrated a breach of contract by ASFG, such that the Trustee is entitled to a judgment on behalf of Career Point's estate for breach of the Account Purchase Program Agreement and recover damages, as demonstrated at trial, as well as consequential damages, attorneys' fees, and costs.

## Count 8 – Breach of Warranty – Tuition Loan Agreement and Account Purchase Program Agreement (ASFG)

126.    Paragraphs 1 through 77 are incorporated herein by reference.

127.    All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

128.    The Trustee files this complaint seeking damages, direct and consequential, attorneys' fees, and costs caused by the actions by ASFG.  The Tuition Loan Agreement and the Account Purchase Program Agreement between Career Point and ASFG included certain representations, warranties, and covenants. The Tuition Loan Agreement and the Account Purchase Program Agreement included a warranty that Cottingham-Texas and ASFG are not affiliated either directly or indirectly. ASFG, however, breached this warranty as ASFG paid for the formation of Cottingham-Texas. Paying for the formation of an entity creates a direct or indirect relationship.

129.    ASFG also received all of Cottingham-Texas' liquid assets and is Cottingham-Texas' sole debtor.

130.    Therefore, the Trustee has demonstrated a breach of warranty, such that the Trustee is entitled to a judgment on behalf of the Career Point estate to recover damages, direct and consequential, attorneys' fees, and costs.

## Count 9 – Common Law Fraud (ASFG)

131.    Paragraphs 1 through 130 are incorporated herein by reference.

132.    All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

133.     ASFG made a material false representation to Career Point with the knowledge of the representations falsity or with reckless disregard of the truth with the intention that such representations be acted upon by Career Point. This material representation stems from the Tuition Loan Agreement and the Account Purchase Program Agreement which included a representation that Cottingham-Texas and ASFG are not affiliated either directly or indirectly. ASFG, however, paid for the formation of Cottingham-Texas. In addition, ASFG failed to disclose material facts to Career Point to which Career Point was ignorant of and had no opportunity to discover. ASFG failed to disclose its relationship with Cottingham-Texas and inform Career Point that Cottingham-Texas would not in fact hold the Program Subsidy Investment from Career Point, but instead Cottingham-Texas would send the money directly back to ASFG, effectively making Cottingham-Texas insolvent.

134.     ASFG was deliberately silent when it had a duty to speak. By failing to disclose material facts, ASFG intended to induce Career Point to enter into the Tuition Loan Agreement and the Account Purchase Program Agreement. Career Point relied on this nondisclosure and was injured as a result of entering into the Tuition Loan Agreement and the Account Purchase Program Agreement.  Specifically, the transfer of funds from Cottingham-Texas to ASFG would appear to violate the separateness required under the HEA, such that Career Point would be in violation of the 90-10 Revenue Test.

135.     Therefore, the Trustee has demonstrated common law fraud, such that the Trustee is entitled to a judgment on behalf of the Career Point estate to recover damages in an amount not less than $7,630,966.00, consequential damages, attorneys' fees, and costs.

## Count 10 – Violations of State Blue Sky Laws (ASFG, Cottingham-Texas and Cottingham Management)

136.     Paragraphs 1 through 77 are incorporated herein by reference.

137.     All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

138.     Cottingham-Texas offered and sold securities pursuant to California Law, and ASFG and Cottingham Management induced and/or assisted Cottingham-Texas in its violations against Career Point.  Pursuant to the 2013 Promissory Note, the 2015 Promissory Note, the Austin Promissory Note, and the Tulsa Promissory Note, Cottingham-Texas' sole member and manager is Cottingham Management which is a state licensed registered investment adviser in good standing with the California Department of Corporations and all other regulatory agencies having jurisdiction over such matters. Pursuant to Cal. Corp. Code § 25008(b), "[a]n offer to sell or buy is made in this state when the offer either originates from this state or is directed by the offeror to this state and received at the place to which it is directed. An offer to buy or to sell is accepted in this state when acceptance is communicated to the offeror in this state." Cottingham-Texas is a California entity that offered securities to Career Point in California which was accepted by Career Point and communicated to Cottingham-Texas in California. Cottingham-Texas and Cottingham Management are both liable to Career Point for violations of California Securities Laws.

139.     ASFG also violated securities laws as it induced or substantially assisted in Cottingham-Texas' violations of securities laws. Pursuant to Cal. Corp. Code § 25403(a), "[e]very person who with knowledge directly or indirectly controls and induces any person to violate any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the controlled and induced person." ASFG paid for

the formation of Cottingham-Texas. Paying for the formation of an entity creates a direct or indirect relationship. Additionally, ASFG received all of the liquid assets of Cottingham-Texas, and as a result caused Cottingham-Texas to be insolvent. ASFG controlled Cottingham-Texas, either directly or indirectly, and therefore is liable for any violations perpetuated by Cottingham-Texas. ASFG, at the very least, "provide[d] substantial assistance to another person in violation" of Cal. Corp. Code § 25403(b).

140.    Cottingham-Texas, Cottingham Management, and ASFG have all violated Cal. Corp. Code § 25401 through the sale of securities to Career Point through fraudulent or misleading actions. "It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Cal. Corp. Code § 25401.

141.    ASFG, Cottingham Management, and Cottingham-Texas failed to disclose their relationship and failed to inform Career Point that Cottingham-Texas would not in fact hold the Program Subsidy Investment from Career Point, but instead Cottingham-Texas would send the money directly back to ASFG. ASFG was deliberately silent when it had a duty to speak. By failing to disclose material facts, ASFG intended to induce Career Point to enter into the Tuition Loan Agreement and the Account Purchase Program Agreement. Career Point relied on this nondisclosure and was injured as a result of entering into the Tuition Loan Agreement and the Account Purchase Program Agreement.

142.    ASFG, Cottingham Management, and Cottingham-Texas' liability is equally true pursuant to Texas law. "A person who offers or sells a security . . . . by means of an untrue

statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." ASFG and Cottingham-Texas have both made an untrue statement of material fact and an omission. The Tuition Loan Agreement and the Account Purchase Program Agreement disclosed that no relationship existed between these two entities, when there was already an existing relationship. Further, ASFG and Cottingham-Texas failed to disclose that the Program Subsidy Investment from Career Point would not be held by Cottingham-Texas, but instead Cottingham-Texas would send the money directly back to ASFG.

143.    Therefore, the Trustee has demonstrated a violation of California and Texas securities laws, such that the Trustee is entitled to a judgment on behalf of the Career Point estate to recover damages, attorneys' fees, and costs.

### Count 11 – Violation of Federal Securities Laws (ASFG, Cottingham-Texas and Cottingham Management)

144.    Paragraphs 1 through 77 are incorporated herein by reference.

145.    All conditions precedent to Plaintiff's recovery have occurred or have been waived, excused, or otherwise satisfied. All notices required have been provided or were waived, excused, or otherwise satisfied.

146.    ASFG, Cottingham-Texas and Cottingham Management all used the instrumentality of Interstate Commerce to effectuate the scheme, device and artifice.

147.    Cottingham-Texas' sole member and manager is Cottingham Management, which is a licensed registered investment adviser. Cottingham-Texas, therefore, acts at the direction of

Cottingham Management. Pursuant to 17 C.F.R. § 240.10b–5 (2017), it is unlawful for or any person, directly or indirectly, through means of interstate commerce to do the following:

> [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

148.    As already described, Cottingham-Texas and Cottingham Management have made an untrue statement of material fact and omitted a material fact. The Tuition Loan Agreement and the Account Purchase Program Agreement stated that no relationship existed between ASFG and either Cottingham-Texas, when there was already an existing relationship. ASFG and Cottingham-Texas also failed to disclose that the Program Subsidy Investment from Career Point would be sent directly back to ASFG, instead of being held by Cottingham-Texas.

149.    Therefore, the Trustee has demonstrated a violation of federal securities laws, such that the Trustee is entitled to a judgment on behalf of the Career Point estate to recover damages, attorneys' fees, and costs.

150.    ASFG is also liable for securities violations pursuant to section 20(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78t(o). "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Id. Trustee has already established ASFG's control over Cottingham-Texas as ASFG paid for the formation of Cottingham-Texas.

## Count 12 – Equitable Subordination of Claims under 11 U.S.C. § 510(c) (ASFG and Tango Delta)

151.     Paragraphs 1 through 150 are incorporated herein by reference.

152.     Equitable subordination is permitted when (1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code.

153.     ASFG and Tango Delta have engaged in inequitable conduct by failing to properly disclose their relationship with Cottingham-Texas, perform their servicing obligations under the Tuition Loan Agreement, holding more almost $8 million in property of the Estate, yet failing to reconvey any Defaulted Loans to the Trustee, and undertaking transactions that would make Career Point's borrower, Cottingham-Texas, insolvent.

154.     The conduct of ASFG and Tango Delta has resulted in harm to the creditors, especially the students of Career Point and the Department of Education, as the underfunding of Career Point led to the ultimate demise of Career Point.  Furthermore, ASFG's failure to take any action during the course of this Bankruptcy Case has caused the Student Notes to become stale, such that the Trustee may not be able to recover any value for the unsecured creditors in this Bankruptcy Case.

155.     Equitable Subordination is not inconsistent with the Bankruptcy Code.  The Trustee seeks to equitably support the claims held by ASFG and Tango Delta to all unsecured creditors, as their actions caused Career Point to be in a precarious financial position that ultimately led to failure.  While the Tuition Loan Agreement and the Account Purchase Program Agreement attempted to grant ASFG a security interest in half of the funds paid to Career Point, the reconveyance requirements forced Career Point to use operating cash for full repayment of Defaulted Loans, while prohibiting Career Point from accessing some of the funds that were

actually intended to repay ASFG. ASFG's security interest continued to grow to the detriment of other creditors.

156. Therefore, the Court should grant the Trustee's request to equitably subordinate the obligations owed to ASFG and Tango Delta from secured obligations to unsecured claims that are paid after payment in full to all other unsecured creditors.

## Count 13 – Avoidance of Lien under 11 U.S.C. § 544 (Tango Delta)

157. Paragraphs 1 through 77 are incorporated herein by reference.

158. Pursuant to 11 U.S.C. §544, the Trustee is authorized to avoid any lien that was not properly perfected prior to the Bankruptcy Case.

159. The Proof of Claim filed by Tango Delta on April 5, 2017, in the amount of $11,748,564.00 ("Claim No. 223") does not contain any documentation demonstrating that Tango Delta properly perfected a lien on Career Point's assets prior to the filing of the Bankruptcy Case. Instead, all of the documents demonstrate that ASFG filed various UCC filings in an attempt to secure a debt owed to ASFG.

160. Furthermore, there is no documentation indicating that ASFG has assigned any of its interests to Tango Delta.

161. Therefore, pursuant to 11 U.S.C. § 541(a)(1), the Trustee, as a judicial lien creditor, would have priority over any alleged liens held by Tango Delta, such that the alleged security interest held by Tango Delta can be avoided by the Trustee.

## Count 14 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) (Cottingham)

162. Paragraphs 1 through 77 are incorporated herein by reference.

163. Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property

of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

164.    The Cottingham 548 Transfers, as well as any concealed or undisclosed transactions, to Cottingham-Texas, were made within the last two years and constitute a transfer of Career Point's interest in property.

165.    The Cottingham 548 Transfers were made with an actual intent to hinder, delay or defraud Career Point's creditors.

166.    Therefore, the Trustee has demonstrated that the Cottingham 548 Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(A), such that the Trustee is entitled to a judgment in the amount of $5,612,205.56 on behalf of the Estate to recover the Cottingham 548 Transfers from Cottingham-Texas.

**Count 15 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) (Cottingham)**

167.    Paragraphs 1 through 77 are incorporated herein by reference.

168.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

169.    The Cottingham 548 Transfers were made within the last two years and constitute a transfer of Career Point's interest in property.

170.    At the time of each of the Cottingham 548 Transfers, Career Point was either (a) insolvent at the time of each of the Cottingham 548 Transfers or became insolvent as a result of the Cottingham 548 Transfers, in that the sum of Career Point's debts were greater than all of Career Point's assets at a fair valuation; (b) engaging in or about to engage in a business or

transaction for which Career Point's remaining assets were unreasonably small in relation to the business or transaction; or (c) intending to incur, or believed or reasonably should have believed that Career Point would incur debts beyond its ability to pay such debts as they became due.

171. Career Point did not receive reasonably equivalent value in exchange for the Cottingham 548 Transfers.

172. Therefore, the Trustee has demonstrated that the Cottingham 548 Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(B), such that the Trustee is entitled to a judgment in the amount of $5,612,205.56 on behalf of the Estate to recover the Cottingham 548 Transfers from Cottingham-Texas.

**Count 16 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1)) (Cottingham)**

173. Paragraphs 1 through 77 are incorporated herein by reference.

174. Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

175. The Cottingham 544 Transfers were made within the last four years and constitute a transfer of Career Point's interest in property.

176. The Cottingham 544 Transfers were made with an actual intent to hinder, delay or defraud Career Point's creditors.

177. Career Point had at least one outstanding creditor at the time of each of the Cottingham 544 Transfers, or such creditor's claim arose within a reasonable time after the Cottingham 544 Transfers, which currently remains unpaid.

178. Therefore, the Trustee has demonstrated that the Cottingham 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $8,445,121.63 on behalf of the Estate to recover the Cottingham 544 Transfers from Cottingham-Texas.

## Count 17 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(2)) (Cottingham)

179. Paragraphs 1 through 77 are incorporated herein by reference.

180. Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

181. The Cottingham 544 Transfers were made within the last four years and constitute a transfer of Career Point's interest in property.

182. At the time of each of the Cottingham 544 Transfers, Career Point was either (a) engaging in or about to engage in a business or transaction for which Career Point's remaining assets were unreasonably small in relation to the business or transaction; or (b) intending to incur, or believed or reasonably should have believed that Career Point would incur debts beyond its ability to pay such debts as they became due.

183. Career Point did not receive reasonably equivalent value in exchange for the Cottingham 544 Transfers.

184. Career Point had at least one outstanding creditor at the time of the Cottingham 544 Transfers, or such creditor's claim arose within a reasonable time after the Cottingham 544 Transfers, which currently remains unpaid.

185.     Therefore, the Trustee has demonstrated that the Cottingham 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), such that the Trustee is entitled to a judgment in the amount of $8,445,121.63 on behalf of the Estate to recover the Cottingham 544 Transfers from Cottingham-Texas.

