

**Signed June 23, 2020.**

_____

**Ronald B. King**
**Chief United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DICKINSON OF SAN ANTONIO, INC., | § | CASE NO. 16-52492-RBK |
| | § | |
| DEBTOR | § | CHAPTER 7 |
| _____ | § | |
| | § | |
| JOHN PATRICK LOWE, CHAPTER 7 | § | |
| TRUSTEE, | § | |
| PLAINTIFF | § | |
| V. | § | ADVERSARY NO. 18-05259-RBK |
| | § | |
| AMERICAN STUDENT FINANCIAL GROUP, | § | |
| INC., _ET AL._, | § | |
| DEFENDANTS | § | |

## OPINION

### I.     Introduction and Brief History

Dickinson of San Antonio, Inc., d/b/a Career Point College (CPC or Debtor), was a for-profit college that derived a significant portion of its revenue from federal student loans and grants. American Student Financial Group, Inc. (ASFG) entered into a complicated transaction with CPC

1

through its principal, Lawrence Earle, which provided a private source of student loan funding to CPC's students. This transaction was designed to allow CPC to skirt the Department of Education's 90/10 rule and claim more money from federal sources than it otherwise would have been able to receive. After self-reporting its non-compliance to the Department of Education, CPC filed for bankruptcy under chapter 11 and soon thereafter converted to chapter 7.

John Patrick Lowe, trustee for the chapter 7 estate (the Trustee), sued ASFG, Cottingham Management Company LLC, Cottingham Apex Texas Fund, LLC (Cottingham-Texas), and Tango Delta Financial, Inc. (the new name under which the principals of ASFG now operate). The complaint was later amended with a sprawling 29-count Second Amended Complaint. Through the live complaint, the Trustee demands repayment of over $8 million in Program Subsidy Loans (PSLs) made by Debtor to Cottingham-Texas, and in turn lent back to ASFG by Cottingham-Texas. In addition, the Trustee seeks to disallow the over $12 million claim of ASFG, which is based on Debtor's contractual obligations to repurchase individual student loans when a student defaulted, or to repurchase all outstanding loans if Debtor materially breached the contracts. The Trustee also claims that the $5.1 million Debtor paid to ASFG under these loan-repurchase obligations constitutes a fraudulent transfer which ASFG must return to the estate.

After a number of dispositive motions and hearings, the case went to a five-day trial involving nearly a hundred exhibits and recorded deposition testimony from Defendants' principals. The Court previously granted partial summary judgment for the Trustee on Counts 1 through 3. The Court will render judgment in favor of the Trustee on most of the remaining counts.

## II.    Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This matter arises under the Bankruptcy Code in a bankruptcy case referred to this Court by the

Standing Order of Reference in this district. This matter is a core proceeding under § 157(b)(2)(B), (F), (H), (K), and (O). Venue is proper under §§ 1408 and 1409. The Court has authority to enter a final judgment under § 157(b)(1) and the parties consented to entry of a final judgment by the bankruptcy court. ECF No. 240 at ¶ 3. This Opinion will constitute the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052, along with the oral findings and conclusions of the Court stated on the record following the close of the evidence.

III.    **Findings of Fact**

A.  Background

The Debtor filed its chapter 11 bankruptcy petition on October 31, 2016. The case was converted to chapter 7 on January 11, 2017. The plaintiff in this adversary proceeding is John Patrick Lowe, who was appointed as the Trustee upon the conversion of this case to chapter 7.

*1. The Parties*

Dickinson of San Antonio, Inc. was a Kansas corporation that did business under the name Career Point College. CPC was the 100% owner of Dickinson of Tulsa, Inc. and Dickinson of Austin, Inc. CPC was a wholly owned subsidiary of Edudyne Systems, Inc. ("Edudyne"), which was in turn owned by its principal, Lawrence Earle. CPC was allegedly the alter ego of Edudyne.[1] CPC operated a private for-profit college which had nursing, business, and technical programs.

ASFG is a Delaware corporation. On or about December 28, 2016, ASFG changed its name to Tango Delta Financial, Inc. ASFG was in the business of making loans to college students that were guaranteed at least in part by the schools attended by the students. ASFG had four contracts

---

[1] Agreed Judgment, Adv. Proc. No. 18-05014-RBK, ECF No. 8. This finding is based on an agreed judgment against Lawrence Earle. Defendants argue that they are not bound by this finding via res judicata or otherwise. The Trustee requests this finding, but it does not appear to be necessary to the causes of action in this adversary proceeding.

with CPC which spanned from 2013 until petition date. ASFG is owned by Mr. Tim Duoos and was managed by Mr. Kevin Jasper, a lawyer.

Cottingham Management is a California limited liability company and a registered investment advisor. Cottingham-Texas is a California limited liability company that was formed on or about April 25, 2013. ASFG paid $1,422.00 for the formation of Cottingham-Texas. Mr. Stephen Bick is the manager of Cottingham Management, which in turn is the manager of Cottingham-Texas. The Cottingham-Texas Operating Agreement provides that Cottingham Management, the sole manager and member of Cottingham-Texas, will make an initial $10,000 capital contribution to Cottingham-Texas. This capital contribution was never made.

### 2.  The 90/10 Rule

To obtain Title IV funding from the United States Department of Education (DOE), for-profit colleges such as CPC must comply with the Higher Education Act's 90/10 rule codified at 20 U.S.C. § 1094. *See Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1055 (11th Cir. 2015). The 90/10 rule provides that at least 10% of a private for-profit school's funding must come from non-government sources, such as private student loan lenders like ASFG. *See* 20 U.S.C. § 1094(a)(24). The statute requires that the school annually submit a form certifying its compliance with the 90/10 rule with its audited financial statements. The 90/10 calculation must be done using cash-basis accounting. 20 U.S.C. § 1094(d)(1). The statute also provides that any funds "required to be refunded or returned" to the lender must be deducted from the school's "10" revenue calculation. *Id.* § (d)(1)(F)(iv). Cindy Shoffstall, C.P.A., was CPC's accountant and generated audited financial reports which detailed CPC's compliance with the 90/10 rule. In doing so, Ms. Shofstall calculated in the Higher Education Act reports that CPC was in compliance with the 90/10 rule through June 30, 2015.

4

### 3. Development of ASFG's Loan Program

Since 2003, ASFG has been in the business of developing and implementing tuition financing programs for post-secondary schools. ASFG offered loans for students to finance tuition and related educational expenses funded by ASFG, banks, licensed lenders, or by the school itself. ASFG subsequently purchased the student loans made by other originating lenders and held the loans for investment purposes. The for-profit schools with which ASFG did business were required to provide some kind of collateral or guaranty of the loans that ASFG would make to the school's students. The principals of ASFG, Mr. Timothy Duoos and Mr. Kevin Jasper, were familiar with the workings of the 90/10 rule.

ASFG's student loan program for private for-profit schools traditionally included: (1) originating student loans that required the for-profit college to provide collateral to secure repurchase obligations in the event that a student defaulted on a loan; (2) originating student loans and requiring the for-profit college to place a percentage of the funds received as a deposit with ASFG (the "Deposit Program"); or (3) originating student loans and requiring the for-profit college to deposit a percentage of the funds with a third-party bank which would then issue a letter of credit to ASFG (the "Letter of Credit Program").

In 2012, ASFG developed a new (fourth) lending program wherein ASFG would lend money to a for-profit school's students and the for-profit school would deposit some percentage of the funds received with an alleged third-party investment fund ("Subsidized Loan Program"). The new lending program offered by ASFG was described in a loan document between ASFG and its own lender, California Bank & Trust. The loan agreement, dated June 1, 2012, detailed the entire transaction, including that the investment fund would lend the money received from the

private for-profit schools back to ASFG. The original third-party investment fund was Cottingham Apex Fund, LLC, a wholly owned subsidiary of Cottingham Management, LLC.

Under ASFG's original Deposit Program, a financially prudent for-profit college could not count the amount deposited with ASFG towards its ten percent of private funding under the 90/10 rule. Under the Letter of Credit Program, however, the for-profit school could count its revenue towards the 90/10 rule, but the costs of lending for ASFG were much higher than other programs because it involved a third-party bank.