### Count 18 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.006(a)) (Cottingham)

186.     Paragraphs 1 through 77 are incorporated herein by reference.

187.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

188.     The Cottingham 544 Transfers were made within the last four years and constitute a transfer of Career Point's interest in property.

189.     Career Point was insolvent at the time of each of the Cottingham 544 Transfers or became insolvent as a result of the Cottingham 544 Transfers, in that the sum of Career Point's debts were greater than all of Career Point's assets at a fair valuation.

190.     Career Point did not receive reasonably equivalent value in exchange for the Cottingham 544 Transfers.

191.     Career Point had at least one outstanding creditor at the time of the Cottingham 544 Transfers, which currently remains unpaid.

192.     Therefore, the Trustee has demonstrated that the Cottingham 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), such that the Trustee is entitled to a judgment in the amount of $8,445,121.63 on behalf of the Estate to recover the Cottingham 544 Transfers from Cottingham-Texas.

**Count 19 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) (ASFG)**

193.     Paragraphs 1 through 77 are incorporated herein by reference.

194.     Pursuant to 11 U.S.C. § 548(a)(1)(A), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

195.     The ASFG 548 Transfers, as well as any concealed or undisclosed transactions, to ASFG, were made within the last two years and constitute a transfer of Career Point's interest in property.

196.     The ASFG 548 Transfers were made with an actual intent to hinder, delay or defraud Career Point's creditors.

197.     Therefore, the Trustee has demonstrated that the ASFG 548 Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(A), such that the Trustee is entitled to a judgment in the amount of $4,084,116.34 on behalf of the Estate to recover the ASFG 548 Transfers from ASFG.

**Count 20 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) (ASFG)**

198.     Paragraphs 1 through 77 are incorporated herein by reference.

199.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

200.     The ASFG 548 Transfers were made within the last two years and constitute a transfer of Career Point's interest in property.

201.     At the time of each of the ASFG 548 Transfers, Career Point was either (a) insolvent at the time of each of the ASFG 548 Transfers or became insolvent as a result of the ASFG 548 Transfers, in that the sum of Career Point's debts were greater than all of Career Point's assets at a fair valuation; (b) engaging in or about to engage in a business or transaction for which Career Point's remaining assets were unreasonably small in relation to the business or transaction; or (c) intending to incur, or believed or reasonably should have believed that Career Point would incur debts beyond its ability to pay such debts as they became due.

202.     Career Point did not receive reasonably equivalent value in exchange for the ASFG 548 Transfers.

203.     Therefore, the Trustee has demonstrated that the ASFG 548 Transfers constituted fraudulent transfers under 11 U.S.C. §548(a)(1)(B), such that the Trustee is entitled to a judgment in the amount of $4,084,116.34 on behalf of the Estate to recover the ASFG 548 Transfers from ASFG.

### Count 21 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(1)) (ASFG)

204.     Paragraphs 1 through 77 are incorporated herein by reference.

205.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

206.     The ASFG 544 Transfers were made within the last four years and constitute a transfer of Career Point's interest in property.

207.     The ASFG 544 Transfers were made with an actual intent to hinder, delay or defraud Career Point's creditors.

208.     Career Point had at least one outstanding creditor at the time of each of the ASFG 544 Transfers, or such creditor's claim arose within a reasonable time after the ASFG 544 Transfers, which currently remains unpaid.

209.     Therefore, the Trustee has demonstrated that the ASFG 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(1), such that the Trustee is entitled to a judgment in the amount of $5,170,034.36 on behalf of the Estate to recover the ASFG 544 Transfers from ASFG.

### Count 22 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.005(a)(2)) (ASFG)

210.     Paragraphs 1 through 77 are incorporated herein by reference.

211.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

212.     The ASFG 544 Transfers were made within the last four years and constitute a transfer of Career Point's interest in property.

213.     At the time of each of the ASFG 544 Transfers, Career Point was either (a) engaging in or about to engage in a business or transaction for which Career Point's remaining assets were unreasonably small in relation to the business or transaction; or (b) intending to incur, or believed or reasonably should have believed that Career Point would incur debts beyond its ability to pay such debts as they became due.

214.     Career Point did not receive reasonably equivalent value in exchange for the ASFG 544 Transfers.

215.     Career Point had at least one outstanding creditor at the time of the ASFG 544 Transfers, or such creditor's claim arose within a reasonable time after the ASFG 544 Transfers, which currently remains unpaid.

216.     Therefore, the Trustee has demonstrated that the ASFG 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.005(a)(2), such that the Trustee is entitled to a judgment in the amount of $5,170,034.36 on behalf of the Estate to recover the ASFG 544 Transfers from ASFG.

### Count 23 – Avoidance of Fraudulent Transfer under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act (Tex. Bus. & Com. Code § 24.006(a)) (ASFG)

217.     Paragraphs 1 through 77 are incorporated herein by reference.

218.     Pursuant to 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), the Trustee files this complaint seeking to avoid a fraudulent transfer, imposition of a constructive trust on fraudulently transferred property of Career Point, and/or for damages against the fraudulent transferees of Career Point during the applicable time periods.

219.     The ASFG 544 Transfers were made within the last four years and constitute a transfer of Career Point's interest in property.

220.     Career Point was insolvent at the time of each of the ASFG 544 Transfers or became insolvent as a result of the ASFG 544 Transfers, in that the sum of Career Point's debts were greater than all of Career Point's assets at a fair valuation.

221.     Career Point did not receive reasonably equivalent value in exchange for the ASFG 544 Transfers.

222.     Career Point had at least one outstanding creditor at the time of the ASFG 544 Transfers, which currently remains unpaid.

223.     Therefore, the Trustee has demonstrated that the ASFG 544 Transfers constituted fraudulent transfers under 11 U.S.C. § 544 and Tex. Bus. & Com. Code § 24.006(a), such that the Trustee is entitled to a judgment in the amount of $5,170,034.36 on behalf of the Estate to recover the ASFG 544 Transfers from ASFG.

### Count 24 – Avoidance of Preferential Transfers Pursuant to 11 U.S.C. § 547 (ASFG)

224.     Paragraphs 1 through 77 are incorporated herein by reference.

225.     Each of the ASFG Preferential Transfers constituted a transfer of an interest of property of Career Point.

226.     The ASFG Preferential Transfers were made, or caused to be made, to or for the benefit of ASFG, a creditor of Career Point.

227.     The ASFG Preferential Transfers were made, or caused to be made, for or on account of an antecedent debt owed by Career Point to ASFG prior to the date on which such ASFG Preferential Transfers were made.

228.     At the time of the ASFG Preferential Transfers, Career Point was insolvent. Pursuant to section 547(f) of the Bankruptcy Code, Career Point is presumed insolvent during the ninety (90) days prior to the Petition Date.

229.     The ASFG Preferential Transfers enabled ASFG to receive 100% of its then-outstanding claims, which is more than it would have received if: (a) paid in the ordinary disposition of the bankruptcy estate under chapter 7 of the Bankruptcy Code; (b) the ASFG Preferential Transfers had not been made; and (c) ASFG had received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

230.     Pursuant to section 547(b) of the Bankruptcy Code, the Trustee may avoid the ASFG Preferential Transfers, which total at least $593,241.12.

**Count 25 – Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550
(Cottingham and ASFG)**

231.    Paragraphs 1 through 230 are incorporated herein by reference.

232.    Cottingham-Texas was the initial transferee of the Cottingham 544 Transfers and Cottingham 548 Transfers.

233.    Trustee is entitled to recover from Cottingham-Texas, or any immediate or mediate transferee of Cottingham-Texas, the Cottingham 544 Transfers and Cottingham 548 Transfers or the value of the Cottingham 544 Transfers and Cottingham 548 Transfers, along with prejudgment and post-judgment interest, for the benefit of the Estate, pursuant to section 550 of the Bankruptcy Code.

234.    ASFG was the initial transferee of the ASFG 544 Transfers, ASFG 548 Transfers and ASFG Preferential Transfers.

235.    Trustee is entitled to recover from ASFG, or any immediate or mediate transferee of ASFG, the ASFG 544 Transfers, ASFG 548 Transfers and ASFG Preferential Transfers or the value of the ASFG 544 Transfers, ASFG 548 Transfers and ASFG Preferential Transfers, along with prejudgment and post-judgment interest, for the benefit of the Estate, pursuant to section 550 of the Bankruptcy Code.

**Count 26 – Objection to Claim under 11 U.S.C. § 502 (Tango Delta)**

236.    Paragraphs 1 through 77 are incorporated herein by reference.

237.    Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3001(c)(1), the Trustee files this complaint objecting to the Proof of Claim filed by Tango Delta on April 5, 2017, in the amount of $11,748,564.00, Number 223 of the Claims Register.

238.    All of the information contained in Claim Number 223 shows agreements by and between ASFG and Career Point.  There is no documentation attached to Claim Number 223 that

evidences Tango Delta's ownership of the claim or relationship with Career Point in a way that would entitle Tango Delta to the requested claim.

239.    Without supporting documentation, the Trustee is unable to form an opinion about the existence or validity of the claim. See Fed. R. Bankr. P. 3001(c)(1).

240.    Further, without supporting documentation the Trustee cannot determine whether a defense or affirmative defense to the enforcement, that is, allowance, of the Proof of Claim exists, the sorts of things reserved to the Trustee by right of 11 U.S.C. § 558. Limitations is one example of such an affirmative defense.

241.    The Trustee moves that the Court sustain this objection and disallow Claim Number 223 pursuant to 11 U.S.C. § 502(b)(1). At this time, the claim is unenforceable against Career Point.

## Count 27 – Recovery of Attorneys' Fees and Costs

242.    Paragraphs 1 through 241 are incorporated herein by reference.

243.    Pursuant to the Tuition Loan Agreement and the Account Purchase Program Agreement, the Court may award costs and reasonable attorneys' fees in connection with a proceeding brought to collect the amounts owed.  The Trustee hereby requests that any judgment include an award of the costs and attorneys' fees incurred by the Trustee in connection with pursuing this Complaint.

244.    The Trustee also requests an award for such attorneys' fees and costs incurred in the filing and prosecution of this Complaint to the extent allowed under the Bankruptcy Code and Texas law.

## PRAYER

WHEREFORE, JOHN PATRICK LOWE, Chapter 7 Trustee for the Bankruptcy Estate of Dickinson of San Antonio, Inc., prays for judgment in favor of the Chapter 7 Trustee on all claims and relief sought herein, including but not limited to:

a. Judgment for all actual damages in the amount of $8,445,121.63 or as otherwise proved at trial;

b. Constructive trust on the Defendants' assets and all property received from ASFG and Cottingham-Texas;

c. Pre-judgment interest at the highest rate allowed by law;

d. Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

e. Reasonable and necessary attorneys' fees and costs;

f. All costs of court for this action; and

g. Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By:     */s/ Randall A. Pulman*
        Randall A. Pulman
        Texas State Bar No. 16393250
        rpulman@pulmanlaw.com
        Thomas Rice
        Texas State Bar No. 24025613
        trice@pulmanlaw.com
        Sarah A. Nickodam
        Texas State Bar No.: 24082580
        snickodam@pulmanlaw.com

**ATTORNEYS FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE FOR DICKINSON OF SAN ANTONIO, INC.**

# EXHIBIT A

# COTTINGHAM APEX TEXAS FUND, LLC

## MASTER PROMISSORY NOTE

in favor of

# DICKINSON OF SAN ANTONIO., a Kansas corporation, d.b.a
# Career Point College

April 25, 2013

SPB

# MASTER PROMISSORY NOTE

FOR VALUE RECEIVED, COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company ("Borrower"), hereby promises to pay to the order of DICKINSON OF SAN ANTONIO, INC., a Kansas corporation, d.b.a Career Point College ("Lender"), in lawful money of the United States of America, all principal sums advanced to Borrower by Lender or any Lender Party under this Master Promissory Note ("Loans" defined below) with interest on the outstanding principal amount of each Loan at the Interest Rate (defined below) in accordance with the terms of this Master Promissory Note ("Note").

## ARTICLE 1
## DEFINITIONS

1.1 **Definitions.** For the purpose of this Note, the capitalized words and expressions listed below shall have the following meanings:

"Loan" means a cash payment by Lender or any Lender Party to Borrower which, upon receipt, Borrower agrees to repay to Lender, with interest, in accordance with the terms of this Note. Each cash payment by Lender or any Lender Party hereunder shall constitute a separate Loan to Borrower. Lender and Borrower contemplate that Lender and other Lender Parties will make multiple Loans pursuant to this Note.

"Loan Date" means the date on which Lender or a Lender Party makes a Loan to Borrower by making a payment of cash to Borrower by electronic wire transfer in immediately available funds to the bank account designated by Borrower in Attachment B.

"ASFG" means American Student Financial Group, Inc., a Delaware corporation.

"ASFG Loan Program" means a tuition loan program evidenced by a Tuition Loan Program Agreement entered into between Lender, other Lender Parties and ASFG dated April 25, 2013, whereby educational loans are made by private lenders to students of educational institutions owned and/or operated by Lender or other Lender Parties and the proceeds of such educational loans are disbursed to Lender or other Lender Party(ies) on behalf of the borrowing students and credited to the students' tuition payment balances.

"Tuition Loan" means a private educational loan originated by a private lender under the ASFG Loan Program.

"Tuition Loan Disbursement" means a disbursement by a lender or lenders of Tuition Loan proceeds to one or more Lender Party(ies) pursuant to the ASFG Loan Program. Only one (1) Tuition Loan Disbursement to Lender Party(ies) is contemplated under the ASFG Loan Program in a single calendar month.

"Lender Party" means Lender and any other entity controlling or controlled by or under common control with Lender. For the purposes of this definition, the term "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") means the power to direct or cause the direction of the management and policies of such entity.

"Disbursement Date" means the date each month that a Lender Party receives a Tuition Loan Disbursement under the ASFG Loan Program. The Loan Date of each Loan made under this

SPB

Note will coincide with a Disbursement Date as Lender or a Lender Party is required under the terms of the Tuition Loan Program Agreement between Lender, the Lender Parties and ASFG to make a Loan to Borrower on each Disbursement Date.

"Average Disbursement Amount" means an average calculated by dividing the total amount of the Tuition Loan Disbursement received by all Lender Parties on a Disbursement Date by the number of Tuition Loans disbursed to such Lender Parties on such Date. Borrower shall confirm in writing to Lender the amount of the Average Disbursement within ten (10) days following each Disbursement Date based on a disbursement roster to be received from ASFG.