For the funds advanced through the Subsidized Loan Program to be counted as "10" revenue in compliance with the 90/10 Rule, the investment fund (in this case, Cottingham-Texas) was required to be arms-length and truly independent from ASFG. In order to comply with the statute, the private student loan money could not be returned to the lender, ASFG, and also counted as "10" revenue. For-profit schools operating under this Program could only count the funds loaned to Cottingham-Texas as "10" revenue if Cottingham-Texas invested that money at arm's length with banks, investment houses, or any investment other than ASFG.

B. The Contracts: TLPA and APPA

In early 2013, representatives from ASFG approached CPC about providing private student loans to CPC's students under ASFG's new Subsidized Loan Program. During the negotiation process, ASFG's then chief operating officer Kevin Jasper explained to CPC's attorney that CPC would be required to lend 50% of the student loan proceeds to the Cottingham entity pursuant to the terms of a Master Promissory Note. During the negotiations, CPC's attorney requested that a new entity, Cottingham-Texas, be formed specifically for CPC's participation in the investment fund program. CPC's principal, Lawrence Earle, knew that the investment fund would subsequently transfer the money to ASFG.

6

    *1. The TLPA*

    As a result of the negotiations, CPC, Edudyne Systems, Inc., and ASFG agreed to implement a Subsidized Loan Program and entered into a Tuition Loan Program Agreement (the "TLPA") on April 25, 2013, under which a tuition loan financing program would provide student loans to CPC's students. The arrangement followed the description in the California Bank & Trust loan agreement and was to function as follows: ASFG would forward student loan proceeds to CPC to cover students' tuition obligations; CPC would then immediately forward 50% of the student loan proceeds to Cottingham-Texas; Cottingham-Texas would return every dollar received from CPC to ASFG. Unlike the California Bank & Trust loan agreement, nothing in the TLPA or the Master Promissory note disclosed or documented the final leg of the transaction from Cottingham-Texas to ASFG. Cottingham-Texas was not a party to the TLPA.

    Section 5.2 of the TLPA provides that the term "Program Subsidy Investment" "means a series of cash payments by [CPC] to [Cottingham-Texas], which, upon receipt, [Cottingham-Texas] shall agree to repay to [CPC] with interest in accordance with the terms of the Master Promissory Note attached hereto . . . Each cash payment by [CPC] to [Cottingham-Texas] will be considered a separate 'Program Subsidy Loan' ("PSL") that will be repaid by [Cottingham-Texas] in accordance with the terms of the Master Promissory Note." Other than the MPNs themselves, there are no documents evidencing the individual Program Subsidy Loans made by CPC to Cottingham-Texas.

    Pursuant to section 7.1 of the TLPA, CPC was obligated to purchase tuition loans owned by ASFG if certain events occurred including, without limitation, (i) if the student borrower became delinquent in making payments under the tuition loan, (ii) if the interest rate of a tuition loan was reduced, or (iii) in the event of a program default. Pursuant to section 11 of the TLPA,

7

CPC granted ASFG a security interest in the Master Promissory Notes payable to CPC by Cottingham-Texas.

The TLPA contains the following representation, warranty, and covenant:

15.1 Representations, Warranties and Covenants of ASFG. As of the Effective Date, and as of the date ASFG sells and conveys each Defaulted Loan, Interest Reduced Loan and Designated Loan to Client hereunder, ASFG represents, warrants and covenants to Client as follows: . . .

15.1.7 Neither Investment Fund nor its manager, Cottingham Management, LLC, are, directly or indirectly, related to or affiliated with ASFG by any common legal or beneficial ownership, common management personnel, or in any other manner. There are no common owners (directly or indirectly), officers, directors, principals or managers between ASFG on one side, and Investment Fund and its manager on the other side. ASFG is an obligor to an affiliated company of Cottingham Management, LLC, under a debt instrument issued by ASFG.

Section 1.1.1 of the TLPA defines as follows:

"Affiliated" means, with respect to any specified party, any other entity controlling or controlled by or under common control with such specified party. For the purposes of this definition, the term "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") means the power to direct or cause the direction of the management and policies of such entity.

Section 22 of the TLPA provides that, "[i]n the event any action is brought for enforcement or interpretation of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred."

On or about April 25, 2013, contemporaneously with the execution of the TLPA, CPC endorsed, assigned, and transferred the 2013 Master Promissory Note to ASFG by executing that certain Endorsement, Assignment and Pledge of Promissory Note (the "2013 Endorsement"). The 2013 Endorsement was physically attached to the 2013 Master Promissory Note. ASFG or its lender have been in continuous possession of the 2013 Master Promissory Note since it was received on or about April 25, 2013.

### 2.  The APPAs

Sometime in 2015, the for-profit school regulatory environment changed and caused a change in the way ASFG and CPC did business. Instead of ASFG issuing a loan to a student and documenting it as such, CPC would enter into a Retail Installment Contract ("RIC") with its student and sell the RIC to ASFG at face value. The other economic terms of the arrangements stayed the same.

Specifically, on or about December 22, 2015, ASFG and CPC entered into the Account Program Purchase Agreement (the "San Antonio APPA") pursuant to which ASFG agreed to purchase and CPC agreed to sell certain RICs ("Accounts") entered into between CPC and one or more student borrowers. Contemporaneously with the execution of the San Antonio APPA, Cottingham-Texas signed the Master Promissory Note as provided in the San Antonio APPA (the "2015 Master Promissory Note"). A separate APPA was executed between ASFG and Dickinson of Austin, Inc. and between ASFG and Dickinson of Tulsa, Inc.

The representation, warranty, and covenant language is different in the APPAs from the language in the TLPA. The APPAs contained the following representations and warranties:

> 15.1 Representations, Warranties and Covenants of ASFG. As of the Effective Date, ASFG make the following representations, warranties and covenants:
> 15.1.6 Neither Investment Fund nor its manager, Cottingham Management, LLC, are, directly or indirectly, related to, or affiliated with, ASFG by any common legal or beneficial ownership or common management personnel. There are no common owners (directly or indirectly), officers, directors, principals or managers between ASFG on one side, and Investment Fund and its manager on the other side.

### 3.  Comparing the Contracts

The TLPA representation, warranty, and covenant in section 15.1 and 15.1.7 is much broader than that in the APPAs. Specifically, the "in any other manner" language does not appear in section 15.1.6 of the APPAs. Additionally, the last sentence of section 15.1.7 of the TLPA has been removed. The removed sentence reads "ASFG is an obligor to an affiliated company of

Cottingham Management, LLC, under a debt instrument issued by ASFG." Finally, the APPAs do not require ASFG to reaffirm to CPC the representation, warranty, and covenant in section 15.1.6 each time that ASFG puts a defaulted RIC to CPC. Under the TLPA and the APPAs, ASFG had the right to "put" defaulted student loans or RICs back to CPC for purchase. In the TLPA, CPC's covenant to repurchase is section 7.1. In the APPAs, CPC's covenant to repurchase is also in section 7.1.

Both CPC's principal, Lawrence Earle, and ASFG actively concealed that the payments to Cottingham-Texas were merely deposits placed with ASFG to secure its lending to CPC's students; in fact, Ms. Shoffstall testified that Mr. Earle told her that ASFG and Cottingham-Texas were completely unrelated and had no dealings with one another. Neither the TLPA nor the APPAs fully disclosed the relationship between ASFG, Cottingham Management, and Cottingham-Texas. Similar to the TLPA discussed above, in the San Antonio APPA, CPC granted ASFG a security interest in all PSLs made by CPC to Cottingham-Texas pursuant to Section 11 of the San Antonio APPA, with the same collateral description.

C. <u>Conduct of the Parties under the Contracts</u>

During the period between April 2013 and CPC's October 31, 2016 bankruptcy petition, ASFG transferred $16,800,000 to CPC in order to satisfy the tuition obligations of ASFG's student borrowers. Of this amount, CPC transferred $8.4 million to Cottingham-Texas. Cottingham-Texas returned the entire $8.4 million to ASFG in exchange for 49 subordinated unsecured promissory notes ("SUPNs"). The amounts and payment terms of the money sent by CPC to Cottingham-Texas and the 49 SUPNs were substantially the same, except that the interest rate on the 49 ASFG Loans was 20 basis points (0.2%) higher than the PSLs. The 20 basis points represented Cottingham-Texas's spread on the ASFG Loans.