"Anti-Terrorism Law" mean any law relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Person" means an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate or any other entity.

"Term" means the scheduled period over which all principal and interest of a Loan will be repaid. The Term of a Loan will begin on the Loan Date and end on the last payment due date of the Principal Repayment Period.

"Interest-Only Period" means a period of consecutive months during which monthly interest-only payments in the full amount of the accrued interest on the principal balance of the Loan at the Interest Rate shall be due and payable. The first (1st) payment of the Interest-Only Period will be due and payable on the first (1st) day of the second (2nd) month following the month in which the Loan Date occurred and monthly interest-only payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Interest-Only Period. The number of consecutive months of the Interest-Only Period of a Loan is based on the Average Disbursement Amount received by the Lender Party(ies) under the ASFG Loan Program on the Loan Date and determined according to the table in Attachment A to this Note.

"Principal Repayment Period" means a period of consecutive months following the Interest-Only Period during which equal amortized monthly payments of principal and interest shall be due and payable until the Loan is repaid in full. The first (1st) Amortized Payment of the Principal Repayment Period will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment due date of the Interest-Only Period occurred and Amortized Payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Principal Repayment Period. The number of consecutive months of the Principal Repayment Period of a Loan shall be based on the Average Disbursement Amount received by the Lender Party(ies) under the ASFG Loan Program on the Loan Date and determined according to the table in Attachment A to this Note.

"Amortized Payment" means the equal monthly payment of principal and interest due and payable each month during the Principal Repayment Period. The amount of the Amortized Payment will be the amount necessary to fully amortize and repay the principal balance of the Loan in equal installments of principal and interest at the Interest Rate over the number of months of the Principal Repayment Period.

SPB

## ARTICLE 2
## PAYMENTS

**2.1** <u>Payment Periods</u>. Each Loan under this Note will be repaid by Borrower during an Interest-Only Period immediately followed by a Principal Repayment Period as defined herein.

**2.2** <u>Payments during Interest-Only Period</u>. Interest-only payments in the full amount of the accrued interest on the principal balance of each Loan at the Interest Rate shall be due and payable beginning on the first (1st) day of the second (2nd) month following the month in which the Loan Date occurred. Interest-only payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Interest-Only Period as determined according to the table in Attachment A.

**2.3** <u>Payments during Principal Repayment Period</u>. The first (1st) Amortized Payment (as defined above) under each Loan will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment of the Interest-Only Period is due. Monthly Amortized Payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Principal Repayment Period as determined according to the table in Attachment A.

**2.4** <u>Loan Confirmation Notice</u>. Within ten (10) days following the Loan Date of each Loan made by a Lender Party to Borrower hereunder, Borrower will provide written confirmation to Lender of the repayment terms of the Loan ("Loan Confirmation Notice") including: (i) the principal amount of the Loan; (ii) the Loan's identifying number assigned by Borrower; (iii) the Average Disbursement Amount pertaining to the Loan: (iv) the Interest Rate and the number of months of the Interest-Only Period and the Principal Repayment Period of the Loan as determined according to Attachment A to the Note; and (v) a Loan repayment and amortization schedule showing the amounts and due dates of the monthly payments due and payable to Lender under the Loan.

Borrower's Loan Confirmation Notice shall be delivered to Lender in accordance with the notice provisions of this Note. In the event of a discrepancy or conflict between the terms of this Note and the terms of a Loan as stated in a Loan Confirmation Notice, the terms of this Note shall govern, unless otherwise agreed in writing by Lender and Borrower. The failure of Borrower to deliver a Loan Confirmation Notice with respect to a Loan shall not relieve it of its obligation to repay the Loan in accordance with the terms of this Note.

**2.5** <u>Application of Payments</u>. Each payment by Borrower under a Loan shall be applied as follows: (i) first, to any accrued interest under the Loan through the date of such payment; (ii) second, to any outstanding late fees or other charges; (iii) then, to the unpaid principal balance of the Loan. Borrower shall reasonably identify the Loan for which each payment is being made to Lender.

**2.6** <u>No Setoff</u>. All payments of any kind due to Lender from Borrower pursuant to this Note shall be made in the full amount due, without setoff, counterclaim, or other defense. All such payments will be free and clear of, and without deduction or withholding for, any present or future taxes. Borrower shall pay any and all costs (administrative or otherwise) imposed by banks, clearing houses, or any other financial institution, in connection with making any payments hereunder, except for any costs assessed by Lender's or ASFG's banking institutions.

4

SPB

**2.7** **Pre-Payment**. Borrower may prepay any amounts due under any Loan in whole or in part, at any time, or from time to time, without penalty or premium, and interest shall immediately cease to accrue on any amount so prepaid.

# ARTICLE 3
## INTEREST, CHARGES AND FEES

**3.1** **Interest Accrual**. Interest on the principal amount of each Loan will begin to accrue as of the Loan Date and will continue until the principal amount of the Loan is repaid in full. Simple interest will be calculated on the outstanding principal balance each day of the term of the Loan at a daily interest rate equal to the annual Interest Rate divided by the actual number of days in the year based on a 365-day year.

**3.2** **Interest Rate.** The Interest Rate over the Term of the each Loan will be a fixed annual rate equal to either the Short-Term Applicable Federal Rate (Table 1 – Annual Compounding) or the Mid-Term Applicable Federal Rate (Table 1 – Annual Compounding) for the month in which the Loan Date occurs as published in a Revenue Ruling each month by the U.S. Internal Revenue Service. The Interest Rate for Loans with a Term of less than three (3) years will be the Short-Term Applicable Federal Rate. Loans with a term longer than three (3) years but not longer than nine (9) years will bear interest at the Mid-Term Applicable Federal Rate. No Loan made under this Note will have a Term longer than nine (9) years.

**3.3** **Savings Provision**. At no time shall Borrower be obligated or required to pay interest on the principal balance of any Loan hereunder at a rate which could subject Lender or any Lender Party to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance a Loan due hereunder at a rate in excess of such maximum rate, the Interest Rate shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**3.4** **Late Charge.** In the event that Lender has not received any installment due under a Loan on or before the date ten (10) days after the date such installment is due and payable, Borrower will be charged, and Borrower hereby agrees to pay to Lender, the lesser of a late charge equal to five percent (5%) of the amount of such installment then due or ten ($10) dollars. Borrower shall be obligated to pay no more than one (1) late charge with respect to any installment.

**3.5** **Returned Payment Fee.** A $15 Returned Payment Fee will be assessed if a payment is dishonored for any reason.

# ARTICLE 4
## DEFAULT

**4.1** **Events of Default**. Each of the following shall constitute an event of default ("Event of Default") under a Loan:

(a)     Borrower fails to make any payment of principal or interest due under the Loan when due and such failure continues uncured for a period of ten (10) days following written notice of such failure given to Borrower according to the notice provisions of this Note;

(b)     Borrower files a petition in bankruptcy or for any form of debtor relief under any present or future law relating to bankruptcy or debtor relief, or such a filing or petition is filed against Borrower, and Borrower either consents to such filing or petition, or such petition is not dismissed within one hundred eighty (180) days after filing;

(c)     Borrower consents to the appointment of or taking possession by a receiver or liquidator of substantially all of its property;

(d)     Borrower makes an assignment for the benefit of its creditors;

(e)     Borrower winds up, liquidates or dissolves; or

(f)     Borrower conveys, sells, assigns, transfers, or otherwise disposes of, whether voluntarily or involuntarily, all or substantially all of its assets.

**4.2     Waivers**.  Borrower hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note.  No extension of time for payment of this Note or any payment due under any Loan made hereunder, and no alteration, amendment or waiver of any provision of this Note or any Loan made hereunder by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of sums due under this Note and any Loan made under this Note.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note.

**4.3     Default and Acceleration**.     At the option of the holder of this Note, the entire unpaid principal balance of, and all accrued interest on, a Loan made under this Note shall immediately become due and payable upon the occurrence at any time of any one or more Event of Default.

# ARTICLE 5
# COVENANTS OF BORROWER

**5.1     Borrower's Covenants**. Borrower covenants to Lender that Borrower shall comply with all the following covenants:

**5.1.1     Use of Proceeds**.  Borrower shall use the proceeds of the Loans hereunder for any legitimate investment purpose as further defined in the Operating Agreement of the Borrower.

**5.1.2     Statements**.  Borrower shall deliver to Lender, within ten (10) days following the end of each calendar month, a statement detailing the principal balance and accrued interest of each Loan made under this Note.

# ARTICLE 6
# REPRESENTATIONS

**6.1** **Borrower's Representations**. Borrower represents and warrants to Lender as follows:

      **6.1.1** **Authority**. Borrower has full power, authority and legal right to execute and deliver this Note.

      **6.1.2** **Enforceability of Documents**. This Note and Borrower's obligations to repay the Loans hereunder, are legal, valid and binding obligations of Borrower and, to the best of Borrower's knowledge, are not subject to any right of rescission, setoff, counterclaim or defense, including the defense of usury.

      **6.1.3** **Litigation**. There are no actions, suits or proceedings pending naming Borrower, or, to the best of Borrower's knowledge, threatened against or affecting Borrower or its assets in any court, at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality that, in each instance, might materially and adversely affect the ability of Borrower to perform its obligations under this Note.

      **6.1.4** **Investment Adviser Status of Manager.** Borrower's sole member and manager is Cottingham Management Company, LLC, a California limited liability company ("Cottingham Management"). Cottingham Management is a California state licensed registered investment adviser in good standing the California Department of Corporations and all other regulatory agencies having jurisdiction over such matters.

**6.2** **Lender's Representations, Covenants and Warranties**. Lender represents, warrants and covenants that (i) Lender is not in violation of, and will not violate, any Anti-Terrorism Law, (ii) Lender does not and will not knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, and (iii) Lender is not in violation of, and will not violate, any rules or regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury or any successor governmental authority.

# ARTICLE 7
# GENERAL PROVISIONS

**7.1** **Costs of Collection**. If any attorney is engaged by Lender: (a) to collect upon Borrower's obligations hereunder, whether or not legal proceedings are thereafter instituted by Lender; (b) to represent Lender in any Borrower bankruptcy, reorganization, receivership or other proceedings affecting Lender's creditors' rights in the Note and involving a claim under this Note; (c) to represent Lender in any other proceedings whatsoever in connection with this Note, including post judgment proceedings to enforce any judgment related thereto; or (d) in connection with seeking an out-of-court workout or settlement of any of the foregoing, then Borrower shall pay to Lender all reasonable costs, attorneys' fees and expenses in connection therewith, in addition to all other amounts due hereunder.

**7.2** **Amendment**. This Note or the terms of any Loan made hereunder may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the

SPB

party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

7.3     **Replacement Note**.    Upon notice from Lender to Borrower of the theft, destruction or mutilation of this Note and, upon receipt of indemnity reasonably satisfactory to Borrower from Lender (except that if the Lender initially named herein is the holder of this Note, an indemnification from the Lender initially named herein shall be sufficient) or, in the case of mutilation hereof, upon surrender of the mutilated Note, Borrower will make and deliver a new note of like tenor in lieu of this Note.

7.4     **Rights of Holders**.    Every legal holder of this Note shall have and may exercise all of the rights and powers given to Lender in this Note.

7.5     **Construction**.    Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors, and administrators.

7.6     **Assignment**.    Lender, at any time and without the consent of Borrower may grant participations in or sell, transfer, assign and convey all or any part, of its right, title and interest in this Note.

7.7     **Time of Essence**.    Time is of the essence of this Note and of each and every obligation of Borrower hereunder.

7.8     **Severability**.    In case any of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

7.9     **Notice**.    Any notice or other communication required or permitted to be given pursuant to this Note ("Communications") shall be in writing and shall be deemed to have been duly given as follows:  (i) upon actual delivery evidenced by written confirmation of receipt after deposit in the United States mail, postage prepaid, certified or registered mail (return receipt requested and received); or (ii) upon actual delivery by a courier service providing written confirmation of delivery; or (iii) by email, upon receipt by the sender of acknowledgement of receipt of the electronic transmission by the recipient. In each case, any such notice, request, demand or other communication shall be addressed or sent to the parties at the following addresses or such other addresses or numbers as provided by a party to the other by written notice from time to time:

| If to Lender: | If to Borrower: |
|---|---|
| Dickinson of San Antonio, Inc. | Cottingham Apex Texas Fund, LLC |
| 4522 Fredericksburg Rd., Ste. A-22 | c/o Cottingham Management Company, LLC |
| San Antonio, Texas 78201 | 2382 Faraday Avenue, Suite 250 |
| Attention: Lawrence D. Earle, CEO | Carlsbad, CA 92008 |
| Email: lldearle@aol.com | Attention: Legal Department |
|  | Email: notice@cottinghammanagementco.com |

**Both Lender and Borrower expressly consent to the delivery of communications and notices by e-mail and certify that they possess the means of accepting and acknowledging delivery by e-mail.**

SPB

**7.10**  <u>Governing Law, Jurisdiction and Venue</u>.  This Note shall be deemed to have been made and performed in the State of California, and the validity, construction, performance, breach, and effect of this Note shall be interpreted and construed pursuant to the laws of the State of California without regard to principles governing conflict of laws. Lender irrevocably (i) submits to the jurisdiction of the United States District Court located in San Diego, California for the purpose of any suit, action, or other proceeding arising out of this Note (each, a "Proceeding"), or if the District Court determines it does not have jurisdiction over the matter, any California state court located in San Diego, California; (ii) agrees that all Proceedings relating to this Note shall be heard and determined in such courts, (iii) waives, to the fullest extent permitted by law, any immunity from jurisdiction of such courts or from any legal process therein, (iv) agrees not to commence any Proceeding other than in such courts; and (v) waives, to the fullest extent permitted by law, any claim that such Proceeding is brought in an inconvenient forum.

**7.11**  <u>Entire Agreement</u>.   THIS NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES

IN WITNESS WHEREOF, Borrower has duly executed this Note effective as of the day and year first above written.

COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company

By: Cottingham Management Company, LLC
    Its Manager

By: _____
    Stephen Bick
    Manager

9

SPB

**Loan Terms.** The repayment terms for the Loans to be made under this Master Promissory Note are as set forth in the following table:

| | Range 1 | Range 2 | Range 3 | Range 4 | Range 5 | Range 6 | Range 7 | Range 8 | Range 9 | Range 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Average Disbursement Amount** | $500 - $1,499 | $1,500 - $2,499 | $2,500 - $3,499 | $3,500 - $4,499 | $4,500 - $5,499 | $5,500 - $6,499 | $6,500 - $7,499 | $7,500 - $8,499 | $8,500 - $9,499 | $9,500 - $40,000 |
| **Interest-Only Period (Months)** | 10 mo. | 10 mo. | 11 mo. | 14 mo. | 18 mo. | 20 Mo. | 22 mo. | 24 mo. | 26 mo. | 27 mo. |
| **Principal Repayment Period (Months)** | 8 mo. | 16 mo. | 24 mo. | 28 mo. | 32 mo. | 48 Mo. | 63 mo. | 72 mo. | 74 mo. | 80 mo. |
| **Total Term (Months)** | 18 | 26 | 35 | 42 | 50 | 68 | 85 | 96 | 100 | 107 |
| **Fixed Interest Rate** | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month |

10

ATTACHMENT B

APEX TEXAS FUND DESIGNATED BANK ACCOUNT

Bank:                California Bank & Trust
Branch:              2141 Palomar Airport Road, Carlsbad, CA 92011
Routing Number:      122232109
Account Number:      2130167251
Name on Account:     Cottingham Apex Texas Fund, LLC

CareerPoint-ApexTexFundMPN0425113

SPB

# EXHIBIT B

# COTTINGHAM APEX TEXAS FUND, LLC

## MASTER PROMISSORY NOTE

in favor of

## DICKINSON OF SAN ANTONIO, INC., a Kansas corporation,

d.b.a Career Point College,

dated as of

December 22, 2015



# MASTER PROMISSORY NOTE

FOR VALUE RECEIVED, COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company ("Borrower"), hereby promises to pay to the order of DICKINSON OF SAN ANTONIO, INC., a Kansas corporation, d.b.a Career Point College ("Lender"), in lawful money of the United States of America, all principal sums advanced to Borrower by Lender under this Master Promissory Note ("Loans" defined below) with interest on the outstanding principal amount of each Loan at the Interest Rate (defined below) in accordance with the terms of this Master Promissory Note ("Note").

## ARTICLE 1
## DEFINITIONS

1.1 **Definitions.** For the purpose of this Note, the capitalized words and expressions listed below shall have the following meanings:

"<u>Loan</u>" means a cash payment by Lender to Borrower which, upon receipt, Borrower agrees to repay to Lender, with interest, in accordance with the terms of this Note. Cash payments hereunder by Lender on the same Loan Date shall constitute a single Loan to Borrower. Lender and Borrower contemplate that multiple Loans will be made pursuant to this Note.

"<u>Loan Date</u>" means the date on which Lender makes a Loan to Borrower by making a payment of cash to Borrower by electronic wire transfer in immediately available funds to the bank account designated by Borrower in <u>Attachment B</u> or to such other bank account as may hereafter be designated by Borrower in writing

"<u>ASFG</u>" means American Student Financial Group, Inc., a Delaware corporation.

"<u>Account Purchase Program</u>" means a tuition financing program evidenced by the Program Agreement (defined herein) pursuant to which Lender will extend tuition credit in the form of retail installment sale agreements ("Accounts" defined herein) to students of educational institutions owned and/or operated by Lender and thereafter certain of the Accounts may be purchased by ASFG from Lender.

"<u>Program Agreement</u>" means that certain Account Purchase Program Agreement made as of December 22, 2015 by and between Lender and ASFG, as may subsequently be amended.

"<u>Account</u>" means a retail installment sale agreement entered into between Lender and a student of an educational institution owned and/or operated by Lender.

"<u>Account Purchase</u>" means the purchase from Lender of one or more Accounts by ASFG pursuant to the Program Agreement.

"<u>Purchase Date</u>" means the date that ASFG purchases one or more Accounts from Lender under the Program Agreement by making the required Account Purchase Price (as defined in the Program Agreement) payment(s) to Lender. Lender is required under the terms of the Program Agreement to make a Loan to Borrower on each Purchase Date.

"<u>Average Account Purchase Price</u>" means an average calculated by dividing the total amount of the Account Purchase Price payments received by Lender on the Purchase Date by the number

SPB

of Accounts purchased by ASFG on such Purchase Date. Borrower shall confirm in writing to Lender the amount of the Average Account Purchase Price within ten (10) days following each Purchase Date based on a purchase report to be received from ASFG.

"Anti-Terrorism Law" mean any law relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Person" means an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate or any other entity.

"Term" means the scheduled period over which all principal and interest of a Loan will be repaid. The Term of a Loan will begin on the Loan Date and end on the last payment due date of the Principal Repayment Period.

"Interest-Only Period" means a period of consecutive months during which monthly interest-only payments in the full amount of the accrued interest on the principal balance of the Loan at the Interest Rate shall be due and payable. The first (1st) payment of the Interest-Only Period will be due and payable on the first (1st) day of the second (2nd) month following the month in which the Loan Date occurred and monthly interest-only payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Interest-Only Period. The number of consecutive months of the Interest-Only Period of a Loan is based on the Average Account Purchase Price received by Lender from the sale of Accounts under the Program Agreement on the Purchase Date and determined according to the table in Attachment A to this Note.

"Principal Repayment Period" means a period of consecutive months following the Interest-Only Period during which equal amortized monthly payments of principal and interest shall be due and payable until the Loan is repaid in full. The first (1st) Amortized Payment of the Principal Repayment Period will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment due date of the Interest-Only Period occurred and Amortized Payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Principal Repayment Period. The number of consecutive months of the Principal Repayment Period of a Loan shall be based on the Average Account Purchase Price received by Lender from the sale of Accounts under the Program Agreement on the Purchase Date and determined according to the table in Attachment A to this Note.

"Amortized Payment" means the equal monthly payment of principal and interest due and payable each month during the Principal Repayment Period. The amount of the Amortized Payment will be the amount necessary to fully amortize and repay the principal balance of the Loan in equal installments of principal and interest at the Interest Rate over the number of months of the Principal Repayment Period.

## ARTICLE 2
## PAYMENTS

**2.1**    **Payment Periods**.  Each Loan under this Note will be repaid by Borrower during an Interest-Only Period immediately followed by a Principal Repayment Period as defined herein.

**2.2**    **Payments during Interest-Only Period**.    Interest-only payments in the full amount of the accrued interest on the principal balance of each Loan at the Interest Rate shall be due and payable beginning on the first (1st) day of the second (2nd) month following the month in

which the Loan Date occurred. Interest-only payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Interest-Only Period as determined according to the table in Attachment A.

2.3     **Payments during Principal Repayment Period**.   The first (1st) Amortized Payment (as defined above) under each Loan will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment of the Interest-Only Period is due. Monthly Amortized Payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Principal Repayment Period as determined according to the table in Attachment A.

2.4     **Loan Confirmation Notice**.  Within ten (10) days following the Loan Date of each Loan made by Lender to Borrower hereunder, Borrower will provide written confirmation to Lender of the repayment terms of the Loan ("Loan Confirmation Notice") including: (i) the principal amount of the Loan; (ii) the Loan's identifying number assigned by Borrower; (iii) the Average Account Purchase Price pertaining to the Loan: (iv) the Interest Rate and the number of months of the Interest-Only Period and the Principal Repayment Period of the Loan as determined according to Attachment A to the Note; and (v) a Loan repayment and amortization schedule showing the amounts and due dates of the monthly payments due and payable to Lender under the Loan.

Borrower's Loan Confirmation Notice shall be delivered to Lender in accordance with the notice provisions of this Note.  In the event of a discrepancy or conflict between the terms of this Note and the terms of a Loan as stated in a Loan Confirmation Notice, the terms of this Note shall control, unless otherwise agreed in writing by Lender and Borrower. The failure of Borrower to deliver a Loan Confirmation Notice with respect to a Loan shall not relieve it of its obligation to repay the Loan in accordance with the terms of this Note.

2.5     **Application of Payments**.  Each payment by Borrower under a Loan shall be applied as follows: (i) first, to any accrued interest under the Loan through the date of such payment; (ii) second, to any outstanding late fees or other charges; (iii) then, to the unpaid principal balance of the Loan. Borrower shall reasonably identify the Loan for which each payment is being made to Lender.

2.6     **No Setoff**.  All payments of any kind due to Lender from Borrower pursuant to this Note shall be made in the full amount due, without setoff, counterclaim, or other defense.  All such payments will be free and clear of, and without deduction or withholding for, any present or future taxes.  Borrower shall pay any and all costs (administrative or otherwise) imposed by banks, clearing houses, or any other financial institution, in connection with making any payments hereunder, except for any costs assessed by Lender's or ASFG's banking institutions.

2.7     **Pre-Payment**. Borrower may prepay any amounts due under any Loan in whole or in part, at any time, or from time to time, without penalty or premium, and interest shall immediately cease to accrue on any amount so prepaid.

## ARTICLE 3
## INTEREST, CHARGES AND FEES

3.1     **Interest Accrual**.  Interest on the principal amount of each Loan will begin to accrue as of the Loan Date and will continue until the principal amount of the Loan is repaid in full. Simple interest will be calculated on the outstanding principal balance each day of the term of the

SPB

Loan at a daily interest rate equal to the annual Interest Rate divided by the actual number of days in the year based on a 365-day year.

**3.2    Interest Rate.** The Interest Rate over the Term of the each Loan will be a fixed annual rate equal to either the Short-Term Applicable Federal Rate (Table 1 – Annual Compounding) or the Mid-Term Applicable Federal Rate (Table 1 – Annual Compounding) for the month in which the Loan Date occurs as published in a Revenue Ruling each month by the U.S. Internal Revenue Service. The Interest Rate for Loans with a Term of less than three (3) years will be the Short-Term Applicable Federal Rate. Loans with a term longer than three (3) years but not longer than nine (9) years will bear interest at the Mid-Term Applicable Federal Rate. No Loan made under this Note will have a Term longer than nine (9) years.

**3.3    Savings Provision**. At no time shall Borrower be obligated or required to pay interest on the principal balance of any Loan hereunder at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance a Loan due hereunder at a rate in excess of such maximum rate, the Interest Rate shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**3.4    Late Charge.** In the event that Lender has not received any installment due under a Loan on or before the date ten (10) days after the date such installment is due and payable, Borrower will be charged, and Borrower hereby agrees to pay to Lender, the lesser of a late charge equal to five percent (5%) of the amount of such installment then due or ten ($10) dollars. Borrower shall be obligated to pay no more than one (1) late charge with respect to any installment.

**3.5    Returned Payment Fee.** A $15 Returned Payment Fee will be assessed if a payment is dishonored for any reason.

**ARTICLE 4**
**DEFAULT**

**4.1    Events of Default**. Each of the following shall constitute an event of default ("Event of Default") under a Loan:

(a)    Borrower fails to make any payment of principal or interest due under the Loan when due and such failure continues uncured for a period of ten (10) days following written notice of such failure given to Borrower according to the notice provisions of this Note;

(b)    Borrower files a petition in bankruptcy or for any form of debtor relief under any present or future law relating to bankruptcy or debtor relief, or such a filing or petition is filed against Borrower, and Borrower either consents to such filing or petition, or such petition is not dismissed within one hundred eighty (180) days after filing;

(c)    Borrower consents to the appointment of or taking possession by a receiver or liquidator of substantially all of its property;

(d)      Borrower makes an assignment for the benefit of its creditors;

(e)      Borrower winds up, liquidates or dissolves; or

(f)      Borrower conveys, sells, assigns, transfers, or otherwise disposes of, whether voluntarily or involuntarily, all or substantially all of its assets.

**4.2**    **Waivers**.  Borrower hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note.  No extension of time for payment of this Note or any payment due under any Loan made hereunder, and no alteration, amendment or waiver of any provision of this Note or any Loan made hereunder by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of sums due under this Note and any Loan made under this Note.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note.

**4.3**    **Default and Acceleration**.   At the option of the holder of this Note, the entire unpaid principal balance of, and all accrued interest on, a Loan made under this Note shall immediately become due and payable upon the occurrence at any time of any one or more Event of Default.

## ARTICLE 5
## COVENANTS OF BORROWER

**5.1**    **Borrower's Covenants**. Borrower covenants to Lender that Borrower shall comply with all the following covenants:

**5.1.1**    **Use of Proceeds**.  Borrower shall use the proceeds of the Loans hereunder for any legitimate investment purpose as further defined in the Operating Agreement of the Borrower.

**5.1.2**    **Statements**.  Borrower shall deliver to Lender, within ten (10) days following the end of each calendar month, a statement detailing the principal balance and accrued interest of each Loan made under this Note.

## ARTICLE 6
## REPRESENTATIONS

**6.1**    **Borrower's Representations**.   Borrower represents and warrants to Lender as follows:

**6.1.1**    **Authority**.  Borrower has full power, authority and legal right to execute and deliver this Note.

**6.1.2**    **Enforceability of Documents**.  This Note and Borrower's obligations to repay the Loans hereunder, are legal, valid and binding obligations of Borrower and, to the best of Borrower's knowledge, are not subject to any right of rescission, setoff, counterclaim or defense, including the defense of usury.

SPB

**6.1.3    Litigation**.  There are no actions, suits or proceedings pending naming Borrower, or, to the best of Borrower's knowledge, threatened against or affecting Borrower or its assets in any court, at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality that, in each instance, might materially and adversely affect the ability of Borrower to perform its obligations under this Note.

**6.1.4    Investment Adviser Status of Manager.**    Borrower's sole member and manager is Cottingham Management Company, LLC, a California limited liability company ("Cottingham Management"). Cottingham Management is a California state licensed registered investment adviser in good standing the California Department of Corporations and all other regulatory agencies having jurisdiction over such matters.

**6.2    Lender's Representations, Covenants and Warranties**.  Lender represents, warrants and covenants that (i) Lender is not in violation of, and will not violate, any Anti-Terrorism Law, (ii) Lender does not and will not knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, and (iii) Lender is not in violation of, and will not violate, any rules or regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury or any successor governmental authority.

## ARTICLE 7
## GENERAL PROVISIONS

**7.1    Costs of Collection**.  If any attorney is engaged by Lender: (a) to collect upon Borrower's obligations hereunder, whether or not legal proceedings are thereafter instituted by Lender; (b) to represent Lender in any Borrower bankruptcy, reorganization, receivership or other proceedings affecting Lender's creditors' rights in the Note and involving a claim under this Note; (c) to represent Lender in any other proceedings whatsoever in connection with this Note, including post judgment proceedings to enforce any judgment related thereto; or (d) in connection with seeking an out-of-court workout or settlement of any of the foregoing, then Borrower shall pay to Lender all reasonable costs, attorneys' fees and expenses in connection therewith, in addition to all other amounts due hereunder.