10

There was no mechanism to credit or offset the Program Subsidy Loans paid to Cottingham-Texas against the amount Debtor owed to ASFG for a purchase or a cancellation of a student loan or RIC. To illustrate the point mathematically, ASFG's filed proof of claim is for $11,749,564.00. Fifty percent of that amount—or the amount of PSLs one would expect were paid to Cottingham-Texas—is $5,874,782.00. Rather than $5.8 million, the amount Cottingham-Texas owed to the Debtor was $8.2 million. ASFG thus has $2.4 million more than it should under the TLPA and APPAs ($8.2 million - $5.8 million = $2.4 million).

From November 20, 2013 until September 30, 2016, ASFG put back defaulted loans to CPC for repurchase in the total amount of $3,689,600.30. CPC purchased the loans at full value, notwithstanding the fact that ASFG already had 50% of the balances on defaulted loans that it had received from Cottingham-Texas in the amount of $1,844,800.15.

1. *The Role and Conduct of Cottingham-Texas*

Black's Law Dictionary defines "straw man" as "[a] third party used . . . as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible." *Straw Man*, BLACK'S LAW DICTIONARY (9th ed. 2009). Cottingham-Texas was a straw man because it was used by Cottingham Management and ASFG to do something otherwise impermissible—to help ASFG and CPC skirt the 90/10 Rule. Stephen Bick testified that the new lending program was functionally the same as the Deposit Program, only with Cottingham-Texas inserted as a "conduit" in order to the help the schools with their 90/10 rule compliance.

The monies received by Cottingham-Texas from CPC were returned directly to ASFG. Cottingham-Texas never had sufficient cash on hand to satisfy its obligations to CPC under the MPNs. ASFG was in control of the cash flow of Cottingham-Texas during the entirety of the relevant period. ASFG controlled Cottingham-Texas's investment policies. The unwritten

11

agreement was that Cottingham-Texas would only "invest" its monies with ASFG. According to Stephen Bick, "that was the deal." No other alternative was ever considered. The Operating Agreement of Cottingham-Texas, which was entered into on May 1, 2013, provided that it would be capitalized with $10,000.00. Cottingham-Texas was never capitalized after it was formed on or about April 25, 2013. Cottingham-Texas never received any funds from anyone other than CPC beyond the initial reimbursement of its formation fee of $1,422.00 from ASFG.

2. *Impact on 90/10 Rule Compliance*

According to the Trustee's expert forensic accountant, Greg Murray, after deducting the Program Subsidy Loans made to Cottingham-Texas by CPC from the 90/10 calculation, CPC was not in compliance with the 90/10 rule for the fiscal year starting on July 1, 2014 and ending on June 30, 2015. CPC's audit for 2016 was never completed. Ms. Shoffstall, CPC's CPA auditor responsible for completing the 90/10 calculations, was misled by Mr. Earle about the relationship between ASFG and Cottingham-Texas. She testified she would not have included CPC's investment in Cottingham-Texas in the 90/10 calculation had she been informed about the lending relationship between ASFG and Cottingham; she would have included it in the related party note in her audit of CPC. ASFG received copies of the debtor's annual audits which included the 90/10 calculations and were reviewed by Mr. Jasper and Mr. Duoos.

ASFG was required to reaffirm the representation and warranty contained in section 15.1.7 of the TLPA to CPC before ASFG could enforce the mutually dependent covenant in Section 7 and 8 for the repurchase of Designated Loans. From November 2013 until September 2016, there were 32 repurchases of defaulted loans by CPC in the amount of $3,689,600.30. The TLPA is clear that CPC was obligated to repurchase from ASFG Designated Loans only after ASFG met the requirements of TLPA Section 15.1.7. Thus, CPC was not obligated to repurchase from ASFG if:

1) Cottingham-Texas was under the control of ASFG for affiliate status under the definition of "Affiliated" in Section 1.1.1 of the TLPA; or 2) Cottingham-Texas was "directly or indirectly, related to . . . ASFG by any common legal or beneficial ownership, common management personnel, *or in any other manner*." From June 2013 until September 2016, there were 49 SUPNs between ASFG and Cottingham-Texas evidencing a debt owing from ASFG to Cottingham-Texas in the amount of $8,415,243.09.

Although the requirements of Section 15.1.7 were met at the inception of the TLPA because there was no initial relationship between ASFG and Cottingham-Texas, and Cottingham Management's other affiliate obligor relationship was disclosed, the requirements of Section 15.1.7 were not and could not have been met at the date of each reaffirmation thereafter. Logically, CPC would only have to repurchase a Designated Loan after ASFG had made a loan to a student and delivered those proceeds to CPC. CPC then in turn lent half of those monies to Cottingham-Texas, which returned those same monies to ASFG, which created the debtor/creditor and affiliate (control) relationship between Cottingham-Texas and ASFG. Therefore, the lending relationship between ASFG and Cottingham-Texas was in existence at the time of the first repurchase and reaffirmation on November 10, 2013, and on the date of each reaffirmation and repurchase thereafter. As evidenced by the 49 SUPNs, ASFG and Cottingham-Texas' lending relationship continued until the petition date and thereafter until today.

The TLPA and APPAs stipulate that the contracts are governed by California law. Section 150 of the California Corporations Code provides that "[a] corporation is an 'affiliate' of, or a corporation is 'affiliated' with, another specified corporation if it directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the other specified corporation." CAL. CORP. CODE § 150. The definition of "affiliate" in the TLPA is

13

consistent with California law. The APPAs do not contain this definition. As is obvious from Cottingham-Texas actions and inactions, ASFG completely controlled Cottingham-Texas's investment policy and all of its assets. No payments were made by ASFG to Cottingham-Texas post-petition, and Cottingham-Texas made no demand on ASFG for payment on the 49 SUPNs. Cottingham-Texas did nothing to collect or enforce the 49 SUPNs and did not approach the Court to seek guidance on what to do in order not to violate the automatic stay. Cottingham-Texas strictly followed ASFG's direction. Cottingham-Texas was under the control of and an affiliate of ASFG at all material times. In fact, despite their alleged debtor-creditor relationship, Cottingham-Texas was represented during this proceeding by the same counsel that represented ASFG.

The contractual provisions in the TLPA and APPAs are material to the agreement between CPC and ASFG. To comply with the DOE's 90/10 rule, Cottingham-Texas was required to be an independent investment fund. If Cottingham-Texas was not independent, then CPC would not be in compliance with the DOE's 90/10 rule, as the 50% sent via Cottingham-Texas to ASFG would simply be a return of ASFG's funds and a deposit to ASFG. Ms. Shofstall agreed when she testified that the revenue associated with the Cottingham Notes should not have been included in the "10 revenue" portion of the 90/10 calculation.

### 3. *Conduct Leading Up to Debtor's Failure*

In September of 2016, Mr. Earle self-reported to the Department of Education that CPC had prematurely drawn down approximately $20,000,000 of student loans over the preceding years. The DOE placed CPC on heightened monitoring and cut off its ability to draw down the proceeds of federally backed student loans. The Department of Education was a creditor of Debtor's estate dating back to 2014. The DOE filed a proof of claim in Debtor's bankruptcy case in the amount of $16,582,033.00. Claim No. 400. The law firm of Ogletree Deakins Nash Smoak

14

& Stewart, P.C. was also a creditor of the estate since as early as March 12, 2013, a month before the TLPA was executed. *See* Claim No. 17-1, at 9.[2]

Mr. Earle reported the material change in CPC's financial condition to ASFG by the accrual of approximately $20,000,000.00 in unearned revenue as a liability. The material change in CPC's financial condition was as a result of fraud. During September of 2016, Mr. Jasper, Mr. Duoos, and Mr. Bick traveled to San Antonio and met with Mr. Earle. Mr. Jasper reviewed the assets CPC had available to pledge for a loan including the Emily Buck Foundation. Mr. Jasper described the assets in the Emily Buck Foundation as "junk."[3] ASFG proceeded over the next month to declare a series of loan repurchases and program defaults by the Debtor.