**7.2    Amendment**.  This Note or the terms of any Loan made hereunder may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**7.3    Replacement Note**.  Upon notice from Lender to Borrower of the theft, destruction or mutilation of this Note and, upon receipt of indemnity reasonably satisfactory to Borrower from Lender (except that if the Lender initially named herein is the holder of this Note, an indemnification from the Lender initially named herein shall be sufficient) or, in the case of mutilation hereof, upon surrender of the mutilated Note, Borrower will make and deliver a new note of like tenor in lieu of this Note.

**7.4    Rights of Holders**.  Every legal holder of this Note shall have and may exercise all of the rights and powers given to Lender in this Note.

SPB

7.5 **Construction**. Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors, and administrators.

7.6 **Assignment**. Lender, at any time and without the consent of Borrower may grant participations in or sell, transfer, assign and convey all or any part, of its right, title and interest in this Note.

7.7 **Time of Essence**. Time is of the essence of this Note and of each and every obligation of Borrower hereunder.

7.8 **Severability**. In case any of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

7.9 **Notice**. Any notice or other communication required or permitted to be given pursuant to this Note ("Communications") shall be in writing and shall be deemed to have been duly given as follows: (i) upon actual delivery evidenced by written confirmation of receipt after deposit in the United States mail, postage prepaid, certified or registered mail (return receipt requested and received); or (ii) upon actual delivery by a courier service providing written confirmation of delivery; or (iii) by email, upon receipt by the sender of acknowledgement of receipt of the electronic transmission by the recipient. In each case, any such notice, request, demand or other communication shall be addressed or sent to the parties at the following addresses or such other addresses or numbers as provided by a party to the other by written notice from time to time:

If to Lender:

Dickinson of San Antonio, Inc.
4522 Fredericksburg Rd., Ste. A-22
San Antonio, Texas 78201
Attention: Lawrence D. Earle, CEO
Email: lldearle@aol.com with copy to
mbelongia@duanemorris.com

If to Borrower:

Cottingham Apex Texas Fund, LLC
c/o Cottingham Management Company, LLC
2382 Faraday Avenue, Suite 250
Carlsbad, CA 92008
Attention: Legal Department
Email: notice@cottinghammanagementco.com

**Both Lender and Borrower expressly consent to the delivery of communications and notices by e-mail and certify that they possess the means of accepting and acknowledging delivery by e-mail.**

7.10 **Governing Law, Jurisdiction and Venue**. This Note shall be deemed to have been made and performed in the State of California, and the validity, construction, performance, breach, and effect of this Note shall be interpreted and construed pursuant to the laws of the State of California without regard to principles governing conflict of laws. Lender irrevocably (i) submits to the jurisdiction of the United States District Court located in San Diego, California for the purpose of any suit, action, or other proceeding arising out of this Note (each, a "Proceeding"), or if the District Court does not have jurisdiction over the matter, any California state court located in San Diego, California; (ii) agrees that all Proceedings relating to this Note shall be heard and determined in such courts, (iii) waives, to the fullest extent permitted by law, any immunity from jurisdiction of such courts or from any legal process therein, (iv) agrees not to commence any Proceeding other than in such courts; and (v) waives, to the fullest extent permitted by law, any claim that such Proceeding is brought in an inconvenient forum.

SPB

**7.11    Entire Agreement**.    THIS NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES

IN WITNESS WHEREOF, Borrower has duly executed this Note effective as of the day and year first above written.

COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company

By: Cottingham Management Company, LLC
    Its Manager

By: _____
    Stephen Bick
    Manager

SPB

# ATTACHMENT A

**Loan Terms.**  The repayment terms for the Loans to be made under this Master Promissory Note are as set forth in the following table:

| | Range 1 | Range 2 | Range 3 | Range 4 | Range 5 | Range 6 | Range 7 | Range 8 | Range 9 | Range 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Average Account Purchase Price** | $500 - $1,499 | $1,500 - $2,499 | $2,500 - $3,499 | $3,500 - $4,499 | $4,500 - $5,499 | $5,500 - $6,499 | $6,500 - $7,499 | $7,500 - $8,499 | $8,500 - $9,499 | $9,500 - $40,000 |
| **Interest-Only Period (Months)** | 10 mo. | 10 mo. | 11 mo. | 14 mo. | 18 mo. | 20 Mo. | 22 mo. | 24 mo. | 26 mo. | 27 mo. |
| **Principal Repayment Period (Months)** | 8 mo. | 16 mo. | 24 mo. | 28 mo. | 32 mo. | 48 Mo. | 63 mo. | 72 mo. | 74 mo. | 80 mo. |
| **Total Term (Months)** | 18 | 26 | 35 | 42 | 50 | 68 | 85 | 96 | 100 | 107 |
| **Fixed Interest Rate** | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month |

SPB

ATTACHMENT B

APEX TEXAS FUND DESIGNATED BANK ACCOUNT


Bank:                    California Bank & Trust
Branch:                  2141 Palomar Airport Road, Carlsbad, CA 92011
Routing Number:          122232109
Account Number:          2130167251
Name on Account:         Cottingham Apex Texas Fund, LLC

SPB

# EXHIBIT C

# COTTINGHAM APEX TEXAS FUND, LLC

## MASTER PROMISSORY NOTE

in favor of

DICKINSON OF AUSTIN, INC., a Delaware corporation,

d.b.a Career Point College,

dated as of

December 22, 2015

SPB

# MASTER PROMISSORY NOTE

FOR VALUE RECEIVED, COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company ("Borrower"), hereby promises to pay to the order of DICKINSON OF AUSTIN, INC., a Delaware corporation, d.b.a Career Point College ("Lender"), in lawful money of the United States of America, all principal sums advanced to Borrower by Lender under this Master Promissory Note ("Loans" defined below) with interest on the outstanding principal amount of each Loan at the Interest Rate (defined below) in accordance with the terms of this Master Promissory Note ("Note").

**ARTICLE 1**
**DEFINITIONS**

1.1 **Definitions.** For the purpose of this Note, the capitalized words and expressions listed below shall have the following meanings:

"<u>Loan</u>" means a cash payment by Lender to Borrower which, upon receipt, Borrower agrees to repay to Lender, with interest, in accordance with the terms of this Note. Cash payments hereunder by Lender on the same Loan Date shall constitute a single Loan to Borrower. Lender and Borrower contemplate that multiple Loans will be made pursuant to this Note.

"<u>Loan Date</u>" means the date on which Lender makes a Loan to Borrower by making a payment of cash to Borrower by electronic wire transfer in immediately available funds to the bank account designated by Borrower in <u>Attachment B</u> or to such other bank account as may hereafter be designated by Borrower in writing

"<u>ASFG</u>" means American Student Financial Group, Inc., a Delaware corporation.

"<u>Account Purchase Program</u>" means a tuition financing program evidenced by the Program Agreement (defined herein) pursuant to which Lender will extend tuition credit in the form of retail installment sale agreements ("Accounts" defined herein) to students of educational institutions owned and/or operated by Lender and thereafter certain of the Accounts may be purchased by ASFG from Lender.

"<u>Program Agreement</u>" means that certain Account Purchase Program Agreement made as of December 22, 2015 by and between Lender and ASFG, as may subsequently be amended.

"<u>Account</u>" means a retail installment sale agreement entered into between Lender and a student of an educational institution owned and/or operated by Lender.

"<u>Account Purchase</u>" means the purchase from Lender of one or more Accounts by ASFG pursuant to the Program Agreement.

"<u>Purchase Date</u>" means the date that ASFG purchases one or more Accounts from Lender under the Program Agreement by making the required Account Purchase Price (as defined in the Program Agreement) payment(s) to Lender. Lender is required under the terms of the Program Agreement to make a Loan to Borrower on each Purchase Date.

"<u>Average Account Purchase Price</u>" means an average calculated by dividing the total amount of the Account Purchase Price payments received by Lender on the Purchase Date by the number

of Accounts purchased by ASFG on such Purchase Date. Borrower shall confirm in writing to Lender the amount of the Average Account Purchase Price within ten (10) days following each Purchase Date based on a purchase report to be received from ASFG.

"Anti-Terrorism Law" mean any law relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Person" means an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate or any other entity.

"Term" means the scheduled period over which all principal and interest of a Loan will be repaid. The Term of a Loan will begin on the Loan Date and end on the last payment due date of the Principal Repayment Period.

"Interest-Only Period" means a period of consecutive months during which monthly interest-only payments in the full amount of the accrued interest on the principal balance of the Loan at the Interest Rate shall be due and payable. The first (1st) payment of the Interest-Only Period will be due and payable on the first (1st) day of the second (2nd) month following the month in which the Loan Date occurred and monthly interest-only payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Interest-Only Period. The number of consecutive months of the Interest-Only Period of a Loan is based on the Average Account Purchase Price received by Lender from the sale of Accounts under the Program Agreement on the Purchase Date and determined according to the table in Attachment A to this Note.

"Principal Repayment Period" means a period of consecutive months following the Interest-Only Period during which equal amortized monthly payments of principal and interest shall be due and payable until the Loan is repaid in full. The first (1st) Amortized Payment of the Principal Repayment Period will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment due date of the Interest-Only Period occurred and Amortized Payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Principal Repayment Period. The number of consecutive months of the Principal Repayment Period of a Loan shall be based on the Average Account Purchase Price received by Lender from the sale of Accounts under the Program Agreement on the Purchase Date and determined according to the table in Attachment A to this Note.

"Amortized Payment" means the equal monthly payment of principal and interest due and payable each month during the Principal Repayment Period. The amount of the Amortized Payment will be the amount necessary to fully amortize and repay the principal balance of the Loan in equal installments of principal and interest at the Interest Rate over the number of months of the Principal Repayment Period.

# ARTICLE 2
# PAYMENTS

2.1  **Payment Periods**.  Each Loan under this Note will be repaid by Borrower during an Interest-Only Period immediately followed by a Principal Repayment Period as defined herein.

2.2  **Payments during Interest-Only Period**.  Interest-only payments in the full amount of the accrued interest on the principal balance of each Loan at the Interest Rate shall be due and payable beginning on the first (1st) day of the second (2nd) month following the month in

SPB

which the Loan Date occurred. Interest-only payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Interest-Only Period as determined according to the table in Attachment A.

2.3 **Payments during Principal Repayment Period**. The first (1st) Amortized Payment (as defined above) under each Loan will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment of the Interest-Only Period is due. Monthly Amortized Payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Principal Repayment Period as determined according to the table in Attachment A.

2.4 **Loan Confirmation Notice**. Within ten (10) days following the Loan Date of each Loan made by Lender to Borrower hereunder, Borrower will provide written confirmation to Lender of the repayment terms of the Loan ("Loan Confirmation Notice") including: (i) the principal amount of the Loan; (ii) the Loan's identifying number assigned by Borrower; (iii) the Average Account Purchase Price pertaining to the Loan: (iv) the Interest Rate and the number of months of the Interest-Only Period and the Principal Repayment Period of the Loan as determined according to Attachment A to the Note; and (v) a Loan repayment and amortization schedule showing the amounts and due dates of the monthly payments due and payable to Lender under the Loan.

Borrower's Loan Confirmation Notice shall be delivered to Lender in accordance with the notice provisions of this Note. In the event of a discrepancy or conflict between the terms of this Note and the terms of a Loan as stated in a Loan Confirmation Notice, the terms of this Note shall control, unless otherwise agreed in writing by Lender and Borrower. The failure of Borrower to deliver a Loan Confirmation Notice with respect to a Loan shall not relieve it of its obligation to repay the Loan in accordance with the terms of this Note.

2.5 **Application of Payments**. Each payment by Borrower under a Loan shall be applied as follows: (i) first, to any accrued interest under the Loan through the date of such payment; (ii) second, to any outstanding late fees or other charges; (iii) then, to the unpaid principal balance of the Loan. Borrower shall reasonably identify the Loan for which each payment is being made to Lender.

2.6 **No Setoff**. All payments of any kind due to Lender from Borrower pursuant to this Note shall be made in the full amount due, without setoff, counterclaim, or other defense. All such payments will be free and clear of, and without deduction or withholding for, any present or future taxes. Borrower shall pay any and all costs (administrative or otherwise) imposed by banks, clearing houses, or any other financial institution, in connection with making any payments hereunder, except for any costs assessed by Lender's or ASFG's banking institutions.

2.7 **Pre-Payment**. Borrower may prepay any amounts due under any Loan in whole or in part, at any time, or from time to time, without penalty or premium, and interest shall immediately cease to accrue on any amount so prepaid.

### ARTICLE 3
### INTEREST, CHARGES AND FEES

3.1 **Interest Accrual**. Interest on the principal amount of each Loan will begin to accrue as of the Loan Date and will continue until the principal amount of the Loan is repaid in full. Simple interest will be calculated on the outstanding principal balance each day of the term of the

SPB

Loan at a daily interest rate equal to the annual Interest Rate divided by the actual number of days in the year based on a 365-day year.

3.2 **Interest Rate.** The Interest Rate over the Term of the each Loan will be a fixed annual rate equal to either the Short-Term Applicable Federal Rate (Table 1 – Annual Compounding) or the Mid-Term Applicable Federal Rate (Table 1 – Annual Compounding) for the month in which the Loan Date occurs as published in a Revenue Ruling each month by the U.S. Internal Revenue Service. The Interest Rate for Loans with a Term of less than three (3) years will be the Short-Term Applicable Federal Rate. Loans with a term longer than three (3) years but not longer than nine (9) years will bear interest at the Mid-Term Applicable Federal Rate. No Loan made under this Note will have a Term longer than nine (9) years.

3.3 **Savings Provision**. At no time shall Borrower be obligated or required to pay interest on the principal balance of any Loan hereunder at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance a Loan due hereunder at a rate in excess of such maximum rate, the Interest Rate shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

3.4 **Late Charge.** In the event that Lender has not received any installment due under a Loan on or before the date ten (10) days after the date such installment is due and payable, Borrower will be charged, and Borrower hereby agrees to pay to Lender, the lesser of a late charge equal to five percent (5%) of the amount of such installment then due or ten ($10) dollars. Borrower shall be obligated to pay no more than one (1) late charge with respect to any installment.