Throughout October of 2016 and leading up to CPC's bankruptcy filing, CPC received numerous letters from ASFG demanding payment under the TLPA and APPAs. On October 20, 2016, Mr. Jasper sent a letter to Cottingham-Texas and Mr. Earle in which Mr. Jasper made a demand on behalf of ASFG that Cottingham-Texas should make all future payments to ASFG rather than to Debtor until ASFG had been paid in the amount of $67,942.56. On October 25, Mr. Jasper sent a similar letter, this time demanding to be paid by Cottingham-Texas in lieu of CPC until the past-due amount of $73,562.61 was paid in full. Cottingham-Texas complied with ASFG's demand without question.

The day after petition date, November 1, 2016, Joanne Cannone, an employee of ASFG who managed the financial books and records of the company, reminded Stephen Bick of Cottingham-Texas to pay ASFG rather than the Debtor. Accordingly, that same day, Mr. Bick sent ASFG a check in the amount of $62,843.28. Prior to this diversion of funds, neither ASFG nor

---

[2] The Court takes judicial notice of the proof of claim and that Ogletree Deakins was a creditor at the time the TLPA was signed. FED. R. EVID. 201(c).

[3] Mr. Murray, expert witness for the Trustee, also testified that the Emily Buck Foundation assets were worthless.

Cottingham-Texas approached the court seeking relief from the stay to obtain an offset or credit with the Debtor. ASFG did file a Motion for Relief from stay three years later in 2019, which was denied.

### D. Insolvency

When examining Debtor's assets on the books since 2012, millions of dollars—a significant chunk of Debtor's stated assets—are in receivables tied to the "Emily Buck Fund." Greg Murray, expert witness for the Trustee, testified that the Emily Buck Fund receivables were essentially worthless. Mr. Jasper, one of the principals of ASFG, testified that the receivables were "junk." These receivables were listed on Debtor's balance sheets to make it appear more profitable in a series of inter-company transfers Greg Murray described as "Enron accounting." After adjusting assets to exclude worthless inter-company transfers, Debtor's liabilities exceeded its assets every year from 2012 through 2016, usually by millions of dollars. The parent company, Edudyne, had negative equity for each year in that period as well.

### E. ASFG's Proof of Claim

ASFG's proof of claim alleges that the Debtor owed ASFG a total of $11,749,564.00, almost exclusively arising from the Debtor's failure to honor the repurchase covenants in the TLPA and APPA. ASFG asserts that the Debtor owes it $9,227,828.09 under the TLPA for the purchase of Designated Loans and $2,494,146.98 under the APPAs for the purchase of Designated Accounts. ASFG did not transfer any of the RICs or Student Loans back to the Debtor pursuant to the TLPA or the APPAs when the Program Defaults and final repurchases were due. Instead, ASFG continued to collect payments from students in the amount of at least $1,023,198.78 through June 31, 2019. ASFG's adjusted damages calculation reflects these collection efforts.

Because Cottingham-Texas was an undercapitalized shell entity without any cash or viable assets and, because the Cottingham-Texas investment funds could not, by design, be used to credit or offset the amount owed to ASFG, these investment funds were valueless to CPC. The Cottingham-Texas transactions lacked economic substance and value for the Debtor.

## IV.    Analysis and Conclusions of Law by Count

### A.    Counts 1 through 3: Notes from Cottingham-Texas to Debtor

The Court granted summary judgment on Counts 1, 2, and 3 against Cottingham-Texas and in favor of the Trustee. *See* ECF No. 62. The Court found that Debtor was the owner of four Master Promissory Notes (2013 MPN, 2015 MPN, Austin MPN, Tulsa MPN), that Cottingham-Texas had breached each MPN, and that Cottingham-Texas was liable to the Trustee for $8,236,787.40 plus interests, costs, and fees. Rejecting ASFG's argument to the contrary, the Court held that the Trustee had standing to enforce the MPNs despite ASFG's purported "assigned" interest in the MPNs.

On appeal, the district court affirmed most of this Court's findings and conclusions, vacating only to the extent that this Court's order granted attorney's fees on appeal that were not expressly conditioned on success on appeal. *See* ECF No. 286, at 5–12 (finding that this Court's entry of summary judgment against Cottingham-Texas was proper); 12–14 (discussing the appeal-fee issue); 14–16 (dismissing Appellants' other arguments, including an adequate-protection argument raised for the first time on appeal). In a footnote, the district court "note[d] its own confusion as to why ASFG" was presenting this appeal at all "[e]ven though Counts 1, 2, and 3 are against Cottingham-Texas alone." *Id.* at 7–8. The footnote also questioned (1) why ASFG and Cottingham-Texas "would present the same arguments and be represented by the same counsel" despite having potentially adverse and incompatible positions, and (2) "how Cottingham-Texas

17

could benefit from the argument that it owes $8.2-plus million to ASFG rather than to the Trustee, absent additional agreements between Cottingham-Texas and ASFG that would lead ASFG to not seek to collect on those sums owed and payable under the MPNs." *Id.*

Importantly, the district court rejected ASFG's full-assignment theory of the Program Subsidy Loans through a close reading of the TLPA and the APPA: at best, Debtor "assigned to ASFG a security interest in the MPNs that does not affect the Debtor's right to enforce against Cottingham-Texas." *Id.* at 10. In other words, Debtor did not assign the whole "bundle of sticks" of the MPNs in some unlimited, unqualified transfer; the transfer to ASFG was just a security interest. ASFG's rights in the MPNs are therefore limited, both by the language of its contracts with Debtor and by UCC Article 9 more generally—rather than by Article 3. *See id.* at 10 (specifically discussing and disposing of ASFG's Article 3-based argument).

The Court has found—and the district court has affirmed—that the promissory notes are valid and enforceable and that Cottingham-Texas breached its obligation to pay. A finding that the MPNs between Cottingham-Texas and CPC are fraudulent transfers would be inconsistent with leaving the summary judgment in place. The prior partial summary judgment also belies an alter ego theory for the same reason. The Court reaffirms the granting of relief under Counts 1, 2, and 3.

B. Count 4: Turnover

The Trustee moves for turnover under § 542 of approximately $2.46 million from Cottingham-Texas, which represents the amount Cottingham-Texas owed under the 4 MPNs between the petition date and January 2019, because Cottingham-Texas made no payments to Debtor during the case. *See* 2d Am. Compl. ¶¶ 135–41 (ECF No. 226). This Court already granted judgment in favor of the Trustee on the MPNs/Program Subsidy Loans in their entirety against

18

Cottingham-Texas—about $8.2 million. Defendants argue this renders the turnover action moot, and that Trustee is not entitled to "double recovery." *See* Def.'s Post-Trial Br., at 18 (ECF No. 303). Defendants also claim Cottingham-Texas does not currently have any property of the estate which could be subject to turnover. *Id.*

To the extent the Trustee seeks to recover funds already included in the judgment, such a remedy is unnecessary. While the Trustee would be entitled to a turnover of whatever estate funds Cottingham-Texas has in its possession, it does not have any such funds, and the Trustee already has a judgment against Cottingham-Texas which includes this amount.

C.  Count 5: Declaratory Judgment on Alter Ego

The Trustee seeks a declaratory judgment under 28 U.S.C. § 2201 that (1) Cottingham-Texas is the "alter ego, extension, and instrumentality" of both ASFG and Cottingham Management; and (2) ASFG and Cottingham Management are liable for the debts of Cottingham-Texas. See 2d Am. Compl. ¶¶ 143–46. Defendants argue that California Limited Liability Company law controls and that (1) Cottingham Management, as member of Cottingham-Texas, is not liable for the debts of the LLC it owns; and (2) the Trustee has not met his burden under California law to show that Cottingham-Texas is an alter ego of either entity. Def.'s Post-Trial Br., at 18–20. Because ASFG is not an owner of Cottingham-Texas, it cannot be found to have "unity of ownership" with Cottingham-Texas and therefore alter ego cannot apply. *Id.* at 20.