3.5 **Returned Payment Fee.** A $15 Returned Payment Fee will be assessed if a payment is dishonored for any reason.

## ARTICLE 4
## DEFAULT

4.1 **Events of Default**. Each of the following shall constitute an event of default ("Event of Default") under a Loan:

(a)    Borrower fails to make any payment of principal or interest due under the Loan when due and such failure continues uncured for a period of ten (10) days following written notice of such failure given to Borrower according to the notice provisions of this Note;

(b)    Borrower files a petition in bankruptcy or for any form of debtor relief under any present or future law relating to bankruptcy or debtor relief, or such a filing or petition is filed against Borrower, and Borrower either consents to such filing or petition, or such petition is not dismissed within one hundred eighty (180) days after filing;

(c)    Borrower consents to the appointment of or taking possession by a receiver or liquidator of substantially all of its property;

(d)       Borrower makes an assignment for the benefit of its creditors;

(e)       Borrower winds up, liquidates or dissolves; or

(f)       Borrower conveys, sells, assigns, transfers, or otherwise disposes of, whether voluntarily or involuntarily, all or substantially all of its assets.

**4.2**    **Waivers**.  Borrower hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note.  No extension of time for payment of this Note or any payment due under any Loan made hereunder, and no alteration, amendment or waiver of any provision of this Note or any Loan made hereunder by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of sums due under this Note and any Loan made under this Note.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note.

**4.3**    **Default and Acceleration**.   At the option of the holder of this Note, the entire unpaid principal balance of, and all accrued interest on, a Loan made under this Note shall immediately become due and payable upon the occurrence at any time of any one or more Event of Default.

## ARTICLE 5
## COVENANTS OF BORROWER

**5.1**    **Borrower's Covenants**. Borrower covenants to Lender that Borrower shall comply with all the following covenants:

**5.1.1**   **Use of Proceeds**.  Borrower shall use the proceeds of the Loans hereunder for any legitimate investment purpose as further defined in the Operating Agreement of the Borrower.

**5.1.2**   **Statements**.  Borrower shall deliver to Lender, within ten (10) days following the end of each calendar month, a statement detailing the principal balance and accrued interest of each Loan made under this Note.

## ARTICLE 6
## REPRESENTATIONS

**6.1**    **Borrower's Representations**.   Borrower represents and warrants to Lender as follows:

**6.1.1**   **Authority**.  Borrower has full power, authority and legal right to execute and deliver this Note.

**6.1.2**   **Enforceability of Documents**.  This Note and Borrower's obligations to repay the Loans hereunder, are legal, valid and binding obligations of Borrower and, to the best of Borrower's knowledge, are not subject to any right of rescission, setoff, counterclaim or defense, including the defense of usury.

SPB

**6.1.3    Litigation**.  There are no actions, suits or proceedings pending naming Borrower, or, to the best of Borrower's knowledge, threatened against or affecting Borrower or its assets in any court, at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality that, in each instance, might materially and adversely affect the ability of Borrower to perform its obligations under this Note.

**6.1.4    Investment Adviser Status of Manager.**    Borrower's sole member and manager is Cottingham Management Company, LLC, a California limited liability company ("Cottingham Management"). Cottingham Management is a California state licensed registered investment adviser in good standing the California Department of Corporations and all other regulatory agencies having jurisdiction over such matters.

**6.2    Lender's Representations, Covenants and Warranties**.    Lender represents, warrants and covenants that (i) Lender is not in violation of, and will not violate, any Anti-Terrorism Law, (ii) Lender does not and will not knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, and (iii) Lender is not in violation of, and will not violate, any rules or regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury or any successor governmental authority.

## ARTICLE 7
## GENERAL PROVISIONS

**7.1    Costs of Collection**.    If any attorney is engaged by Lender: (a) to collect upon Borrower's obligations hereunder, whether or not legal proceedings are thereafter instituted by Lender; (b) to represent Lender in any Borrower bankruptcy, reorganization, receivership or other proceedings affecting Lender's creditors' rights in the Note and involving a claim under this Note; (c) to represent Lender in any other proceedings whatsoever in connection with this Note, including post judgment proceedings to enforce any judgment related thereto; or (d) in connection with seeking an out-of-court workout or settlement of any of the foregoing, then Borrower shall pay to Lender all reasonable costs, attorneys' fees and expenses in connection therewith, in addition to all other amounts due hereunder.

**7.2    Amendment**.    This Note or the terms of any Loan made hereunder may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**7.3    Replacement Note**.    Upon notice from Lender to Borrower of the theft, destruction or mutilation of this Note and, upon receipt of indemnity reasonably satisfactory to Borrower from Lender (except that if the Lender initially named herein is the holder of this Note, an indemnification from the Lender initially named herein shall be sufficient) or, in the case of mutilation hereof, upon surrender of the mutilated Note, Borrower will make and deliver a new note of like tenor in lieu of this Note.

**7.4    Rights of Holders**.    Every legal holder of this Note shall have and may exercise all of the rights and powers given to Lender in this Note.

SPB

**7.5**    **Construction**. Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors, and administrators.

**7.6**    **Assignment**. Lender, at any time and without the consent of Borrower may grant participations in or sell, transfer, assign and convey all or any part, of its right, title and interest in this Note.

**7.7**    **Time of Essence**. Time is of the essence of this Note and of each and every obligation of Borrower hereunder.

**7.8**    **Severability**. In case any of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**7.9**    **Notice**. Any notice or other communication required or permitted to be given pursuant to this Note ("Communications") shall be in writing and shall be deemed to have been duly given as follows: (i) upon actual delivery evidenced by written confirmation of receipt after deposit in the United States mail, postage prepaid, certified or registered mail (return receipt requested and received); or (ii) upon actual delivery by a courier service providing written confirmation of delivery; or (iii) by email, upon receipt by the sender of acknowledgement of receipt of the electronic transmission by the recipient. In each case, any such notice, request, demand or other communication shall be addressed or sent to the parties at the following addresses or such other addresses or numbers as provided by a party to the other by written notice from time to time:

| If to Lender: | If to Borrower: |
|---|---|
| Dickinson of Austin, Inc. | Cottingham Apex Texas Fund, LLC |
| 9001 North Interstate Hwy. 35, #105 | c/o Cottingham Management Company, LLC |
| Austin, TX 78753 | 2382 Faraday Avenue, Suite 250 |
| Attention: Lawrence D. Earle, CEO | Carlsbad, CA 92008 |
| Email: lldearle@aol.com with copy to | Attention: Legal Department |
| mbelongia@duanemorris.com | Email: notice@cottinghammanagementco.com |

**Both Lender and Borrower expressly consent to the delivery of communications and notices by e-mail and certify that they possess the means of accepting and acknowledging delivery by e-mail.**

**7.10**    **Governing Law, Jurisdiction and Venue**. This Note shall be deemed to have been made and performed in the State of California, and the validity, construction, performance, breach, and effect of this Note shall be interpreted and construed pursuant to the laws of the State of California without regard to principles governing conflict of laws. Lender irrevocably (i) submits to the jurisdiction of the United States District Court located in San Diego, California for the purpose of any suit, action, or other proceeding arising out of this Note (each, a "Proceeding"), or if the District Court does not have jurisdiction over the matter, any California state court located in San Diego, California; (ii) agrees that all Proceedings relating to this Note shall be heard and determined in such courts, (iii) waives, to the fullest extent permitted by law, any immunity from jurisdiction of such courts or from any legal process therein, (iv) agrees not to commence any Proceeding other than in such courts; and (v) waives, to the fullest extent permitted by law, any claim that such Proceeding is brought in an inconvenient forum.

**7.11** **Entire Agreement**. THIS NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES

IN WITNESS WHEREOF, Borrower has duly executed this Note effective as of the day and year first above written.

COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company

By: Cottingham Management Company, LLC
    Its Manager

By: _____
    Stephen Bick
    Manager

SPB

**Loan Terms.** The repayment terms for the Loans to be made under this Master Promissory Note are as set forth in the following table:

| | Range 1 | Range 2 | Range 3 | Range 4 | Range 5 | Range 6 | Range 7 | Range 8 | Range 9 | Range 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Average Account Purchase Price** | $500 - $1,499 | $1,500 - $2,499 | $2,500 - $3,499 | $3,500 - $4,499 | $4,500 - $5,499 | $5,500 - $6,499 | $6,500 - $7,499 | $7,500 - $8,499 | $8,500 - $9,499 | $9,500 - $40,000 |
| **Interest-Only Period (Months)** | 10 mo. | 10 mo. | 11 mo. | 14 mo. | 18 mo. | 20 Mo. | 22 mo. | 24 mo. | 26 mo. | 27 mo. |
| **Principal Repayment Period (Months)** | 8 mo. | 16 mo. | 24 mo. | 28 mo. | 32 mo. | 48 Mo. | 63 mo. | 72 mo. | 74 mo. | 80 mo. |
| **Total Term (Months)** | 18 | 26 | 35 | 42 | 50 | 68 | 85 | 96 | 100 | 107 |
| **Fixed Interest Rate** | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month |

SPB

## ATTACHMENT B

## APEX TEXAS FUND DESIGNATED BANK ACCOUNT

Bank:                      California Bank & Trust
Branch:                    2141 Palomar Airport Road, Carlsbad, CA 92011
Routing Number:            122232109
Account Number:            2130167251
Name on Account:           Cottingham Apex Texas Fund, LLC

SPB

# EXHIBIT D

# COTTINGHAM APEX TEXAS FUND, LLC

## MASTER PROMISSORY NOTE

in favor of

DICKINSON OF TULSA, INC., a Delaware corporation,

d.b.a Career Point College,

dated as of

December 22, 2015

SPB

# MASTER PROMISSORY NOTE

FOR VALUE RECEIVED, COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company ("Borrower"), hereby promises to pay to the order of DICKINSON OF TULSA, INC., a Delaware corporation, d.b.a Career Point College ("Lender"), in lawful money of the United States of America, all principal sums advanced to Borrower by Lender under this Master Promissory Note ("Loans" defined below) with interest on the outstanding principal amount of each Loan at the Interest Rate (defined below) in accordance with the terms of this Master Promissory Note ("Note").

## ARTICLE 1
## DEFINITIONS

1.1 **Definitions.** For the purpose of this Note, the capitalized words and expressions listed below shall have the following meanings:

"Loan" means a cash payment by Lender to Borrower which, upon receipt, Borrower agrees to repay to Lender, with interest, in accordance with the terms of this Note. Cash payments hereunder by Lender on the same Loan Date shall constitute a single Loan to Borrower. Lender and Borrower contemplate that multiple Loans will be made pursuant to this Note.

"Loan Date" means the date on which Lender makes a Loan to Borrower by making a payment of cash to Borrower by electronic wire transfer in immediately available funds to the bank account designated by Borrower in Attachment B or to such other bank account as may hereafter be designated by Borrower in writing

"ASFG" means American Student Financial Group, Inc., a Delaware corporation.

"Account Purchase Program" means a tuition financing program evidenced by the Program Agreement (defined herein) pursuant to which Lender will extend tuition credit in the form of retail installment sale agreements ("Accounts" defined herein) to students of educational institutions owned and/or operated by Lender and thereafter certain of the Accounts may be purchased by ASFG from Lender.

"Program Agreement" means that certain Account Purchase Program Agreement made as of December 22, 2015 by and between Lender and ASFG, as may subsequently be amended.

"Account" means a retail installment sale agreement entered into between Lender and a student of an educational institution owned and/or operated by Lender.

"Account Purchase" means the purchase from Lender of one or more Accounts by ASFG pursuant to the Program Agreement.

"Purchase Date" means the date that ASFG purchases one or more Accounts from Lender under the Program Agreement by making the required Account Purchase Price (as defined in the Program Agreement) payment(s) to Lender. Lender is required under the terms of the Program Agreement to make a Loan to Borrower on each Purchase Date.

"Average Account Purchase Price" means an average calculated by dividing the total amount of the Account Purchase Price payments received by Lender on the Purchase Date by the number

SPB

of Accounts purchased by ASFG on such Purchase Date. Borrower shall confirm in writing to Lender the amount of the Average Account Purchase Price within ten (10) days following each Purchase Date based on a purchase report to be received from ASFG.

"Anti-Terrorism Law" mean any law relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Person" means an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate or any other entity.

"Term" means the scheduled period over which all principal and interest of a Loan will be repaid. The Term of a Loan will begin on the Loan Date and end on the last payment due date of the Principal Repayment Period.

"Interest-Only Period" means a period of consecutive months during which monthly interest-only payments in the full amount of the accrued interest on the principal balance of the Loan at the Interest Rate shall be due and payable. The first (1st) payment of the Interest-Only Period will be due and payable on the first (1st) day of the second (2nd) month following the month in which the Loan Date occurred and monthly interest-only payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Interest-Only Period. The number of consecutive months of the Interest-Only Period of a Loan is based on the Average Account Purchase Price received by Lender from the sale of Accounts under the Program Agreement on the Purchase Date and determined according to the table in Attachment A to this Note.

"Principal Repayment Period" means a period of consecutive months following the Interest-Only Period during which equal amortized monthly payments of principal and interest shall be due and payable until the Loan is repaid in full. The first (1st) Amortized Payment of the Principal Repayment Period will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment due date of the Interest-Only Period occurred and Amortized Payments will continue to be due on the first (1st) day of each consecutive month thereafter during the Principal Repayment Period. The number of consecutive months of the Principal Repayment Period of a Loan shall be based on the Average Account Purchase Price received by Lender from the sale of Accounts under the Program Agreement on the Purchase Date and determined according to the table in Attachment A to this Note.

"Amortized Payment" means the equal monthly payment of principal and interest due and payable each month during the Principal Repayment Period. The amount of the Amortized Payment will be the amount necessary to fully amortize and repay the principal balance of the Loan in equal installments of principal and interest at the Interest Rate over the number of months of the Principal Repayment Period.

## ARTICLE 2
## PAYMENTS

**2.1    Payment Periods**.  Each Loan under this Note will be repaid by Borrower during an Interest-Only Period immediately followed by a Principal Repayment Period as defined herein.

**2.2    Payments during Interest-Only Period**.    Interest-only payments in the full amount of the accrued interest on the principal balance of each Loan at the Interest Rate shall be due and payable beginning on the first (1st) day of the second (2nd) month following the month in

SPB

which the Loan Date occurred. Interest-only payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Interest-Only Period as determined according to the table in Attachment A.