Some factors do support a finding of alter ego as to ASFG: arguably commingled funds, use of one as a mere shell or conduit for the affairs of the other, and inadequate capitalization. *See Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538–39 (Cal. Ct. App. 2000). In addition, the Trustee presented evidence that ASFG paid the LLC filing fees for Cottingham-Texas, although this is not one of the listed factors. The same factors, plus a unity of ownership,

19

generally apply as to Cottingham Management. Regardless, a finding of alter ego is an extraordinary remedy, and it is not clear what benefit the estate would gain from this avenue of relief over others. The Trustee can collect on the judgment against Cottingham-Texas by garnishing ASFG's receivables. In addition, a declaratory judgment that the Trustee can collect from these two entities on debts owed by Cottingham-Texas does not address the larger-ticket item—Debtor's repurchase obligation to ASFG.

The Trustee did not meet its burden to show that Cottingham-Texas was the alter ego of the other entities, despite evidence to suggest that it was an entity designed to help both entities facilitate a fourth party's (namely, CPC) circumvention of federal regulations. Because an alter ego finding would be inconsistent with the partial summary judgment, it will not be granted.

### D.  Counts 6 through 8: Breach of Contract and Warranty (TLPA and APPA)

The Trustee claims ASFG breached the TLPA and APPAs because the representation and warranty that ASFG and Cottingham-Texas were not "affiliated" was false. Under TLPA's internal definition of "affiliated," as well as the broad "in any other manner" language of the representation itself, the control-and-credit relationship between ASFG and Cottingham-Texas makes this provision false. As for the more tightly drafted APPAs, the Trustee alleges that ASFG's relationship with Cottingham-Texas was one of "control," and the representation is false even though the broader language of the TLPA is absent. The Trustee argues that the breach was material because it put Debtor out of compliance with the 90/10 rule.

ASFG argues that the representation is true, because the representation specifically discloses the credit relationship between ASFG and Cottingham-Texas and ASFG did not control Cottingham-Texas. Alternatively, if the representation was false, it did not constitute breach of contract because no specific language in the contract says that a false representation by ASFG

constitutes breach, even though a false representation by Debtor would be a breach. ASFG further claims that even if the false representation was a breach of the agreements, the breach was not material.

Both parties agree that Debtor did not pay the repurchase obligations and offers no excuse for nonperformance. "A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." ***Miles v. Deutsche Bank Nat'l Tr. Co.***, 236 Cal. App. 4th 394, 402 (Cal. App. 2015). Generally, a suit for breach of contract requires a showing that the party bringing suit did not itself breach the contract; in other words, a breach by plaintiff ends the inquiry as to breach by defendant. *Id.*; *see also* ***Chen v. Thomas & Betts Corp.***, 268 F. App'x 508, 511 (9th Cir. 2008) ("We need not reach the issues of [defendant]'s alleged breach or [plaintiff]'s purported damages because the district court's finding with respect to [plaintiff]'s non-performance is a sufficient basis for affirming its judgment as to the breach of contract claim.").

Both parties to the TLPA and APPAs did not meet their obligations under the contracts. Debtor arguably breached the contracts both by self-reporting to the DOE and by nonpayment; and ASFG breached by making representations which were not true because ASFG controlled and was "affiliated" with Cottingham-Texas and did not deliver "put" student loans back to Debtor. A finding of liability for breach of contract or warranty is not necessary, however, to find that ASFG is liable to the Trustee under a fraudulent-transfer theory for the money received under the contracts. Because the Trustee is entitled to only one satisfaction, the Court declines to award breach of contract relief.

E. Count 9: Common-Law Fraud

The Trustee claims that ASFG's false representation that it was not "affiliated" with Cottingham-Texas was fraudulent in that it induced Debtor to execute the TLPA and APPAs; had Debtor known the two entities were affiliated, it would not have entered into the contract.

Whether or not the representation was false, the fraud claim fails on a separate element: reliance. It is clear from the testimony of each party to the transaction—other than Lawrence Earle, who did not testify—that Earle was informed of the structure of the transaction and the purpose and function of Cottingham-Texas as a pass-through entity. Earle was in the loop: he entered into these agreements with knowledge of how the system was supposed to work, whether or not that knowledge was reduced to writing in the form of a true representation in the contracts. From the beginning, Lawrence Earle, on behalf of the Debtor, was in on the scheme; the Trustee has not shown that Earle would not have entered into the contract had he known how it was structured. The fraud claim will be denied.

F. Count 10 and 11: Violations of Securities Laws

The Trustee claims ASFG, Cottingham Management, and Cottingham-Texas violated federal and state securities laws by failing to disclose that ASFG, not Cottingham-Texas, would ultimately receive the funds Debtor lent Cottingham-Texas under the MPNs. ASFG presents five main arguments: the MPNs are not a security; the Trustee presented no evidence that the MPNs were securities; under Texas and California law, the MPNs are excepted from securities laws; no misrepresentations were made; and the statute of limitations has run for federal, California, and Texas securities law claims.

The MPNs are not securities. Under the *Howey* test, whether an instrument is a security depends on "whether the scheme involves an investment of money in a common enterprise with

22

profits to come solely from the efforts of others." ***S.E.C. v. Howey Co.***, 328 U.S. 293, 301 (1946). A common enterprise "may be established by showing 'that the fortunes of the investors are linked with those of the promoters,'" such as by a profit-sharing arrangement. ***S.E.C. v. R.G. Reynolds Enterprises, Inc.***, 952 F.2d 1125, 1130 (9th Cir. 1991). An expectation of profits produced by the efforts of others exists when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." ***S.E.C. v. Glenn W. Turner Enterprises, Inc.***, 474 F.2d 476, 482 (9th Cir. 1973). Here, none of the success of the notes depended on Cottingham-Texas's or ASFG's "success"; on their face, they depended on Debtor's performance of the repurchase obligation. The MPNs were structured as a business loan back to the primary lender, not as a security, bond, or investment contract.

The MPNs are not securities under Texas securities law and also qualify for an exception under Texas securities law. When reading the statute generally, the Texas Supreme Court uses the *Howey* test for the definition of "security." *See* ***Life Partners, Inc. v. Arnold***, 464 S.W.3d 660, 681 (Tex. 2015); ***Searsy v. Commercial Trading Corp.***, 560 S.W.2d 637, 640–42 (Tex. 1977). But Article 581-5 also provides an exception for sales of securities to less than 35 persons. *See* TEX. REV. CIV. STAT. ANN. art. 581-5. Even if they were a security under Texas law, this exception applies. The MPNs were not issued publicly and were given only to Dickinson entities (San Antonio, Tulsa, and Austin); clearly less than 35 holders in total.

The California exception that applies is different: it specifically excepts debts not sold to the public. "Any offer or sale of any evidence of indebtedness, whether secured or unsecured, and any guarantee thereof, in a transaction not involving any public offering" is exempted from California's blue-sky laws. CAL. CORP. CODE § 25102(e). This "offering" was not public, but was

23

directed only at the Dickinson entities. California's blue-sky laws therefore except the MPNs. Because there were no securities involved in these transactions, it is unnecessary to discuss the statute of limitations issue. Relief will be denied under Counts 10 and 11.

G.  Count 12: Equitable Subordination

The Trustee claims that ASFG's secured claim should be equitably subordinated to share *pari passu* with the general unsecured creditor class; effectively, the Trustee is using equitable subordination as an alternative method to avoid ASFG's lien. ASFG argues that no "inequitable conduct" occurred and that none of its conduct harmed creditors or yielded an unfair advantage.

The Fifth Circuit employs a three-element test for equitable subordination: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." ***Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)***, 926 F.2d 1458, 1464–65 (5th Cir. 1991) (citing ***Benjamin v. Diamond (In re Mobile Steel Co.)***, 563 F.2d 692, 700 (5th Cir. 1977)). The Trustee bears the initial burden of showing that equitable subordination is appropriate; once that is established, Defendants bear the burden to show the good faith and fairness of their conduct. *See id.* at 1465.