  **2.3** **Payments during Principal Repayment Period**. The first (1st) Amortized Payment (as defined above) under each Loan will be due and payable on the first (1st) day of the first (1st) month following the month in which the last payment of the Interest-Only Period is due. Monthly Amortized Payments will continue to be due and payable on the first (1st) day of each consecutive month thereafter during the remainder of the Principal Repayment Period as determined according to the table in Attachment A.

  **2.4** **Loan Confirmation Notice**. Within ten (10) days following the Loan Date of each Loan made by Lender to Borrower hereunder, Borrower will provide written confirmation to Lender of the repayment terms of the Loan ("Loan Confirmation Notice") including: (i) the principal amount of the Loan; (ii) the Loan's identifying number assigned by Borrower; (iii) the Average Account Purchase Price pertaining to the Loan: (iv) the Interest Rate and the number of months of the Interest-Only Period and the Principal Repayment Period of the Loan as determined according to Attachment A to the Note; and (v) a Loan repayment and amortization schedule showing the amounts and due dates of the monthly payments due and payable to Lender under the Loan.

  Borrower's Loan Confirmation Notice shall be delivered to Lender in accordance with the notice provisions of this Note. In the event of a discrepancy or conflict between the terms of this Note and the terms of a Loan as stated in a Loan Confirmation Notice, the terms of this Note shall control, unless otherwise agreed in writing by Lender and Borrower. The failure of Borrower to deliver a Loan Confirmation Notice with respect to a Loan shall not relieve it of its obligation to repay the Loan in accordance with the terms of this Note.

  **2.5** **Application of Payments**. Each payment by Borrower under a Loan shall be applied as follows: (i) first, to any accrued interest under the Loan through the date of such payment; (ii) second, to any outstanding late fees or other charges; (iii) then, to the unpaid principal balance of the Loan. Borrower shall reasonably identify the Loan for which each payment is being made to Lender.

  **2.6** **No Setoff**. All payments of any kind due to Lender from Borrower pursuant to this Note shall be made in the full amount due, without setoff, counterclaim, or other defense. All such payments will be free and clear of, and without deduction or withholding for, any present or future taxes. Borrower shall pay any and all costs (administrative or otherwise) imposed by banks, clearing houses, or any other financial institution, in connection with making any payments hereunder, except for any costs assessed by Lender's or ASFG's banking institutions.

  **2.7** **Pre-Payment**. Borrower may prepay any amounts due under any Loan in whole or in part, at any time, or from time to time, without penalty or premium, and interest shall immediately cease to accrue on any amount so prepaid.

**ARTICLE 3**
**INTEREST, CHARGES AND FEES**

  **3.1** **Interest Accrual**. Interest on the principal amount of each Loan will begin to accrue as of the Loan Date and will continue until the principal amount of the Loan is repaid in full. Simple interest will be calculated on the outstanding principal balance each day of the term of the

SPB

Loan at a daily interest rate equal to the annual Interest Rate divided by the actual number of days in the year based on a 365-day year.

**3.2** **Interest Rate.** The Interest Rate over the Term of the each Loan will be a fixed annual rate equal to either the Short-Term Applicable Federal Rate (Table 1 – Annual Compounding) or the Mid-Term Applicable Federal Rate (Table 1 – Annual Compounding) for the month in which the Loan Date occurs as published in a Revenue Ruling each month by the U.S. Internal Revenue Service. The Interest Rate for Loans with a Term of less than three (3) years will be the Short-Term Applicable Federal Rate. Loans with a term longer than three (3) years but not longer than nine (9) years will bear interest at the Mid-Term Applicable Federal Rate. No Loan made under this Note will have a Term longer than nine (9) years.

**3.3** **Savings Provision**. At no time shall Borrower be obligated or required to pay interest on the principal balance of any Loan hereunder at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance a Loan due hereunder at a rate in excess of such maximum rate, the Interest Rate shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**3.4** **Late Charge.** In the event that Lender has not received any installment due under a Loan on or before the date ten (10) days after the date such installment is due and payable, Borrower will be charged, and Borrower hereby agrees to pay to Lender, the lesser of a late charge equal to five percent (5%) of the amount of such installment then due or ten ($10) dollars. Borrower shall be obligated to pay no more than one (1) late charge with respect to any installment.

**3.5** **Returned Payment Fee.** A $15 Returned Payment Fee will be assessed if a payment is dishonored for any reason.

## ARTICLE 4
## DEFAULT

**4.1** **Events of Default**. Each of the following shall constitute an event of default ("Event of Default") under a Loan:

(a)    Borrower fails to make any payment of principal or interest due under the Loan when due and such failure continues uncured for a period of ten (10) days following written notice of such failure given to Borrower according to the notice provisions of this Note;

(b)    Borrower files a petition in bankruptcy or for any form of debtor relief under any present or future law relating to bankruptcy or debtor relief, or such a filing or petition is filed against Borrower, and Borrower either consents to such filing or petition, or such petition is not dismissed within one hundred eighty (180) days after filing;

(c)    Borrower consents to the appointment of or taking possession by a receiver or liquidator of substantially all of its property;

SPB

(d)     Borrower makes an assignment for the benefit of its creditors;

(e)     Borrower winds up, liquidates or dissolves; or

(f)     Borrower conveys, sells, assigns, transfers, or otherwise disposes of, whether voluntarily or involuntarily, all or substantially all of its assets.

4.2     **Waivers**.  Borrower hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind, except for notices expressly provided for in this Note.  No extension of time for payment of this Note or any payment due under any Loan made hereunder, and no alteration, amendment or waiver of any provision of this Note or any Loan made hereunder by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of sums due under this Note and any Loan made under this Note.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note.

4.3     **Default and Acceleration**.  At the option of the holder of this Note, the entire unpaid principal balance of, and all accrued interest on, a Loan made under this Note shall immediately become due and payable upon the occurrence at any time of any one or more Event of Default.

## ARTICLE 5
## COVENANTS OF BORROWER

5.1     **Borrower's Covenants**. Borrower covenants to Lender that Borrower shall comply with all the following covenants:

5.1.1     **Use of Proceeds**.  Borrower shall use the proceeds of the Loans hereunder for any legitimate investment purpose as further defined in the Operating Agreement of the Borrower.

5.1.2     **Statements**.  Borrower shall deliver to Lender, within ten (10) days following the end of each calendar month, a statement detailing the principal balance and accrued interest of each Loan made under this Note.

## ARTICLE 6
## REPRESENTATIONS

6.1     **Borrower's Representations**.  Borrower represents and warrants to Lender as follows:

6.1.1     **Authority**.  Borrower has full power, authority and legal right to execute and deliver this Note.

6.1.2     **Enforceability of Documents**.  This Note and Borrower's obligations to repay the Loans hereunder, are legal, valid and binding obligations of Borrower and, to the best of Borrower's knowledge, are not subject to any right of rescission, setoff, counterclaim or defense, including the defense of usury.

SPB

**6.1.3** <u>Litigation</u>. There are no actions, suits or proceedings pending naming Borrower, or, to the best of Borrower's knowledge, threatened against or affecting Borrower or its assets in any court, at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality that, in each instance, might materially and adversely affect the ability of Borrower to perform its obligations under this Note.

**6.1.4** <u>Investment Adviser Status of Manager.</u> Borrower's sole member and manager is Cottingham Management Company, LLC, a California limited liability company ("Cottingham Management"). Cottingham Management is a California state licensed registered investment adviser in good standing the California Department of Corporations and all other regulatory agencies having jurisdiction over such matters.

**6.2** <u>Lender's Representations, Covenants and Warranties</u>. Lender represents, warrants and covenants that (i) Lender is not in violation of, and will not violate, any Anti-Terrorism Law, (ii) Lender does not and will not knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, and (iii) Lender is not in violation of, and will not violate, any rules or regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury or any successor governmental authority.

# ARTICLE 7
# GENERAL PROVISIONS

**7.1** <u>Costs of Collection</u>. If any attorney is engaged by Lender: (a) to collect upon Borrower's obligations hereunder, whether or not legal proceedings are thereafter instituted by Lender; (b) to represent Lender in any Borrower bankruptcy, reorganization, receivership or other proceedings affecting Lender's creditors' rights in the Note and involving a claim under this Note; (c) to represent Lender in any other proceedings whatsoever in connection with this Note, including post judgment proceedings to enforce any judgment related thereto; or (d) in connection with seeking an out-of-court workout or settlement of any of the foregoing, then Borrower shall pay to Lender all reasonable costs, attorneys' fees and expenses in connection therewith, in addition to all other amounts due hereunder.

**7.2** <u>Amendment</u>. This Note or the terms of any Loan made hereunder may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender or Borrower, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**7.3** <u>Replacement Note</u>. Upon notice from Lender to Borrower of the theft, destruction or mutilation of this Note and, upon receipt of indemnity reasonably satisfactory to Borrower from Lender (except that if the Lender initially named herein is the holder of this Note, an indemnification from the Lender initially named herein shall be sufficient) or, in the case of mutilation hereof, upon surrender of the mutilated Note, Borrower will make and deliver a new note of like tenor in lieu of this Note.

**7.4** <u>Rights of Holders</u>. Every legal holder of this Note shall have and may exercise all of the rights and powers given to Lender in this Note.

SPB

7.5 **Construction**. Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors, and administrators.

7.6 **Assignment**. Lender, at any time and without the consent of Borrower may grant participations in or sell, transfer, assign and convey all or any part, of its right, title and interest in this Note.

7.7 **Time of Essence**. Time is of the essence of this Note and of each and every obligation of Borrower hereunder.

7.8 **Severability**. In case any of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

7.9 **Notice**. Any notice or other communication required or permitted to be given pursuant to this Note ("Communications") shall be in writing and shall be deemed to have been duly given as follows: (i) upon actual delivery evidenced by written confirmation of receipt after deposit in the United States mail, postage prepaid, certified or registered mail (return receipt requested and received); or (ii) upon actual delivery by a courier service providing written confirmation of delivery; or (iii) by email, upon receipt by the sender of acknowledgement of receipt of the electronic transmission by the recipient. In each case, any such notice, request, demand or other communication shall be addressed or sent to the parties at the following addresses or such other addresses or numbers as provided by a party to the other by written notice from time to time:

| If to Lender: | If to Borrower: |
|---|---|
| Dickinson of Tulsa, Inc. | Cottingham Apex Texas Fund, LLC |
| 3138 S. Garnett | c/o Cottingham Management Company, LLC |
| Tulsa, OK 74146 | 2382 Faraday Avenue, Suite 250 |
| Attention: Lawrence D. Earle, CEO | Carlsbad, CA 92008 |
| Email: lldearle@aol.com with copy to | Attention: Legal Department |
| mbelongia@duanemorris.com | Email: notice@cottinghammanagementco.com |

**Both Lender and Borrower expressly consent to the delivery of communications and notices by e-mail and certify that they possess the means of accepting and acknowledging delivery by e-mail.**

7.10 **Governing Law, Jurisdiction and Venue**. This Note shall be deemed to have been made and performed in the State of California, and the validity, construction, performance, breach, and effect of this Note shall be interpreted and construed pursuant to the laws of the State of California without regard to principles governing conflict of laws. Lender irrevocably (i) submits to the jurisdiction of the United States District Court located in San Diego, California for the purpose of any suit, action, or other proceeding arising out of this Note (each, a "Proceeding"), or if the District Court does not have jurisdiction over the matter, any California state court located in San Diego, California; (ii) agrees that all Proceedings relating to this Note shall be heard and determined in such courts, (iii) waives, to the fullest extent permitted by law, any immunity from jurisdiction of such courts or from any legal process therein, (iv) agrees not to commence any Proceeding other than in such courts; and (v) waives, to the fullest extent permitted by law, any claim that such Proceeding is brought in an inconvenient forum.

SPB

**7.11**    __Entire Agreement__.    THIS NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES

IN WITNESS WHEREOF, Borrower has duly executed this Note effective as of the day and year first above written.

COTTINGHAM APEX TEXAS FUND, LLC, a California limited liability company

By: Cottingham Management Company, LLC
    Its Manager

By: _____
    Stephen Bick
    Manager

SPB

## ATTACHMENT A

**Loan Terms.** The repayment terms for the Loans to be made under this Master Promissory Note are as set forth in the following table:

| | Range 1 | Range 2 | Range 3 | Range 4 | Range 5 | Range 6 | Range 7 | Range 8 | Range 9 | Range 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Average Account Purchase Price** | $500 - $1,499 | $1,500 - $2,499 | $2,500 - $3,499 | $3,500 - $4,499 | $4,500 - $5,499 | $5,500 - $6,499 | $6,500 - $7,499 | $7,500 - $8,499 | $8,500 - $9,499 | $9,500 - $40,000 |
| **Interest-Only Period (Months)** | 10 mo. | 10 mo. | 11 mo. | 14 mo. | 18 mo. | 20 Mo. | 22 mo. | 24 mo. | 26 mo. | 27 mo. |
| **Principal Repayment Period (Months)** | 8 mo. | 16 mo. | 24 mo. | 28 mo. | 32 mo. | 48 Mo. | 63 mo. | 72 mo. | 74 mo. | 80 mo. |
| **Total Term (Months)** | 18 | 26 | 35 | 42 | 50 | 68 | 85 | 96 | 100 | 107 |
| **Fixed Interest Rate** | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Short-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month | Mid-Term AFR in Loan Date Month |

SPB

ATTACHMENT B

APEX TEXAS FUND DESIGNATED BANK ACCOUNT

| | |
|---|---|
| Bank: | California Bank & Trust |
| Branch: | 2141 Palomar Airport Road, Carlsbad, CA 92011 |
| Routing Number: | 122232109 |
| Account Number: | 2130167251 |
| Name on Account: | Cottingham Apex Texas Fund, LLC |