The Trustee has shown inequitable conduct and unfair advantage obtained by ASFG. Not only did ASFG breach its representation that it was not affiliated with Cottingham-Texas, which indirectly caused Debtor to fall out of compliance with the 90/10 rule, it did not keep Cottingham-Texas solvent and diverted funds from Debtor as it approached bankruptcy. In addition, ASFG held onto millions of dollars in cash—proceeds of the Program Subsidy Loans and loan repurchase obligations—yielding a nearly 150% recovery on defaulted student loans, and on the whole

24

program once it declared a Program Default. Its inflation of its own claim via the Program Subsidy Loans and circumvention of the 90/10 rule resulted in injury to creditors, particularly the Department of Education, with a $16.5 million claim, and other unsecured creditors. *Cf. Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 361–62 (5th Cir. 2008) (no injury to creditors proven). This conduct also put ASFG in an unfairly advantageous position: it was secured in virtually all receivables of Debtor, namely the MPNs, and used that secured status to inflate its claim and collect what little value remained in the estate. Equitable subordination would not be inconsistent with other provisions of the Bankruptcy Code and the creditors were harmed. *Id.*

Despite their best efforts, Defendants have not shown that they operated in good faith; quite the opposite. The principals knew that this program would put them in a more secure position than other creditors and allow Debtor to evade DOE regulations—even if only temporarily. Because the Trustee has met his burden and Defendants have not met theirs, the Trustee is entitled to equitable subordination, with two significant caveats. First, the claim should only be subordinated to the extent it is allowed, which means that if the claim is disallowed under § 502(d), the claim is not subordinated. Second, the claim is subordinated, if at all, only to the extent necessary to prevent harm to other creditors. In this case, that means returning the lien to the estate under § 510(c)(2) and allowing ASFG's claim as a general unsecured claim, but only if the claim is allowed.

H. Count 13: Avoidance of Lien under § 544

The Trustee articulates two separate bases for avoiding ASFG's lien on the MPNs. In the Second Amended Complaint, the Trustee alleges that the security interest ASFG claims to have is in the Program Subsidy Loans, which "do not actually exist." While the description of collateral in the TLPA, APPAs, and UCC-1 leaves some possible room for argument, the contention is not well taken. The Program Subsidy Loans were the individual transfers of money under the MPNs,

25

and being secured in the MPNs is what counts—ASFG does not need separate security interests in each individual advance under the MPNs.

The second theory, which is clearer from the Trustee's trial briefing, is that the lien should be avoided under § 544(b)(1) because ASFG's underlying claim should be disallowed under § 502(d)—which in turn relies on a finding that ASFG has not paid back to the estate the proceeds of a fraudulent transfer under TUFTA or some other chapter 5 cause of action. The Court finds that the lien should be avoided under § 544(b)(1).

I.  Counts 14 through 18: Fraudulent Transfer Claims against Cottingham-Texas

A fraudulent-transfer finding against Cottingham-Texas would be inconsistent with the summary judgment on the Master Promissory Notes, which was affirmed on appeal. Relief under Counts 14 through 18 will be denied.

J.  Counts 19 through 23: Fraudulent Transfer Claims against ASFG

The Trustee brings five separate fraudulent transfer claims against ASFG: two under § 548 and three under the Texas Uniform Fraudulent Transfer Act (TUFTA), recoverable under § 544(b). *See* TEX. BUS. & COM. CODE § 24.001 et seq.; 11 U.S.C. § 544(b)(1) (enabling trustee to avoid transfers of property of the estate that are "voidable under applicable law"). The § 548 claims have a two-year lookback from the petition date. 11 U.S.C. § 548(a)(1). Each of the TUFTA claims have a four-year lookback but require some "triggering creditor" existing at the time of the transfer (or, in the case of TUFTA § 24.005, future creditors with claims arising a reasonable time after the transfer). *See* TEX. BUS. & COM. CODE §§ 24.005–006. Two causes of action, TUFTA § 24.005(a)(1) and Bankruptcy Code § 548(a)(1)(A), require a showing of "actual intent to hinder, delay, or defraud" creditors. *See* TEX. BUS. & COM. CODE § 24.005(a)(1); 11 U.S.C. § 548(a)(1)(A); ***Galaz v. Galaz (In re Galaz)***, 850 F.3d 800, 804–05 (5th Cir. 2017) (affirming

26

lower court's finding of fraudulent transfer under TUFTA § 24.005 based on actual intent). Two causes of action, § 548(a)(1)(B) and TUFTA § 24.006, require a showing that Debtor was insolvent at the time of the transaction, became insolvent as a result of the transaction, or in the case of § 548(a)(1)(B), "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."[4] The same causes of action require a showing that Debtor did not receive reasonably equivalent value for the transfer.

All five claims are based on sums Debtor paid ASFG to repurchase defaulted student loans which ASFG "put" back to Debtor over the course of the transaction, between November 2013 and October 31, 2016 when Debtor filed for bankruptcy. Because the § 548 claims have only a two-year lookback, the Trustee seeks relief based only on payments made between October 31, 2014 and the petition date. These transactions total $4,084,116.34. *See* 2d Am. Compl. ¶ 236. The TUFTA claims have a four-year lookback, which encompasses the entire life of the transaction, or $5,170,034.36 in repurchase payments. *See id.* ¶ 248.

The Trustee is entitled to judgment on four of the five fraudulent-transfer theories. The Trustee is entitled to only one satisfaction, however. The relief granted is supported by alternative rationales for awarding the Trustee $5,170,034.36, because he has met his burden under each of four separate tests. As to the § 548 claims, the Trustee would be entitled to a judgment for $4,084,116.34, the amount of repurchase transactions that happened within two years before the petition date. That amount is included in, rather than in addition to, the $5,170,034.36 award.

### 1. *Section 24.006*

Texas Business and Commerce Code § 24.006 covers transfers fraudulent as to creditors that existed at the time of the transaction. To sustain this claim, the Trustee must show (1) at least

---

[4] This excludes special provisions covering transfers to insiders, because no party alleges or presents evidence that ASFG is an insider of the Debtor.

one creditor's claim arose before the transfer; (2) the property was transferred for less than reasonably equivalent value; and (3) Debtor "was insolvent at the time of the transfer, or was rendered insolvent as a result of the transfer." ***In re Wren Alexander Investments, LLC***, 2011 WL 748131, at *6 (Bankr. W.D. Tex. Feb. 23, 2011), *aff'd*, 530 F. App'x 302 (5th Cir. 2013); *see also* ***Wyly v. Wyly (In re Wyly)***, 607 B.R. 862, 873 (Bankr. N.D. Tex 2018).

### a.  Triggering Creditor

At the time the TLPA was executed and through the life of the transaction, Ogletree Deakins (Claim No. 17) was a creditor of Debtor. Ogletree Deakins's claim is the same amount or greater than it was when the TLPA was executed. The Court takes judicial notice of the claim. In addition, the entire scheme was an effort to defraud the federal government—specifically, the DOE—which was a creditor when the transaction took place as well. *See **Wyly***, 607 B.R. at 873 (holding that the IRS was a creditor before a fraudulent transfer occurred, even though IRS did not assess the taxes until later); ***Wren Alexander Investments***, 2011 WL 748131, at *6 (same); *see also **Guffy v. Brown (In re Brown Medical Center, Inc.)***, 552 B.R. 165, 170 (S.D. Tex. 2016) (plaintiff stated claim under § 24.006 where it identified the United States as a creditor existing at the time the transaction occurred). Even if the federal government were not a creditor at the time the transactions in question occurred, this element would nonetheless be satisfied because the Trustee can bring this claim on behalf of any creditor and Ogletree Deakins was a creditor at the time. *See* 11 U.S.C. § 544. Because Ogletree Deakins was a creditor through the life of the transaction, this element is satisfied; it is also satisfied as to the Trustee's claims under § 24.005.

### b.  Less than Reasonably Equivalent Value

Reasonably equivalent value requires "a transfer or obligation that is within the range of values for which the transferor would have sold the assets at an arm's length transaction." TEX.