SPB

# EXHIBIT E

# COTTINGHAM 544 TRANSFERS

| Description | Date | Cottingham Apex Texas Fund |
|---|---|---|
| Cottinghan Apex | 6/12/2013 | $23,406.00 |
| Cottingham Apex | 6/26/2013 | $136,944.00 |
| Cottingham Apex | 7/25/2013 | $75,323.54 |
| Cottingham Apex | 8/28/2013 | $313,357.75 |
| Cottingham Apex | 9/25/2013 | $50,295.00 |
| Cottingham Apex | 10/23/2013 | $99,345.36 |
| Cottingham Apex | 11/27/2013 | $138,864.00 |
| Cottingham Apex | 12/26/2013 | $56,580.50 |
| Cottingham Apex | 1/22/2014 | $126,582.00 |
| Cottingham Apex | 2/26/2014 | $36,418.00 |
| Cottingham Apex | 3/26/2014 | $261,745.50 |
| Cottingham Apex | 4/23/2014 | $210,721.00 |
| Cottingham Apex | 5/28/2014 | $113,085.50 |
| Cottingham Apex | 6/25/2014 | $516,958.00 |
| Cottingham Apex | 7/23/2014 | $75,835.50 |
| Cottingham Apex | 8/27/2014 | $153,111.50 |
| Cottingham Apex | 9/24/2014 | $246,522.92 |
| Cottingham Apex | 10/22/2014 | $147,820.00 |
| Cottingham Apex | 10/23/2014 | $50,000.00 |
| Cottingham Apex | 11/26/2014 | $177,814.50 |
| Cottingham Apex | 12/24/2014 | $232,811.00 |
| Cottingham Apex | 1/28/2015 | $320,675.00 |
| Cottingham Apex | 2/25/2015 | $112,774.00 |
| Cottingham Apex | 3/25/2015 | $185,862.50 |
| Cottingham Apex | 4/22/2015 | $154,715.50 |
| Cottingham Apex | 5/27/2015 | $170,620.50 |
| Cottingham Apex | 6/24/2015 | $167,300.50 |
| Cottingham Apex | 7/22/2015 | $251,662.85 |
| Cottingham Apex | 8/26/2015 | $198,575.00 |
| Cottingham Apex | 9/23/2015 | $215,802.71 |
| Cottingham Apex | 10/28/2015 | $106,706.00 |
| Cottingham Apex | 11/25/2015 | $342,549.00 |
| Cottingham Apex | 12/23/2015 | $384,075.50 |
| Cottingham Apex | 1/27/2016 | $108,930.50 |
| Cottingham Apex | 2/24/2016 | $718,243.50 |
| Cottingham Apex | 3/23/2016 | $105,511.00 |
| Cottingham Apex | 4/27/2016 | $60,665.00 |
| Cottingham Apex | 5/25/2016 | $346,775.50 |
| Cottingham Apex | 6/22/2016 | $98,335.00 |
| Cottingham Apex | 7/27/2016 | $128,718.50 |
| Cottingham Apex | 8/24/2016 | $634,973.00 |
| Cottinghan Apex | 9/28/2016 | $388,109.00 |
| **Total** | | **$8,445,121.63** |

# EXHIBIT F

**COTTINGHAM 548 TRANSFERS**

| Description | Date | Cottingham Apex Texas Fund |
|---|---|---|
| Cottinghan Apex | 11/26/2014 | $177,814.50 |
| Cottinghan Apex | 12/24/2014 | $232,811.00 |
| Cottinghan Apex | 1/28/2015 | $320,675.00 |
| Cottinghan Apex | 2/25/2015 | $112,774.00 |
| Cottinghan Apex | 3/25/2015 | $185,862.50 |
| Cottinghan Apex | 4/22/2015 | $154,715.50 |
| Cottinghan Apex | 5/27/2015 | $170,620.50 |
| Cottinghan Apex | 6/24/2015 | $167,300.50 |
| Cottinghan Apex | 7/22/2015 | $251,662.85 |
| Cottinghan Apex | 8/26/2015 | $198,575.00 |
| Cottinghan Apex | 9/23/2015 | $215,802.71 |
| Cottinghan Apex | 10/28/2015 | $106,706.00 |
| Cottinghan Apex | 11/25/2015 | $342,549.00 |
| Cottinghan Apex | 12/23/2015 | $384,075.50 |
| Cottinghan Apex | 1/27/2016 | $108,930.50 |
| Cottinghan Apex | 2/24/2016 | $718,243.50 |
| Cottinghan Apex | 3/23/2016 | $105,511.00 |
| Cottinghan Apex | 4/27/2016 | $60,665.00 |
| Cottinghan Apex | 5/25/2016 | $346,775.50 |
| Cottinghan Apex | 6/22/2016 | $98,335.00 |
| Cottinghan Apex | 7/27/2016 | $128,718.50 |
| Cottinghan Apex | 8/24/2016 | $634,973.00 |
| Cottinghan Apex | 9/28/2016 | $388,109.00 |
| **Total** | | **$5,612,205.56** |

# EXHIBIT G

**ASFG 544 TRANSFERS**

| Description | Date | ASFG |
|---|---|---|
| ASFG | 7/11/2013 | $1,350.00 |
| ASFG | 7/11/2013 | $6,075.00 |
| ASFG | 7/25/2013 | $3,345.00 |
| ASFG | 8/28/2013 | $12,810.00 |
| ASFG | 8/28/2013 | $25,094.00 |
| ASFG | 8/28/2013 | $14,695.00 |
| ASFG | 9/18/2013 | $11,313.00 |
| ASFG | 9/25/2013 | $3,550.00 |
| ASFG | 9/30/2013 | $47,173.24 |
| ASFG | 10/4/2013 | $9,911.47 |
| ASFG | 10/8/2013 | $12,933.46 |
| ASFG | 11/13/2013 | $567.00 |
| ASFG | 11/19/2013 | $5,714.48 |
| ASFG | 11/21/2013 | $6,034.00 |
| ASFG | 11/27/2013 | $5,560.00 |
| ASFG | 11/27/2013 | $64,983.61 |
| ASFG | 12/3/2013 | $427.00 |
| ASFG | 12/4/2013 | $3,501.00 |
| ASFG | 12/26/2013 | $2,415.00 |
| ASFG | 1/17/2014 | $19,552.95 |
| ASFG | 2/10/2014 | $14,091.19 |
| ASFG | 2/21/2014 | $44,995.73 |
| ASFG | 2/26/2014 | $1,390.00 |
| ASFG | 3/21/2014 | $9,811.76 |
| ASFG | 3/26/2014 | $8,410.00 |
| ASFG | 3/26/2014 | $113,668.18 |
| ASFG | 4/9/2014 | $8,935.22 |
| ASFG | 4/23/2014 | $8,220.00 |
| ASFG | 4/23/2014 | $868.00 |
| ASFG | 4/23/2014 | $13,521.21 |
| ASFG | 5/28/2014 | $4,090.00 |
| ASFG | 5/28/2014 | $53,672.48 |
| ASFG | 6/25/2014 | $19,990.00 |
| ASFG | 7/2/2014 | $96,173.14 |
| ASFG | 7/16/2014 | $57,085.99 |
| ASFG | 7/23/2014 | $2,575.00 |
| ASFG | 8/4/2014 | $62,757.23 |
| ASFG | 8/27/2014 | $5,855.00 |
| ASFG | 8/27/2014 | $38,809.81 |
| ASFG | 9/19/2014 | $118,595.75 |
| ASFG | 9/24/2014 | $10,435.00 |
| ASFG | 9/25/2014 | $125,855.12 |
| ASFG | 10/14/2014 | $1,077.00 |
| ASFG | 10/22/2014 | $8,030.00 |

## ASFG 544 TRANSFERS

| Description | Date | ASFG |
|---|---|---|
| ASFG | 11/13/2014 | $105,010.72 |
| ASFG | 11/26/2014 | $5,679.00 |
| ASFG | 12/14/2014 | $259,687.99 |
| ASFG | 12/24/2014 | $7,621.97 |
| ASFG | 1/26/2015 | $235,601.72 |
| ASFG | 1/28/2015 | $5,906.13 |
| ASFG | 1/28/2015 | $9,895.00 |
| ASFG | 2/25/2015 | $3,360.00 |
| ASFG | 3/4/2015 | $159,864.00 |
| ASFG | 3/4/2015 | $15,419.98 |
| ASFG | 3/11/2015 | $12,236.03 |
| ASFG | 3/11/2015 | $3,568.54 |
| ASFG | 3/25/2015 | $5,305.00 |
| ASFG | 3/25/2015 | $201,516.97 |
| ASFG | 4/22/2015 | $4,615.00 |
| ASFG | 4/23/2015 | $11,131.53 |
| ASFG | 5/12/2015 | $200,000.00 |
| ASFG | 5/15/2015 | $12,809.09 |
| ASFG | 5/15/2015 | $4,262.16 |
| ASFG | 5/27/2015 | $5,035.00 |
| ASFG | 7/8/2015 | $4,252.55 |
| ASFG | 7/16/2015 | $310,478.52 |
| ASFG | 7/22/2015 | $225,596.87 |
| ASFG | 8/24/2015 | $53,243.69 |
| ASFG | 9/23/2015 | $173,132.50 |
| ASFG | 10/20/2015 | $100,105.99 |
| ASFG | 11/25/2015 | $325,590.43 |
| ASFG | 12/29/2015 | $126,347.30 |
| ASFG | 1/29/2016 | $100,282.91 |
| ASFG | 2/29/2016 | $40,417.56 |
| ASFG | 3/11/2016 | $70,065.22 |
| ASFG | 3/29/2016 | $8,308.51 |
| ASFG | 4/4/2016 | $88,211.09 |
| ASFG | 4/27/2016 | $41,561.17 |
| ASFG | 4/29/2016 | $99,244.85 |
| ASFG | 5/17/2016 | $500.00 |
| ASFG | 6/6/2016 | $84,143.36 |
| ASFG | 7/1/2016 | $131,647.31 |
| ASFG | 7/28/2016 | $83,144.30 |
| ASFG | 8/1/2016 | $16,075.26 |
| ASFG | 8/1/2016 | $140,000.00 |
| ASFG | 8/2/2016 | $8,856.27 |
| ASFG | 8/4/2016 | $6,650.00 |
| ASFG | 8/11/2016 | $10,281.98 |

## ASFG 544 TRANSFERS

| Description | Date | ASFG |
|---|---|---|
| ASFG | 8/24/2016 | $142,852.70 |
| ASFG | 8/31/2016 | $78,468.36 |
| ASFG | 8/31/2016 | $7,271.28 |
| ASFG | 9/15/2016 | $11,369.00 |
| ASFG | 9/16/2016 | $151.00 |
| ASFG | 9/16/2016 | $1,025.00 |
| ASFG | 9/16/2016 | $177,708.63 |
| ASFG | 9/19/2016 | $1,000.00 |
| ASFG | 9/30/2016 | $147,606.90 |
| **Total** | | **$5,170,034.36** |

# EXHIBIT H

## ASFG 548 TRANSFERS

| Description | Date | ASFG |
|---|---|---|
| ASFG | 11/13/2014 | $105,010.72 |
| ASFG | 11/26/2014 | $5,679.00 |
| ASFG | 12/14/2014 | $259,687.99 |
| ASFG | 12/24/2014 | $7,621.97 |
| ASFG | 1/26/2015 | $235,601.72 |
| ASFG | 1/28/2015 | $5,906.13 |
| ASFG | 1/28/2015 | $9,895.00 |
| ASFG | 2/25/2015 | $3,360.00 |
| ASFG | 3/4/2015 | $159,864.00 |
| ASFG | 3/4/2015 | $15,419.98 |
| ASFG | 3/11/2015 | $12,236.03 |
| ASFG | 3/11/2015 | $3,568.54 |
| ASFG | 3/25/2015 | $5,305.00 |
| ASFG | 3/25/2015 | $201,516.97 |
| ASFG | 4/22/2015 | $4,615.00 |
| ASFG | 4/23/2015 | $11,131.53 |
| ASFG | 5/12/2015 | $200,000.00 |
| ASFG | 5/15/2015 | $12,809.09 |
| ASFG | 5/15/2015 | $4,262.16 |
| ASFG | 5/27/2015 | $5,035.00 |
| ASFG | 7/8/2015 | $4,252.55 |
| ASFG | 7/16/2015 | $310,478.52 |
| ASFG | 7/22/2015 | $225,596.87 |
| ASFG | 8/24/2015 | $53,243.69 |
| ASFG | 9/23/2015 | $173,132.50 |
| ASFG | 10/20/2015 | $100,105.99 |
| ASFG | 11/25/2015 | $325,590.43 |
| ASFG | 12/29/2015 | $126,347.30 |
| ASFG | 1/29/2016 | $100,282.91 |
| ASFG | 2/29/2016 | $40,417.56 |
| ASFG | 3/11/2016 | $70,065.22 |
| ASFG | 3/29/2016 | $8,308.51 |
| ASFG | 4/4/2016 | $88,211.09 |
| ASFG | 4/27/2016 | $41,561.17 |
| ASFG | 4/29/2016 | $99,244.85 |
| ASFG | 5/17/2016 | $500.00 |
| ASFG | 6/6/2016 | $84,143.36 |
| ASFG | 7/1/2016 | $131,647.31 |
| ASFG | 7/28/2016 | $83,144.30 |
| ASFG | 8/1/2016 | $16,075.26 |
| ASFG | 8/1/2016 | $140,000.00 |
| ASFG | 8/2/2016 | $8,856.27 |
| ASFG | 8/4/2016 | $6,650.00 |
| ASFG | 8/11/2016 | $10,281.98 |

## ASFG 548 TRANSFERS

| Description | Date | ASFG |
|---|---|---|
| ASFG | 8/24/2016 | $142,852.70 |
| ASFG | 8/31/2016 | $78,468.36 |
| ASFG | 8/31/2016 | $7,271.28 |
| ASFG | 9/15/2016 | $11,369.00 |
| ASFG | 9/16/2016 | $151.00 |
| ASFG | 9/16/2016 | $1,025.00 |
| ASFG | 9/16/2016 | $177,708.63 |
| ASFG | 9/19/2016 | $1,000.00 |
| ASFG | 9/30/2016 | $147,606.90 |
| **Total** | | **$4,084,116.34** |

# EXHIBIT I

## ASFG PREFERENTIAL TRANSFERS

| Description | Date | ASFG |
|---|---|---|
| ASFG | 8/2/2016 | $8,856.27 |
| ASFG | 8/4/2016 | $6,650.00 |
| ASFG | 8/11/2016 | $10,281.98 |
| ASFG | 8/24/2016 | $142,852.70 |
| ASFG | 8/31/2016 | $78,468.36 |
| ASFG | 8/31/2016 | $7,271.28 |
| ASFG | 9/15/2016 | $11,369.00 |
| ASFG | 9/16/2016 | $151.00 |
| ASFG | 9/16/2016 | $1,025.00 |
| ASFG | 9/16/2016 | $177,708.63 |
| ASFG | 9/19/2016 | $1,000.00 |
| ASFG | 9/30/2016 | $147,606.90 |
| **Total** | | **$593,241.12** |