BUS. & COM. CODE § 24.004(d). "Value in an allegedly fraudulent transfer is determined" by focusing "'on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors.'" *Wren Alexander Investments*, 2011 WL 748131, at *6 (quoting *Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 644 (5th Cir. 2000)). The reasonably equivalent value inquiry requires courts to "'examine all the circumstances surrounding a transaction, looking to whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return.'" *Milbank v. Sharpshooter II, Inc. (In re Worldwide Diamond Ventures, LP)*, 559 B.R. 143, 150 (Bankr. N.D. Tex. 2016) (quoting *Bowman v. El Paso CGP Co.*, 431 S.W.3d 781, 788 (Tex. App.—Houston [14th] 2014, pet. denied)). The most "salient issue is whether the estate lost value." *Id.* (quoting *In re IFS Fin. Corp.*, 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009), *aff'd*, 669 F.3d 255 (5th Cir. 2012)).

In this case, it is helpful to think of the repurchase obligation in the context of the larger transaction. For each loan that defaulted, Debtor had already paid ASFG through Cottingham-Texas at least half the value of the loan, then was obligated to pay full price for the defaulted loan before receiving the loan or triggering any repayment obligation by ASFG. To make matters worse, Debtor's right to repayment of the deposit was pledged as collateral for the repurchase obligation. Essentially, a defaulted loan yields a 150% recovery for ASFG, which retained no risk for the defaulted loan but *did* retain the cash Debtor lent back to it through Cottingham-Texas. Each loan repurchase transaction was, in the context of the overarching scheme, for far less than reasonably equivalent value. *See Worldwide Diamond Ventures*, 559 B.R. at 151 (finding that debtors did not receive reasonably equivalent value where debtor overpaid for a diamond which later sold at auction for a much lower price).

29

Even as to each individual loan repurchase, the purchase was not for reasonably equivalent value; the student had already defaulted, discounting the value of the loan considerably, yet Debtor was obligated to pay full price. *See id.* Worse, Debtor was required to pay full price for all outstanding repurchase obligations before receiving any of the loans it was purportedly repurchasing. Finally, ASFG already had half of the student loan proceeds. However the Court frames the transaction, Debtor did not receive reasonably equivalent value for the funds it paid to ASFG. Trustee has satisfied this element as to all claims that require a showing that Debtor did not receive reasonably equivalent value.

### c. Debtor was insolvent at the time of the transfers

"Under both Texas law and the Bankruptcy Code, a debtor is insolvent if the sum of its liabilities is greater than the sum of its assets at a fair valuation." ***Indiana Bell Telephone Co., Inc. v. Lovelady (In re Lovelady)***, 2007 WL 4754174, at *1 (W.D. Tex. Mar. 19, 2007) (citing TEX. BUS. & COM. CODE § 24.003(a); 11 U.S.C. § 101(32)); *see also **Osherow v. Nelson Hensley & Consolidated Fund Mgmt., L.L.C (In re Pace)***, 456 B.R. 253, 273 (Bankr. W.D. Tex. 2011). In making an insolvency determination, courts may discount assets and liabilities that were contingent at the time the transfer was made based on how likely the contingent event was to occur, including by "consider[ing] events subsequent to challenged transfers." ***Ingalls v. SMTC Corp. (In re SMTC Mfg. of Texas)***, 421 B.R. 251, 289 (Bankr. W.D. Tex. 2009) (collecting cases).

When examining Debtor's assets since 2012, millions of dollars—a significant chunk of Debtor's stated assets—are in receivables tied to the "Emily Buck Fund." Greg Murray, expert witness for Trustee, testified that the Emily Buck Fund receivables were essentially worthless. Mr. Jasper, one of the principals of ASFG, testified that the receivables were "junk." These receivables were adjusted on Debtor's balance sheets to make it appear solvent in a series of inter-company

entries and accounts receivable Greg Murray described as "Enron accounting." After adjusting

assets to exclude worthless receivables and inter-company transfers, Debtor's liabilities exceeded

its assets every year from 2012 through 2016, usually by millions of dollars. Debtor was insolvent

when the TLPA was signed and when each repurchase transfer was made; accordingly, the Trustee

has satisfied this element as to all claims that require a showing that Debtor was insolvent at the

time the transfer was made. Because all elements of § 24.006 are satisfied, the Trustee is entitled

to judgment under this section in the amount of $5,170,034.36, the amount of the puts paid to

ASFG.

### 2.  *Section 24.005(a)(2)*

This section has two of the same elements as § 24.006: Debtor did not receive reasonably

equivalent value for the payments, and at least one creditor had a claim at the time the transfer was

made. TEX. BUS. & COM. CODE § 24.005(a)(2). As explained above, both elements have been

satisfied.

The additional element is that "the debtor (A) was engaged or was about to engage in a

business or a transaction for which the remaining assets of the debtor were unreasonably small in

relation to the business or transaction; or (B) intended to incur, or believed or reasonably should

have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became

due." TEX. BUS. & COM. CODE § 24.005(a)(2). Because Debtor was insolvent when this transaction

occurred, the Trustee may argue this element is already satisfied. *See Pace*, 456 B.R. at 274 (noting

debtor's insolvency at the time of the transaction as evidence for holding that this element of

24.005(a)(2) was satisfied); *see also Life Partners Creditors' Trust v. Cowley (In re Life Partners

Holdings, Inc.)*, 926 F.3d 103, 120 (5th Cir. 2019) (citing *Janvey v. Golf Channel, Inc.*, 487

S.W.3d 560, 562, 566 & n.21 (Tex. 2016)) (indicating in dicta that this element can be satisfied by

demonstrating that "the transferor was 'financially vulnerable' or insolvent at the time of the transaction"). Nevertheless, most courts analyzing claims under section 24.005(a)(2) generally focus on Debtor's ability to pay debts as they become due, or unreasonably low asset value after the transfer. *See, e.g.*, ***Tow v. Amegy Bank, N.A.***, 505 B.R. 455, 464 (S.D. Tex. 2014) (holding a fact issue existed where summary-judgment evidence showed debtor "had an unreasonably small amount of capital to pay its debts as they came due"); ***Tow v. Speer***, 2015 WL 1058080, at \*14 (S.D. Tex. Mar. 10, 2015) (affirming jury verdict where the evidence showed that debtor "was left with an unreasonably small amount of capital after each of the transfers found constructively fraudulent"); ***Pace***, 456 B.R. at 274 (relying not only on debtor's insolvency but also on debtor's belief "that he would incur debts beyond his ability to pay as they came due"). In other words, a transferee may be liable under section 24.006 because it was insolvent at the time of the transfer but not be liable under section 24.005(a)(2) because this element is not satisfied. ***Wyly***, 607 B.R. at 878 (granting summary judgment in favor of plaintiff under section 24.006 but not section 24.005(a)(2) because "the record lack[ed] evidence of either of the two remaining factors [of section 24.005(a)(2)]").

There is no evidence that, during the period of balance-sheet insolvency, Debtor was not paying its debts—at least until a few weeks before the bankruptcy case was filed. In addition, this transaction, by its very design as an instrument to tweak the 90/10 rule, was for roughly 10–15% of Debtor's operating revenue—15–23% if you double-count the deposit given back to ASFG. It follows that the overall transaction, let alone the individual loan-repurchase transaction, was not unreasonably large in relation to the remaining assets of the Debtor. Relief under § 24.005(a)(2) will be denied.

32

### 3. *Section 548(a)(1)(B)*

The Bankruptcy Code's constructive fraudulent transfer provision allows for relief on a showing that Debtor received less than reasonably equivalent value and either was insolvent when the transaction occurred (or became insolvent as a result of it); "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B). This provision, therefore, allows recovery if *either* the insolvency element of § 24.006 is satisfied *or* the too-few-assets-to-pay test of § 24.005(a)(2) is satisfied. Because Debtor was insolvent at the time of the payments and did not receive reasonably equivalent value for the payments, the Trustee is entitled to relief under § 548(a)(1)(B) for the payments within 2 years before the petition date, or $4,084,116.34.

### 4. *Actual Fraud*

Both § 548(a)(1)(A) and TUFTA § 24.005(a)(1) require a showing that the transfer was made "with actual intent to hinder, delay, or defraud" any creditor. TUFTA § 24.005(a)(1) also requires a showing that a "creditor's claim arose before or within a reasonable time after the transfer was made." TEX. BUS. & COM. CODE § 24.005(a)(1). Because that showing has already been discussed above, this analysis focuses on ASFG and Debtor's actual fraudulent intent.

The evidence is clear that Earle, Debtor's principal, and ASFG put this transaction together in a careful, concerted effort to evade the DOE's 90/10 rule and maximize the amount of revenue Debtor could squeeze from federal sources to fund its operations. In addition, TUFTA sets forth a non-exclusive list of factors to consider in determining actual intent:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the **transfer or obligation was concealed**;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the **value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred**;

(9) the **debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred**;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b). The bolded factors apply. ASFG "concealed," at least from federal reporting, that Cottingham-Texas was not independent and that without an independent intermediary, Debtor would be in violation of the 90/10 rule. As for factors 8 and 9, analysis above already discusses that Debtor was insolvent at the time of each repurchase payment and did not receive reasonably equivalent value for any payment. These three factors, coupled with ASFG and Earle's brazen efforts to evade federal caps on funding sources, show an intent to defraud the DOE and other creditors as well. ASFG actually intended to defraud Debtor's creditors.

K. Count 24: Preference under § 547

The Trustee claims its payments to ASFG during the 90 days before the petition date were preferences and thus recoverable under § 547. *See* 11 U.S.C. § 547(b). All of these payments were loan-repurchase payments, some of which were the result of a free-look refund while others were

34

not. ASFG argues that these loan-repurchase payments were made in the ordinary course of both parties' business, including the free-look refunds, because ASFG regularly processed student refunds and did not know about the free-look program.

Relief under § 547 will be denied, although the same relief will be awarded under a fraudulent-transfer theory as discussed above. The payments—both free-look refunds and loan repurchase payments—were made in the ordinary course of both Debtor's and ASFG's business, and the Trustee has not met his burden to show otherwise. *See* 11 U.S.C. § 547(c)(2).

L.  Count 25: Recovery under § 550 of Avoided Transfers from Counts 14–23

In Count 25, Trustee simply asks to recover the value of any transfers the Court deems avoidable under §§ 544 and 548. This relief is available as to the initial transferee and "any immediate or mediate transferee of such initial transferee." *See* 11 U.S.C. § 550(a)(1)–(2). The Court finds that the Trustee can recover any transfer avoided under §§ 544 and 548.

M.  Count 26: Objection to ASFG's Claim under § 502

Section 502(d) of the Code gives clear instruction to disallow ASFG's claim based on its repurchase obligation until ASFG repays any and all amounts owed on chapter 5 claims. Section 502(d) states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). ASFG is liable to the estate under §§ 544 and 548 (fraudulent transfer of the price of put-back loans) and § 549 (diverted check from Cottingham-Texas that was a transfer of estate property after filing) and has not satisfied its liability. Accordingly, its claim should be disallowed in full.

35

N.  Count 27: Avoidance of Post-Petition Transfer under § 549

Section 549 enables the Trustee to avoid unauthorized post-petition transfers of property of the estate. 11 U.S.C. § 549(a). The Trustee seeks to reclaim the value of a check ($62,843.28) that Cottingham-Texas sent to ASFG on November 1, 2016, the day after the petition date, because that payment was property of the estate which was diverted without permission or leave from the Court. ASFG has two arguments, each without real support from the law or the record. First, the money was not property of the estate because ASFG had "exercised its rights" to its "collateral" by diverting the payment. Specifically, ASFG argues that because it had a security interest in the MPNs and because Debtor defaulted on the underlying obligation, ASFG was entitled to divert the funds without permission from the Court. Second, ASFG argues that, on the date the transfer was made, neither it nor Cottingham-Texas had received notice of the bankruptcy case.

As to ASFG's second argument, there is no lack-of-notice exception under § 549. There is a good-faith-purchaser exception—see 11 U.S.C. § 549(c)—but nothing was purchased and ASFG did not act in good faith. As to its first argument, the Court has settled the issue already: the MPNs are property of the estate, and Debtor can collect on them from Cottingham-Texas and ASFG (by garnishment). The Court will grant relief under section 549 in the amount of $62,843,28, the amount of the unauthorized transfer.

O.  Count 28: Violation of Automatic Stay

The Trustee claims ASFG violated the automatic stay by retaining possession of the MPNs and diverting payment on the MPNs to itself rather than to Debtor. In that same vein, the Trustee alleges Cottingham-Texas violated the stay by paying ASFG rather than Debtor on the MPNs. *See* 2d Am. Compl. ¶¶ 287–94. Defendants oppose this claim on several grounds: first, the Trustee does not have standing to seek damages for stay violations because he is not an "individual" under

362(k). *See* Def.'s Post-Trial Br., at 87–88. Second, Defendants did not receive notice until November 3, 2016—after the alleged transfers took place, which means sanctions for those transfers are not available under § 342(g)(2). Third, the Trustee cannot show damages from a purported stay violation because the transfers were applied to their outstanding debt to ASFG (and because the loans were collateral ASFG had seized); and fourth, neither ASFG nor Cottingham-Texas violated the automatic stay because withholding payments allegedly owed to Debtor is not an act covered by § 362. *Id.* at 90–92.[5]

The Trustee's automatic-stay claim is duplicative of at least two other causes of action—namely, breach of the MPNs against Cottingham (which has already been reduced to judgment) and post-petition transfer under § 549. This is an alternative remedy to both, and relief under Count 28 will be denied.

P. Count 29: Attorney's Fees

The Trustee requests attorney's fees and costs under the TLPA and APPAs as well as whatever fees may be available under the Bankruptcy Code and Texas law for each corresponding cause of action. Section 22 of the TLPA provides that "[i]n the event any action is brought for enforcement or interpretation of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred." The APPAs have an identical clause. ASFG argues that (1) this clause would only apply to fees and costs related to the breach of contract claim; and (2) if ASFG is the prevailing party, it is entitled to that amount.

---

[5] This last argument is very similar to the subject of a case before the Supreme Court this term: *City of Chicago v. Fulton*, No. 19-357, 140 S.Ct. 680 (2019) (granting petition for writ of certiorari); *In re Fulton*, 926 F.3d 916 (7th Cir. 2019) (opinion below). Neither party cites the Fifth Circuit as part of the circuit split. The Seventh Circuit below held that passive retention of property of the estate violates the automatic stay; if the Supreme Court affirmed, ASFG's argument would fail. *See Fulton*, 926 F.3d at 923–25. Resolution in favor of the minority view—that passive retention of property of the estate does not violate the automatic stay—would make this a winning argument. Because no relief is granted on this cause of action for other reasons, the Court need not decide this issue.

Nothing prevents the Court from granting fees and costs in essentially the same manner as it did in the Cottingham-Texas judgment, except that the Court should find that any prospective appeal fees are conditioned on success on appeal and whether the fees are reasonable and necessary. ***ExxonMobil Corp. v. Elec. Reliability Servs.***, 868 F.3d 408, 421 (5th Cir. 2017); ***Ventling v. Johnson***, 466 S.W.3d 143, 154 (Tex. 2015), *reh'g denied*, (Sept. 11, 2015). As for ASFG's contention that only breach-of-contract attorney's fees are available, that is not true; TUFTA allows for reasonable and necessary attorney's fees and costs, and Rule 7054(d) allows an award of costs to the prevailing party and for attorney's fees by separate motion after a judgment is rendered. TEX. BUS. & COM. CODE § 24.013 ("In any proceeding under this chapter, the court may award costs and reasonable attorney's fees as are equitable and just."); FED. R. BANKR. P. 7054(d).

The Trustee is entitled to reasonable and necessary attorney's fees for bringing this action under Texas Business and Commerce Code § 24.013 and Rule 7054 of the Federal Rules of Bankruptcy Procedure. Local Bankruptcy Rule 7054 allows the Trustee to request attorney's fees post-judgment.

A separate judgment in favor of the Trustee will be rendered pursuant to FED. R. BANKR. P. 7058.

# # #